UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT L. GARBER, on Behalf of Himself and All Others Similarly Situated and Derivatively on Behalf of WM. WRIGLEY JR. COMPANY, | ) ) ) ) ) | Case No. |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| WILLIAM WRIGLEY, JR., WILLIAM D. PEREZ, JOHN F. BARD, HOWARD B. BERNICK, THOMAS A. KNOWLTON, JOHN RAU, STEVEN B. SAMPLE, ALEX SHUMATE, RICHARD K. SMUCKER and MELINDA R. RICH, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| WM. WRIGLEY JR. COMPANY., a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | |

FILED: APRIL 29, 2008
08 CV 2449 RCC
JUDGE LINDBERG
MAGISTRATE JUDGE SCHENKIER

DEMAND FOR JURY TRIAL

VERIFIED SHAREHOLDER CLASS AND DERIVATIVE COMPLAINT
FOR BREACH OF FIDUCIARY DUTY

## SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of nominal party Wm. Wrigley Jr. Company ("Wrigley" or the "Company") on behalf of the Company, and a class action brought by plaintiff on behalf of the holders of Wrigley common stock. The action is brought against Wrigley's Board of Directors (the "Board") for breaches of fiduciary duty arising out of defendants' efforts to sell the Company to Mars, Inc. ("Mars") via an unfair process and at the inadequate and unfair price of $80.00 per share (the "Proposed Buyout").

2.     Defendants' efforts to provide Wrigley insiders and directors with preferential treatment at the expense of the public shareholders is unlawful and a breach of defendants' fiduciary duties to the Company and Wrigley's public stockholders.

3.     After suffering some market setbacks due to the failed strategies of defendants, Wrigley's share price was poised to soar higher over the coming months. As one analyst stated, in a March 20, 2008 article entitled "Wrigley Shares Ready to Pop":

> While shares of most publicly traded companies have hit the skids this year, those of consumer staples have maintained an upward bias. One such firm that falls under this umbrella is gum manufacturer William Wrigley Jr. Co. (WWY), which is about as resistant to economic downturns as could be found.
>
> We issued an upgrade of our rating on Wrigley shares upon preliminary analysis of the 4Q'07 financials February 4, citing a potential bottom in operating margins and strong price increases enacted in 2H'07.
>
> Having revisited our analysis, we believe a more aggressive posture is warranted given the volatility associated with many sectors of the U.S. economy and attributes of Wrigley's business. On this basis, we are particularly optimistic on Wrigley's earnings potential in 2H'08 as a result of price increases, new gum launches, the cycling of retail trade adjustments that hurt volume in 2007, and exposure to robust international growth trends.
>
> Valuation relative to other packaged food companies is not cheap by any stretch of the imagination, but in our opinion the premiums are justified by Wrigley's positioning as a best in class consumer staple enterprise.

4.    This prediction proved prophetic. On April 28, 2008, Wrigley announced outstanding quarterly results:

> The Wm. Wrigley Jr. Company today announced record first quarter sales of $1.45 billion, up 16 percent from the year-ago quarter. The sales increase reflected the positive impact of currency translation and price/mix, in combination with worldwide shipment growth.
>
>     Net earnings for the quarter of $0.61 per diluted share were up 17 percent or $0.09 from the year ago period. On a non-GAAP basis, excluding the negative impact of the supply chain restructuring and a one-time gain from the sale of a corporate asset in the year-ago period, first quarter earnings per share were up $0.11 or 22 percent from the same quarter last year.
>
>     "In addition to delivering strong first quarter results, we are taking the necessary steps to strengthen our brands, our marketplace position, and some key financial metrics. Gross margins are up, operating expenses as a percentage of sales are down, and we continue to make strategic, incremental investments in brand support," noted President and Chief Executive Officer, Bill Perez. "We are focused on growth, particularly in the U.S., where we remain pleased with the continued strong performance of 5™ and are excited about the potential of our new product and packaging initiatives currently rolling out into the marketplace, both in the U.S. and around the world."
>
>     Bill Wrigley, Executive Chairman and Chairman of the Board added, "The strong results this quarter are a reflection of our broad global base of operations, in particular, the vigor of our business operations in fast-growing marketplaces across the developing geographies of East Europe and Asia. The overall confectionery category remains strong despite the economic turbulence so far this year, and we continue to make significant investments in sales capabilities, innovation and brand building to take full advantage of long-term business opportunities."

5.    Unfortunately for Wrigley's public shareholders, defendants announced these results simultaneously with the announcement of the Proposed Buyout, thus placing an artificial cap on the price of the Company's stock, which would have surged upwards on the earnings news and thus diminished the apparent, but illusory, premium being offered in the Proposed Buyout.

6.    William Wrigley, Jr. ("Bill Wrigley"), the Company's former President and Chief Executive Officer, and current Executive Chairman and Chairman of the Board, as well as the Company's controlling shareholder (with over 40% voting control over the Company), was extremely conflicted, as he had a personal interest in creating a liquidity event to cash out his illiquid

equity interest in Wrigley and substantial change in control benefits. Despite these conflicts, or indeed because of them, Bill Wrigley and the Board that he dominates and controls quickly negotiated – in only two weeks – the Proposed Buyout. As a result of the Proposed Buyout, not only will Bill Wrigley, fellow Board member and current Chief Executive Officer William D. Perez ("Perez"), and other Company executives trigger massive change in control benefits in excess of $70 million for themselves, but it was announced that Bill Wrigley will be staying on as Executive Chairman and most of management will be continuing on with the Company post-buyout as well. Thus, Company insiders get to "have their cake and eat it too" while the Company's public shareholders are frozen out of the Company's brightening future prospects.

7.     Seeking to deny plaintiff and the Company's other public shareholders the opportunity to share Wrigley's long-term profit expansion and future growth potential, defendants have been using their superior knowledge and position concerning the Company's future business and growth prospects to arrange the Proposed Buyout to the detriment of the Company and its shareholders.

8.     Because the Proposed Buyout, if completed, will mark the end for Wrigley as a public company and will force its current public shareholders to abandon their ownership of the Company, the Wrigley Board has a fiduciary duty to conduct a fair process in seeking the best possible price to maximize the value of the Company's shares. However, rather than fulfilling their duty to engage in a fair process, the Board – in a "process" lasting only two weeks – agreed to a deal that reflects a strong preference for Mars (who will be able to reap the Company's future growth potential) and also for Company insiders, including Board members Bill Wrigley and Perez, who will be given the chance to receive lucrative "change of control" payouts as well as retain their lucrative positions with Mars after the Proposed Buyout is consummated.

9.     In pursuing the unlawful plan to squeeze out Wrigley's public stockholders pursuant to a defective sales process and without full and fair disclosure of all material information, the defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or have aided and abetted such breaches. Instead of acting in the best interests of Wrigley and its shareholders, defendants spent substantial effort tailoring the Proposed Buyout to meet their own needs and those of Mars.

10.     Because defendants dominate and control the business and corporate affairs of Wrigley and are in possession of private corporate information concerning Wrigley's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Wrigley which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value. Additionally, because Wrigley shareholders will have been stripped of their equity interest in the Company, they will not be able to participate in the continued growth and profitability of Wrigley as a private entity.

11.     The Proposed Buyout is the product of a hopelessly flawed process that is designed to ensure the sale of Wrigley to Mars, on terms preferential to defendants and other Wrigley insiders and to subvert the interests of plaintiff and the other public stockholders of the Company. By abusing their power as directors and officers, the defendants are attempting to strategically subvert the interests of plaintiff, the Company and the other public shareholders of Wrigley. Plaintiff, on behalf of the Company and the Class, seeks to enjoin the Proposed Buyout.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds

$75,000, exclusive of interest and costs. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

13.     Venue is proper in this District because nominal defendant Wrigley is headquartered in this District and thus a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this District. Additionally, one or more of the defendants either resides in or maintains executive offices in this District.

## PARTIES

14.     Plaintiff Robert L. Garber is the owner of shares of Wrigley common stock and has been the owner of such shares continuously since prior to the wrongs complained of herein. Plaintiff is a citizen of Pennsylvania.

15.     Nominal party Wrigley is a Delaware corporation with its principal place of business located at 410 North Michigan Avenue, Chicago, Illinois 60611. The Company manufactures and markets chewing gum and other confectionery products worldwide. Wrigley products are sold in over 180 countries.

16.     Defendant Bill Wrigley is the Executive Chairman of the Company, as well as the Chairman of its Board. He also served as President and Chief Executive Officer of the Company from 1999 to 2006, Vice President of the Company from 1991 to 1999 and Assistant to the President from 1985 to 1992. He also is the Company's controlling stockholder with approximately 40% voting control over the Company due to his ownership of common stock and super-voting Class B shares. He also stands to receive in excess of $26 million in change of control benefits as a result of the Proposed Buyout. He is a citizen of Illinois.

17.     Defendant Perez is a director and President and Chief Executive Officer of the Company. He stands to receive over $15 million in change of control benefits as a result of the Proposed Buyout. He is a citizen of Illinois.

18.     Defendant John F. Bard ("Bard") is a director of the Company and has been since 1999. Bard previously served as Senior Vice President of the Company from 1991 until 1999 and Executive Vice President from 1999 until 2000. He is a citizen of Illinois. He received in excess of $160,000 in 2007 for service on the Board.

19.     Defendant Howard B. Bernick ("Bernick") is a director of the Company, and has been since 2001. He is a citizen of Illinois. He received in excess of $160,000 in 2007 for service on the Board.

20.     Defendant Thomas A. Knowlton ("Knowlton") is a director of the Company and has been since 1996. He is a citizen of Florida. He received in excess of $170,000 in 2007 for service on the Board.

21.     Defendant John Rau ("Rau") is a director of the Company and has been since 2005. He is a citizen of Illinois. He received nearly $150,000 in 2007 for service on the Board.

22.     Defendant Steven B. Sample ("Sample") is a director of the Company and has been since 1997. He is a citizen of California. He received in excess of $160,000 in 2007 for service on the Board.

23.     Defendant Alex Shumate ("Shumate") is a director of the Company and has been since 1998. He is a citizen of Ohio. He received in excess of $160,000 in 2007 for service on the Board.

24.     Defendant Richard K. Smucker ("Smucker") is a director of the Company and has been since 1988. He is a citizen of Ohio. He received in excess of $170,000 in 2007 for service on the Board.

25.    Defendant Melinda R. Rich ("Rich") is a director of the Company and has been since 1999.  She is a citizen of Florida.  She received in excess of $170,000 in 2007 for service on the Board.

26.    The defendants named in ¶¶16-25 are sometimes collectively referred to herein as the "Individual Defendants."

## DEFENDANTS' FIDUCIARY DUTIES

27.    By reason of defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with plaintiff and the other public shareholders of Wrigley and owe them, as well as the Company, a duty of highest good faith, fair dealing, loyalty and full, candid and adequate disclosure, as well as a duty to maximize shareholder value.

28.    Where the officers and/or directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control, or (ii) a break up of the corporation's assets, or (iii) a sale of the corporation, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with their fiduciary duties, the directors and/or officers may not take any action that:

(a)    adversely affects the value provided to the corporation's shareholders;

(b)    favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)    contractually prohibits them from complying with their fiduciary duties;

(d)    will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

29.     In accordance with their duties of loyalty and good faith, the defendants, as directors and/or officers of Wrigley, are obligated to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation;

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders; and/or

(d)     failing to inform shareholders of all material information regarding the transaction before requesting shareholder approval.

30.     Plaintiff alleges herein that defendants, separately and together, in connection with the Proposed Buyout, are knowingly and/or recklessly violating their fiduciary duties, including their duties of loyalty, good faith and independence owed to plaintiff and other public shareholders of Wrigley, or are aiding and abetting others in violating those duties. The Individual Defendants stand on both sides of the transaction, are engaging in self-dealing and abusing their control of Wrigley, are obtaining for themselves personal benefits, including personal financial benefits not shared equally by plaintiff or the Class, and/or are aiding and abetting other defendants' breaches. As a result of defendants' self dealing and divided loyalties, neither plaintiff, the Company, nor the Class is being treated fairly in connection with the Proposed Buyout.

31.     Defendants also owe the Company's stockholders a duty of truthfulness, which includes the disclosure of all material facts concerning the Proposed Buyout and, particularly, the

- 8 -

fairness of the price offered for the stockholders' equity interest. Defendants are knowingly or recklessly breaching their fiduciary duties of candor and good faith by failing to disclose all material information concerning, among other things, the Company's true value, and/or aiding and abetting other defendants' breaches.

32.     Defendants are knowingly or recklessly breaching their duties of loyalty, good faith, independence and candor in connection with the Proposed Buyout, and/or are aiding and abetting other defendants' breaches, and have the burden of proving the inherent or entire fairness of the Proposed Buyout, including all aspects of its negotiation, structure, price and terms.

### THE ENTIRE FAIRNESS STANDARD

33.     In any situation where company insiders stand on both sides of a challenged transaction, the entire fairness standard is implicated, and the defendants bear the burden of demonstrating the two basic aspects of *fair dealing* and *fair price*.

34.     The concept of fair dealing embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The concept of fair price relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects and any other elements that affect the intrinsic or inherent value of a company's stock.

35.     The test for fairness is not a bifurcated one as between fair dealing and price. All aspects of fairness must be examined as a whole since the question is one of *entire fairness*.

36.     To demonstrate entire fairness, the defendants must present evidence of the cumulative manner by which they discharged all of their fiduciary duties. An entire fairness analysis then requires the Court to consider carefully how the board of directors discharged all of its fiduciary

duties with regard to each aspect of the non-bifurcated components of entire fairness: fair dealing and fair price.

37.    The burden of proof may shift to the plaintiff, however, only if defendants can demonstrate an approval of the transaction by a truly independent committee of directors who have real bargaining power that can be exerted in dealings with a majority or controlling shareholder who does not dictate the terms of the merger, or the inclusion of a majority of the minority provision in the merger agreement.

38.    Because a number of the defendants do, in fact, stand on both sides of the Proposed Buyout, the burden to prove the entire fairness of the Proposed Buyout will remain with defendants.

## CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this action individually and as a class action on behalf of all holders of Wrigley stock who are being and will be harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any defendant.

40.    This action is properly maintainable as a class action.

41.    The Class is so numerous that joinder of all members is impracticable. The number of shares of common stock of Wrigley outstanding is over 216 million, and the number of Class B super-voting shares outstanding is over 56 million. The number of shareholders of Wrigley is unknown, but likely numbers in the hundreds if not thousands, and includes investors spread across the country.

42.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)     Whether the defendants have engaged and are continuing to engage in a plan and scheme to benefit themselves at the expense of the members of the Class;

(b)     Whether the Individual Defendants have fulfilled, and are capable of fulfilling, their fiduciary duties to plaintiff and the other members of the Class, including their duties of loyalty, due care, and candor, which include, in this instance, the duty to maximize shareholder value;

(c)     Whether defendants have unlawfully employed lockup provisions in order to impede, thwart or prevent the successful emergence of any alternative bid for Wrigley shares that offers greater value to plaintiff and the Class than does the Proposed Buyout;

(d)     Whether the Individual Defendants are engaging in self-dealing in connection with the Proposed Buyout;

(e)     Whether the Individual Defendants are unjustly enriching themselves and other insiders or affiliates of Wrigley;

(f)     Whether the Proposed Buyout is entirely fair to the members of the Class;

(g)     Whether the defendants have disclosed all material facts in connection with the true value of the Company and the challenged transaction; and

(h)     Whether plaintiff and the other members of the Class would be irreparably harmed if the defendants are not enjoined from effectuating the conduct described herein.

43.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

44.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the defendants, or adjudications with respect to individual members of the Class, which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

45.    Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

46.    To the extent defendants take further steps to effectuate the Proposed Buyout, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate because defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

## DERIVATIVE ALLEGATIONS

47.    Plaintiff also brings this action derivatively in the right and for the benefit of Wrigley pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, to redress injuries that have been suffered and are continuing to be suffered by Wrigley as a direct result of the defendants' violations of law.  Plaintiff was a shareholder at the time of the transaction complained of herein.  Wrigley is named as a nominal party in this derivative action solely in a derivative capacity.  This action is not a collusive one of confer jurisdiction on this Court which it would not otherwise have.

48.    Plaintiff will adequately and fairly represent the interests of Wrigley in enforcing and prosecuting its rights, and has retained counsel experienced and competent in litigating complex actions and shareholder litigation.

49.    Any demand made by plaintiff to the Wrigley Board to institute this action is excused. Based on all the allegations in this complaint and defendants' actions to date, including their refusal to protect the interests of Wrigley and its shareholders in favor of Company insiders, such demand would be a futile and useless act. The Board consists of ten directors, all of whom are defendants to the action. These defendants constitute a of majority of the Board and thus maintain complete voting control over any decisions required to be made by the Board, including any action to be taken in response to a demand made by shareholders. Each of these members of the Board have directly participated in the wrongs complained of herein, which disables them from acting independently, objectively or in good faith to advance the interests of Wrigley or respond to a demand by shareholders. The Board and senior management are not disinterested or independent as detailed herein and set forth below:

(a)    Each of the defendants served on the Wrigley Board during the relevant period and, as Board members, each was charged with oversight and operation of the Company and the conduct of its business affairs. Each of the defendants has breached the fiduciary duties owed to Wrigley and its shareholders by, among other things, failing to take reasonable steps to maximize shareholder value, failing to consider in good faith value-maximizing alternatives for the Company and/or advancing their own interests and/or those of senior Wrigley management at the expense of and to the detriment of Wrigley and its public stockholders.

(b)    As more fully detailed herein, defendants participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Wrigley's shareholders or recklessly and/or knowingly disregarded the wrongs complained of herein. Its members are, therefore, not disinterested parties.

50.    The defendants named herein have not exercised and cannot exercise independent or objective judgment in deciding whether to bring this action or whether to vigorously prosecute this

action because each of the defendants has participated in and/or acquiesced to the misconduct alleged herein.

51.     Defendants have demonstrated their unwillingness to act in compliance with federal or state law or sue themselves and/or their fellow directors and allies in the top ranks of the corporation for failure to do so, as they have developed professional relationships with their fellow Board members who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

52.     Wrigley's senior insiders and directors named as defendants herein have shown their interests to be antagonistic to Wrigley and this lawsuit as they have refused to consider in good faith options to maximize shareholder value for Wrigley and its shareholders. Defendants have not and will not authorize a suit against themselves as such a suit would require these defendants to expose themselves to millions of dollars in personal liability to Wrigley, as, due to the particular language of currently utilized directors' and officers' liability insurance policies (*i.e.*, the insured vs. insured exclusion), such an action would not be an insured claim.

53.     The underlying misconduct of defendants is not a product of a valid exercise of business judgment, and can not be properly ratified by the Board.

54.     Plaintiff has not made any demand on shareholders of Wrigley to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Wrigley is a publicly traded company. The number of shares of common stock of Wrigley outstanding is over 216 million, and the number of Class B super-voting shares outstanding is over 56 million. The Company has hundreds of not thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

- 14 -

      (c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## BACKGROUND TO THE PROPOSED BUYOUT

55.    Wrigley manufactures and markets chewing gum and other confectionery products worldwide. Wrigley products are sold in over 180 countries.

56.    After suffering some market setbacks due to the failed strategies of defendants, Wrigley's share price was poised to soar higher over the coming months. As one analyst stated, in a March 20, 2008 article entitled "Wrigley Shares Ready to Pop":

> While shares of most publicly traded companies have hit the skids this year, those of consumer staples have maintained an upward bias. One such firm that falls under this umbrella is gum manufacturer William Wrigley Jr. Co. (WWY), which is about as resistant to economic downturns as could be found.

> We issued an upgrade of our rating on Wrigley shares upon preliminary analysis of the 4Q'07 financials February 4, citing a potential bottom in operating margins and strong price increases enacted in 2H'07.

> Having revisited our analysis, we believe a more aggressive posture is warranted given the volatility associated with many sectors of the U.S. economy and attributes of Wrigley's business. On this basis, we are particularly optimistic on Wrigley's earnings potential in 2H'08 as a result of price increases, new gum launches, the cycling of retail trade adjustments that hurt volume in 2007, and exposure to robust international growth trends.

> Valuation relative to other packaged food companies is not cheap by any stretch of the imagination, but in our opinion the premiums are justified by Wrigley's positioning as a best in class consumer staple enterprise.

57.    This prediction proved prophetic. On April 28, 2008, Wrigley announced outstanding quarterly results:

> Wrigley Reports 17% Earnings Per Share Increase on Double-Digit Sales Gain to New First Quarter Record

> . . . The Wm. Wrigley Jr. Company today announced record first quarter sales of $1.45 billion, up 16 percent from the year-ago quarter. The sales increase reflected the positive impact of currency translation and price/mix, in combination with worldwide shipment growth.

Net earnings for the quarter of $0.61 per diluted share were up 17 percent or $0.09 from the year ago period. On a non-GAAP basis, excluding the negative impact of the supply chain restructuring and a one-time gain from the sale of a corporate asset in the year-ago period, first quarter earnings per share were up $0.11 or 22 percent from the same quarter last year.

"In addition to delivering strong first quarter results, we are taking the necessary steps to strengthen our brands, our marketplace position, and some key financial metrics. Gross margins are up, operating expenses as a percentage of sales are down, and we continue to make strategic, incremental investments in brand support," noted President and Chief Executive Officer, Bill Perez. "We are focused on growth, particularly in the U.S., where we remain pleased with the continued strong performance of 5™ and are excited about the potential of our new product and packaging initiatives currently rolling out into the marketplace, both in the U.S. and around the world."

Bill Wrigley, Executive Chairman and Chairman of the Board added, "The strong results this quarter are a reflection of our broad global base of operations, in particular, the vigor of our business operations in fast-growing marketplaces across the developing geographies of East Europe and Asia. The overall confectionery category remains strong despite the economic turbulence so far this year, and we continue to make significant investments in sales capabilities, innovation and brand building to take full advantage of long-term business opportunities."

Sales and Gross Margins

First quarter sales of $1.45 billion increased by $198 million, or 16 percent, over the same quarter last year. The positive impact of currency, due to translation of international sales into a relatively weaker U.S. dollar, accounted for approximately half of the increase. The balance of the gain was due to a combination of price/mix and a one percent growth in shipments.

The operating geographic regions discussed below have been revised as of the first quarter of 2008 to reflect the Company's current management and reporting structure. The Company moved the Pacific and Latin America regions from the Other Geographic Regions segment into Asia/Pacific and All Other, respectively

In Asia/Pacific, sales increased by $63 million or 25 percent to $317 million on volume growth of over 13 percent. Currency benefit accounted for the vast majority of the remaining gain, which also included a two percent contribution from price/mix. Growth in the region was driven by strong double-digit gains in China, Australia and Vietnam. In China, Wrigley strengthened its position as the #1 confectioner, led by strong sales increases for Extra®, Doublemint® and Tata® bubble gum; while in Australia, growth was driven by the combined success of Extra gum and Extra mints. Increased sales in Vietnam were fueled by the growing popularity of Cool Air®.

In EMEAI, sales were $679 million, up $113 million or 20 percent on volume growth of 4 percent, including the incremental contribution from the A. Korkunov® chocolate acquisition in Russia. Of the remaining sales growth in the quarter, approximately a quarter is attributable to positive price/mix and the remainder to currency translation. Russia, Germany, Poland and India all recorded strong double-digit sales increases and helped drive growth in the region. Growth in Russia was fueled by its new chocolate business and a positive contribution from pricing, and India's growth followed the continued expansion of the Boomer® brand. Poland benefited from the growth of Winterfresh® mints and bag packaging for gum, while sales of Airwaves® and Extra in Germany – especially in bottle packaging – led the growth there. Partially offsetting this were declines in the United Kingdom. The U.K. business remained solid in the face of increased competition, but the overall gum category declined in comparison to the year-ago quarter.

"The latest wave of competitive new product launches in the U.K. – and the accompanying advertising and promotional blitz – have already played out in the first quarter, with only a modest impact on our share," noted Bill Perez. "In the second quarter, we are looking to energize U.K. consumers and spark the category with the introduction of exciting new versions of Extra Ice® and Orbit Complete®, supported by outstanding marketing campaigns."

North America net sales were $433 million, up $19 million or five percent, despite an overall 10 percent decline in volume. The positive impact of price/mix accounted for the lion's share of the differential, with currency translation contributing about two percent in the quarter. Gum sales showed strength, led by the record-setting growth of the 5™ brand, along with continuing sales gains for Orbit and Eclipse® in the quarter. Those gains were more than offset by declines for Altoids® and Lifesavers®, which faced difficult comparisons versus new product launches in the year-ago period.

Consolidated gross margins for the first quarter were 53.1 percent versus 52.1 percent the same quarter last year. Excluding the impact from restructuring in the year-ago period, the gross margin differential would have been 40 basis points – 53.1 percent versus 52.7 percent.

Selling, general and administrative (SG&A) expenses climbed 13 percent in the quarter versus the year-ago period, with approximately half of the increase resulting from currency translation. Within SG&A, operating expenses declined by 130 basis points as a percent of sales versus the comparable quarter in 2008, while investment in brand support increased by 50 basis points over the same time frame.

"With the cost environment every bit as challenging in 2008 as it was a year ago, we are pleased with our ability to show improvement in our gross margin," said Senior Vice President and Chief Financial Officer Reuben Gamoran. "Even more encouraging is our management of operating expenses, which increased at only half the rate of sales growth in the quarter, consistent with our commitment to continue leveraging our sales and innovation investments."

Operating Profits and Net Earnings

Consolidated operating profits in the period were $270 million, up 28 percent from the same quarter in the prior year. The increase was primarily driven by improved pricing and product mix, lower expense growth and slightly higher shipment volume, partially offset by increased investment in brand support. Favorable translation of foreign currencies to the weaker U.S. dollar accounted for approximately half the gain.

Consolidated net earnings of $169 million were up by nearly 18 percent or $26 million from the first quarter of 2007. On a diluted per share basis, earnings were $0.61, up 17 percent versus the prior year, with positive currency translation adding about seven cents to the gain. On a non-GAAP basis, excluding the impact of restructuring and the one-time asset sale gain in the year-ago period, earnings per share increased 22 percent versus the first quarter of 2007.

New Product Activity

U.S. 2008 launches unveiled at the March Annual Meeting included product improvements and new Slim Pack envelope packaging for Wrigley's Spearmint®, Doublemint, Juicy Fruit®, Big Red®, Winterfresh and Extra, in addition to the roll-out of the new Extra Fruit Sensations™ line, two new fruit flavors for Orbit and the new Altoids Crème de Menthe mints – both regular and chocolate-dipped. Other new offerings that will begin shipments later in the second quarter include Eclipse Fresh and Cool pellet gum and Life Savers Gummies® Tangy Fruits. Also coming to market will be the first fruit versions of the fast-growing 5™ brand – Lush and Elixir.

## THE PROPOSED BUYOUT

58.    Unfortunately for Wrigley's public shareholders, defendants announced these results simultaneously with the announcement of the Proposed Buyout, thus placing an artificial cap on the price of the Company's stock, which would have surged upwards on the earnings news and thus diminished the apparent, but illusory, premium being offered in the Proposed Buyout. Specifically, on April 28, 2008, defendants announced, in pertinent part:

The Wrigley Company Agrees to Merger with Mars, Incorporated

Historic Combination Values Wrigley at $80 Per Share

. . . The Wm. Wrigley Jr. Company today announced that it had reached an agreement to merge with Mars, Incorporated, one of the world's leading confectionery and consumer goods companies. As a result of this transaction, Wrigley will become a private company and part of one of the world's premier family-owned companies. The combined organization will have a product portfolio

- 18 -

containing some of the world's most recognizable and well-loved confectionery brands – including Orbit®, Extra®, Doublemint®, M&M's®, Snickers® and Mars® – as well as leading food, beverage and pet care brands, totaling over $27 billion in global sales.

Mars, Incorporated has agreed to pay $80 cash for each share of Common Stock and Class B Common Stock of the Wrigley Company in a transaction valued at approximately $23 billion. The terms of the transaction have been unanimously approved by the Wrigley Board of Directors. Based on Wrigley's closing share price of $62.45 on April 25, 2008, and its three-month weighted average share price of $59.88, this price represents a premium of 28 percent and 34 percent, respectively, to the Company's stockholders. This price also represents 4.3 times Wrigley's 2007 net sales and over 35 times Wrigley's 2007 earnings per share.

Mars, Incorporated, will acquire 100 percent of Wrigley's outstanding shares and all of its outstanding options will be cashed out. The Wrigley Company will operate as a separate, stand-alone subsidiary, keeping its headquarters in Chicago and continuing its civic and philanthropic involvement, both locally and in its communities around the world. Additionally, Bill Wrigley, Jr. will continue serving as the Company's Executive Chairman. As part of the transaction, Mars' non-chocolate sugar brands – including Starburst® and Skittles® – will be added to Wrigley's confectionery portfolio, joining such well-known brands as Lifesavers® and Altoids®.

59.    This Proposed Buyout was negotiated in only two weeks without any effort to maximize shareholder value. It was agreed to in furtherance of an unfair plan by the Individual Defendants to sell the Company, which, if not enjoined, will result in the improper elimination of the public stockholders of Wrigley in a transaction that is inherently unfair to them and that is the product of the Individual Defendants' conflicts of interest and breach of fiduciary duties, as described herein. More particularly, the transaction is in violation of the Individual Defendants' fiduciary duties and has been timed and structured unfairly in that:

(a)    The Proposed Buyout is designed and intended to eliminate members of the Class as stockholders of the Company from continued equity participation in the Company for cash consideration, which the Individual Defendants know or should know is unfair and inadequate.

(b)    The Individual Defendants have unique knowledge of the Company and have access to information denied or unavailable to the Class. Without all material information, Class members are unable to determine whether the price offered in the transaction is fair.

(c)    The Individual Defendants have violated their duty of fair dealing by manipulating the timing of the transaction to benefit themselves and/or other Company officers and directors at the expense of plaintiff and the Class.

60.    Defendants are engaging in self-dealing and not acting in good faith toward plaintiff and the other members of the Class. By reason of the foregoing, defendants have breached and are breaching their fiduciary duties to the members of the Class.

61.    Because the Individual Defendants dominate and control the business and corporate affairs of Wrigley, and are in possession of private corporate information concerning Wrigley's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Wrigley which makes it inherently unfair for them to pursue any proposed transaction wherein they and/or any third party will reap disproportionate benefits to the exclusion of maximizing stockholder value.

62.    As a result of the actions of defendants, plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Wrigley assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

63.    Unless enjoined by this Court, the defendants will continue to breach their fiduciary duties owed to the Company, plaintiff and the Class, and may consummate the Proposed Buyout which will exclude the Class from its fair share of Wrigley's valuable assets and businesses, and/or benefit them in the unfair manner complained of herein, all to the irreparable harm of the Company and the Class, as aforesaid.

64.    Plaintiff and the other members of the Class have an inadequate remedy at law.

## FIRST CLAIM FOR RELIEF

### Class and Derivative Claim for Breach of Fiduciary Duties
### Against the Individual Defendants

65.     Plaintiff repeats and realleges each allegation set forth herein.

66.     Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, candor and independence owed to the public shareholders of Wrigley and have acted to put their personal interests ahead of the interests of Wrigley's shareholders.

67.     By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, knowingly or recklessly and in bad faith are attempting to unfairly deprive plaintiff and other members of the Class of the true value of their investment in Wrigley.

68.     Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by entering into a transaction with Wrigley without regard to the fairness of the transaction to Wrigley's shareholders and by failing to disclose all material information concerning the Company's true value and/or the Proposed Buyout to such shareholders.

69.     As demonstrated by the allegations above, defendants knowingly or recklessly failed to exercise the care required and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Wrigley because, among other reasons:

(a)     They failed to take steps to maximize the value of Wrigley to its public shareholders and they took steps to avoid competitive bidding, to cap the price of Wrigley's stock and to give defendants an unfair advantage by, among other things, failing to solicit other potential acquirers or alternative transactions;

(b)     They failed to properly value Wrigley;

(c)     They ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Buyout; and

(d)    They have failed and are failing to disclose all material information that would permit Wrigley's stockholders to properly evaluate their responses to the Proposed Buyout.

70.    Because defendants dominate and control the business and corporate affairs of Wrigley, and are in possession of private corporate information concerning Wrigley's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Wrigley which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

71.    By reason of the foregoing acts, practices and course of conduct, defendants have knowingly or recklessly and in bad faith failed to exercise care and diligence in the exercise of their fiduciary obligations toward the Company, plaintiff and the other members of the Class.

72.    Unless enjoined by this Court, defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to the Company, plaintiff and the Class, and may consummate the Proposed Buyout which will exclude the Class from its fair share of Wrigley's valuable assets and businesses, and/or benefit them in the unfair manner complained of herein, all to the irreparable harm of the Company and the Class.

73.    Defendants are engaging in self dealing, are not acting in good faith toward plaintiff and the other members of the Class, and knowingly or recklessly have breached and are continuing to breach their fiduciary duties owed to the Company and members of the Class.

74.    As a result of defendants' unlawful actions, plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Wrigley's assets and businesses and will be prevented from obtaining the real value of their equity ownership of the Company. Unless the Proposed Buyout is enjoined by the Court, defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to the

Company, plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Proposed Buyout terms, and will not supply to Wrigley's minority stockholders sufficient information to enable them to cast informed votes on the Proposed Buyout and may consummate the Proposed Buyout, all to the irreparable harm to the Company and members of the Class.

75.     The Company, plaintiff and the members of the Class have an inadequate remedy at law.  Only through the exercise of this Court's equitable powers can the Company, plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## SECOND CLAIM FOR RELIEF

### Derivative Claim Against the Individual Defendants for Abuse of Control

76.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

77.     The Individual Defendants employed the alleged plan for the purpose of deriving material personal benefits for themselves as part of the Proposed Buyout.

78.     Defendants' conduct constituted an abuse of their ability to control and influence Wrigley.

79.     By reason of the foregoing, Wrigley has been harmed.

## THIRD CLAIM FOR RELIEF

### Derivative Claim Against the Individual Defendants for Gross Mismanagement

80.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

81.     The Individual Defendants had a duty to Wrigley and its shareholders to prudently supervise, manage and control the operations and business of Wrigley.

82.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Wrigley in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, defendants breached their duties of due care, diligence and candor in the management and administration of Wrigley's affairs and in the use and preservation of Wrigley's assets.

83.     During the course of the discharge of their duties, defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused Wrigley to engage in the plan complained of herein which they knew had an unreasonable risk of harm to Wrigley, thus breaching their duties to the Company. As a result, defendants grossly mismanaged Wrigley.

84.     By reason of the foregoing, Wrigley has been harmed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands injunctive relief, in plaintiff's favor and in favor of the Company and the Class and against defendants, as follows:

A.     Declaring that this action is properly maintainable as a class and derivative action;

B.     Declaring and decreeing that the Proposed Buyout and/or Merger Agreement was entered into in breach of the fiduciary duties of defendants and is therefore unlawful and unenforceable;

C.     Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Buyout, unless and until the Company adopts and implements a procedure or process to obtain the highest possible price for shareholders;

- 24 -

D.    Directing defendants to exercise their fiduciary duties to obtain a transaction which is in the best interest of Wrigley shareholders until the process for the sale or auction of the Company is completed and the highest possible price is obtained;

E.    Rescinding, to the extent already implemented, the Proposed Buyout or any of the terms thereof;

F.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  April 29, 2008

LASKY & RIFKIND, LTD.
LEIGH R. LASKY
NORMAN RIFKIND
AMELIA S. NEWTON

NORMAN RIFKIND

350 North LaSalle Street, Suite 1320
Chicago, IL  60610
Telephone:  312/634-0057
312/634-0059 (fax)

(Local Counsel for Plaintiff)

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
RANDALL J. BARON
A. RICK ATWOOD, JR.
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LAW OFFICE OF ALFRED G. YATES JR., PC
ALFRED G. YATES JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: 412/391-5164
412/471-1033 (fax)

Attorneys for Plaintiff

## VERIFICATION

I, Robert L. Garber, hereby declare as follows:

1.      I am the plaintiff in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

Executed this 29th day of April, 2008, at Pittsburgh, Pennsylvania.

_____
Robert L. Garber