**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT L. GARBER, on behalf of himself and all others similarly situated and derivatively on behalf of Wm. Wrigley Jr. Company, | ) ) ) ) | |
| | ) | Case No. 08 CV 2449 |
| Plaintiff, | ) ) | |
| vs. | ) ) | Hon. George W. Lindberg |
| | ) | |
| WILLIAM WRIGLEY, JR., WILLIAM D. PEREZ, JOHN F. BARD, HOWARD B. BERNICK, THOMAS A. KNOWLTON, JOHN RAU, STEVEN B. SAMPLE, ALEX SHUMATE, RICHARD K. SMUCKER, and MELINDA R. RICH, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| WM. WRIGLEY JR. COMPANY, a Delaware corporation, | ) ) | |
| | ) | |
| Nominal Defendant. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR A STAY OF PROCEEDINGS**

Defendants respectfully submit this memorandum of law in support of their motion for a stay of proceedings.

**Preliminary Statement**

On April 28, 2008, the Wm. Wrigley Jr. Co. ("Wrigley" or the "Company") announced that it had agreed to be purchased by Mars, Incorporated ("Mars") for $23 billion in cash, a price that valued the Company at a premium of 28% over its most recent closing price. The very next

day, long before the Company had issued a proxy statement, set the date for a shareholder vote, or conducted the vote itself, a lone shareholder brought this action seeking to enjoin the transaction. Shortly thereafter, two other plaintiffs filed putative class actions in Delaware Chancery Court seeking the same relief.

The merits (or lack thereof) of this action aside, this case should be stayed in view of the two near-identical proceedings pending in the Delaware Chancery Court. The complaint here mirrors the two complaints before the Delaware Chancery Court in nearly every respect, including commencement date, allegations of fact, theories of liability, causes of action, defendants, and requested relief. Moreover, the claims alleged in each of the three complaints are all governed by Delaware law. Although the complaints are not identical, their differences are superficial and do not justify separate proceedings.

Because the complaints overlap almost completely and because Delaware law controls, principles of judicial economy militate strongly in favor of staying the proceeding here and allowing the litigation to move forward in Delaware. Indeed, as explained herein, this case meets all of the standards of the *Colorado River* abstention doctrine, which permits a federal court to stay proceedings in deference to concurrent state court proceedings in certain circumstances. Consistent with the purposes of the *Colorado River* doctrine, a stay here would advance judicial economy by preventing duplicative, wasteful litigation and would allow the Delaware Chancery Court to decide issues of Delaware law. Moreover, a stay would not cause Plaintiff any prejudice.

Defendants, therefore, respectfully request that the Court enter an order staying proceedings in this case pending resolution of the parallel proceedings in Delaware.

**Background**

The Proposed Merger

On April 28, 2008, Wrigley announced that it had agreed to a proposed merger with Mars. (*See* Agreement and Plan of Merger, dated as of April 28, 2008, attached hereto as Ex. A.) Under the terms of the proposed merger, Mars will pay $80 in cash for each share of Wrigley. The $80 per share offer price represents a 28% premium over the closing price of Wrigley stock on the last trading day preceding the announcement of the proposed merger and a 34% premium over the weighted average closing price of Wrigley stock during the preceding three-month period; it also is 17% higher than the all-time high price of Wrigley stock. (*See* Wrigley news release dated April 28, 2008, attached hereto as Ex. B.) The purchase price also represents 4.3 times Wrigley's 2007 net sales and over 35 times Wrigley's 2007 earnings per share. (*Id.*) The terms of the proposed merger allow Wrigley to furnish information to and negotiate with a third party if the Wrigley board determines that the offer may result in a superior proposal. (*See* Agreement and Plan of Merger, § 6.5, Ex. A.) Upon consummation of the transaction, Wrigley will become a private, wholly-owned subsidiary of Mars, and Mars's non-chocolate sugar brands, including Starburst® and Skittles®, will be added to Wrigley's confectionery portfolio.

The Ensuing Illinois and Delaware Complaints

One day following the announcement of the proposed merger, on April 29, 2008, Plaintiff Robert L. Garber, a purported holder of an unspecified number of Wrigley shares, filed this putative class action and derivative complaint for breach of fiduciary duty. On May 8, 2008, Insulators and Asbestos Workers Local No. 14, a purported shareholder, filed in Delaware Chancery Court a parallel putative class action complaint, *Insulators & Asbestos Workers No. 14 v. William Wrigley, Jr. et al.*, Case No. 3750 (Del. Ch.) (attached hereto as Ex. C), and purported

shareholder Cora E. Bennett filed in Delaware Chancery Court another putative class action complaint, *Cora E. Bennett v. William Wrigley, Jr. et al.*, Case No. 3756 (Del. Ch.) (attached hereto as Ex. D). Wrigley answered both Delaware complaints on May 16, 2008.

For all practical purposes, the three complaints are indistinguishable.[1] All three complaints purportedly are brought on behalf of a class of all holders of Wrigley stock. (Compl. ¶ 39; *Insulators* Compl. ¶ 1; *Bennett* Compl. ¶ 1.) Moreover, the complaints make substantially identical factual allegations. First, all complaints allege that the process leading to the proposed merger was unfair, purportedly evidenced by the two-week negotiation period and the lack of an auction. (Compl. ¶¶ 11, 59; *Insulators* Compl. ¶¶ 1, 31, 34; *Bennett* Compl. ¶¶ 20-21.) Second, all complaints allege that the price to be paid per share is inadequate. (Compl. ¶ 5; *Insulators* Compl. ¶¶ 1-2; *Bennett* Compl. ¶ 31.) Third, the *Garber* and *Insulators* complaints allege that the proposed merger is the product of the Wrigley directors' conflicts of interest, purportedly because the directors, as shareholders, stand to reap financial benefits while maintaining their positions on the Board. (Compl. ¶¶ 6, 30, 49; *Insulators* Compl. ¶¶ 24-27, 35-36.) Based on these alleged facts, all three complaints assert purported claims for breach of fiduciary duty. (Compl. ¶¶ 61, 66-73; *Insulators* Compl. ¶ 35; *Bennett* Compl. ¶ 35.) For relief, all three complaints request an injunction of the merger and attorneys' fees.

---

[1]     The differences between the complaints arise primarily in the level of detail in the factual allegations, such as the extent to which public statements by Wrigley and its representatives are quoted. Other differences include the *Garber* complaint's assertion of purported derivative claims and the *Insulators* complaint's assertion of purported claims against Mars for aiding and abetting alleged breaches of fiduciary duty. All of the claims asserted in the complaints, however, are premised on the same set of operative facts, and all claims seek the same equitable relief—enjoining the merger.

<u>**Argument**</u>

**I.    The Proceedings Here Should Be Stayed Under the *Colorado River* Doctrine.**

The doctrine set forth in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), authorizes a federal court to "stay a suit in exceptional circumstances when there is a concurrent state proceeding and the stay would promote 'wise judicial administration.'" *Clark v. Lacy*, 376 F.3d 682, 685 (7th Cir. 2004) (citing *Colorado River*, 424 U.S. at 818). Courts deciding whether to order a stay under the *Colorado River* doctrine conduct a two-step analysis, considering first whether concurrent state and federal proceedings are parallel and then whether "exceptional circumstances" justify a stay, based on a balancing of ten factors. *See*, *e.g.*, *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 700-01 (7th Cir. 1992). As discussed below, the federal proceedings here are parallel to the Delaware proceedings, and the applicable factors demonstrate the existence of exceptional circumstances justifying a stay.

**A.    The Proceedings Here and in Delaware Are Parallel.**

The Seventh Circuit has established that proceedings are parallel under *Colorado River* where "'substantially the same parties are contemporaneously litigating substantially the same issues in another forum.'" *Caminiti*, 962 F.2d at 700 (citations omitted). Each component of this standard—same parties, contemporaneous litigation, same issues, and different forums—is met here.

The proceedings plainly involve the same parties, as the plaintiffs and defendants in each are the shareholders and directors of Wrigley and Wrigley itself, though the named plaintiffs vary and one of the Delaware complaints names Mars as an additional defendant. The proceedings clearly are contemporaneous, as they were filed within nine days of each other and are ongoing. The proceedings concern the same issues, as they all center on whether the director

5

defendants breached their fiduciary duties in approving the merger. The minor differences in the characterization of the claims asserted, such as the inclusion of purported derivative claims in the instant complaint, do not alter the fact that the central issues are identical, all claims are premised on the same set of operative facts, and the plaintiffs in all three actions are seeking the same relief. As the Seventh Circuit in *Clark* observed, the parallel nature of the actions cannot be "dispelled by repackaging the same issue under different causes of action." 376 F.3d at 687 (concluding that, because the "thrust of the lawsuits is the same" despite additional claims in one of the complaints, the district court did not abuse its discretion in finding the proceedings parallel). Finally, the proceedings obviously are in different forums. Accordingly, the proceedings here and in Delaware qualify as parallel under *Colorado River*, and thus the first requirement for obtaining a stay under that doctrine is satisfied.

### B.    The Factors Indicate "Exceptional Circumstances" to Justify a Stay.

After finding that proceedings are parallel, courts conducting a *Colorado River* analysis decide whether "exceptional circumstances" exist to support the issuance of a stay. This decision turns on a balancing of the following ten factors:

> 1) whether the state has assumed jurisdiction over property; 2) the inconvenience of the federal forum; 3) the desirability of avoiding piecemeal litigation; 4) the order in which jurisdiction was obtained by the concurrent forums; 5) the source of governing law, state or federal; 6) the adequacy of state-court action to protect the federal plaintiff's rights; 7) the relative progress of state and federal proceedings; 8) the presence or absence of concurrent jurisdiction; 9) the availability of removal; and 10) the vexatious or contrived nature of the federal claim.

*Clark*, 376 F.3d at 685. Courts have noted that, in considering these factors, "'[n]o one factor is necessarily determinative,'" and that "'[t]he weight to be given any one factor is determined solely by the circumstances of the particular case.'" *Id.* at 687 (citations omitted).

6

Although some of the factors are irrelevant or neutral in the context of this case, the third factor—the desirability of avoiding piecemeal litigation—is paramount given the aforementioned overlap of central issues, operative facts, and relief sought.[2] The Seventh Circuit has explained that "[i]n analyzing whether a dismissal or stay will further the interest in avoiding piecemeal litigation, we look not for formal symmetry between the two actions, but for a substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Lumen Constr., Inc. v. Brant Constr. Co.*, 780 F.2d 691, 695 (7th Cir. 1985). The Seventh Circuit in several cases has applied the piecemeal litigation factor to uphold a stay where parallel proceedings involving the same central issue posed a risk of duplicative litigation and inconsistent results. In *Clark*, for example, the Seventh Circuit found that both proceedings at issue required a showing of a breach of fiduciary duty and on that basis concluded, "[n]ot only would a stay save judicial resources, but it would also protect against the danger of the two proceedings reaching inconsistent results." 376 F.3d at 687. Similarly, in *Caminiti*, the Seventh Circuit noted that the parallel proceedings turned on the same issue and therefore found that the policy of avoiding piecemeal litigation weighed in favor of a stay. 962 F.2d at 701. The court concluded that "allowing both cases to proceed would result in duplicative and wasteful litigation with the potential of inconsistent resolutions of the issue" and affirmed the stay under *Colorado River. Id.*[3]

---

[2]    Regarding the neutral factors, the seventh factor (the relative progress of state and federal proceedings) counsels neither for nor against a stay, because both the Delaware and federal proceedings are in nascent stages. That the instant complaint was filed nine days before the Delaware complaints has no practical import. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 (1983) (clarifying that priority element of *Colorado River* analysis "should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions").

[3]    Likewise, Judge Aspen of the Northern District in *Starr v. Levin*, No. 02 C 2258, 2002 WL 1941375 (N.D. Ill. Aug. 21, 2002) (attached hereto as Ex. E), ordered a stay to preclude the possibility of inconsistent results in parallel proceedings. Judge Aspen observed that the plaintiffs were involved in three cases

As in *Clark* and *Caminiti*, the *Garber* complaint and the Delaware complaints all turn on a central issue: whether Defendants breached their fiduciary duties in approving the merger. To save judicial resources and to preclude possible inconsistent results, the Court should stay the proceedings here and allow that issue to be resolved in Delaware alone. This is especially true under the circumstances because the Delaware Chancery Court is unlikely to relinquish jurisdiction, even if the proceedings in this Court are not stayed. *See In re Topps Co. S'holders Litig.*, 924 A.2d 951, 964 (Del. Ch. 2007) (refusing to dismiss or stay shareholder class action seeking to enjoin a Delaware corporation's merger transaction, even though (1) parallel proceedings were pending in New York State Supreme Court, which declined to entertain defendants' motion to stay or to dismiss on grounds that the New York action was first-filed; and (2) the defendant corporation was headquartered in New York).

The fifth factor, concerning the governing law, also weighs in favor of a stay because Delaware law controls. *See Clark*, 376 F.3d at 687-88 (deferring to the New York courts to consider the issues presented where New York state law governed the parallel proceedings); *Kimmel v. Wirtz*, 793 F. Supp. 818, 821-22 (N.D. Ill. 1992) (refusing to assert equitable powers where to do so "would directly interfere with the internal affairs of . . . Delaware corporations").

---

"having substantially the same parties and involving substantially the same issues" and based on that fact concluded:

> We will not take the chance that our rulings will be inconsistent with that of the [foreign court]. The integrity and authority of the judicial process must be preserved against inconsistent decisions and obligations on the parties. Thus, the likelihood of piecemeal litigation weighs in favor of a stay.

*Starr*, 2002 WL 1941375, at *4. The court in *Starr* ultimately found that exceptional circumstances existed under the *Colorado River* doctrine and granted the motion for a stay of proceedings. *Id.* at *5. *See also Liebert Corp. v. Mazur*, No. 04 C 3737, 2004 WL 2095666, at *3 (N.D. Ill. Sept. 17, 2004) ("Avoiding piecemeal litigation strongly favors staying the present action. Proceeding with both cases could result in duplicative discovery, summary judgment motions based on nearly identical facts, and/or two different juries having nearly identical evidence.") (attached hereto as Ex. F).

Quite simply, "'a state court's expertise in applying its own law favors a *Colorado River* stay.'" *Clark*, 376 F.3d at 687-88 (citation omitted).

Delaware state law governs the claims for breach of fiduciary duty at issue in this litigation. *See*, *e.g.*, *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 382 (7th Cir. 1990) (recognizing that under Illinois choice-of-law principles the laws of the state of incorporation apply to a corporation's internal affairs); *Georgeson v. DuPage Surgical Consultants, Ltd.*, No. 05 CV 1653, 2007 WL 914219, at *3 (N.D. Ill. Mar. 22, 2007) (recognizing that "under Illinois' choice-of-law rules, breach of fiduciary duty claims are governed by the law of the state of incorporation" (citing *Prime Leasing, Inc. v. Kendig*, 332 Ill. App. 3d 300, 313 (1st Dist. 2002)) (attached hereto as Ex. G). That the law at issue is the corporate law of Delaware provides yet another reason to stay the proceedings here, and makes deference to the Delaware Chancery Court all the more appropriate given the well-established preference for questions of Delaware corporate law to be decided by Delaware courts. *See*, *e.g.*, *Kimmel*, 793 F. Supp. at 821 (recognizing that "'Delaware has a strong interest in the formation and termination of corporations under its laws'" (citation omitted)); *Topps*, 924 A.2d at 959 (recognizing Delaware's "compelling public policy interest" in regulating the internal affairs of its corporations). Moreover, all three complaints seek to enjoin a $23 billion merger—relief the Delaware Chancery Court, given its expertise in adjudicating requests for equitable relief under Delaware law, is particularly well-suited to grant or deny.

Furthermore, consistent with the principle that a Delaware court should decide issues under Delaware law, the tenth *Colorado River* balancing factor, concerning the "vexatious or contrived nature of the federal claim," favors a stay. Here, Garber has no federal claim, but rather has brought an action in federal court based on diversity jurisdiction. Garber's claims have no

federal nature but rather are rooted in Delaware law. As such, the claims should be adjudicated in Delaware, a result the Court should facilitate by ordering a stay.

## II.    A Stay of the Case Will Cause No Prejudice to Plaintiff or the Putative Class.

Not only will a stay order advance interests of judicial efficiency, it also will cause no prejudice to Garber or the class he purports to represent. Although a stay will put the litigation here on hold, nearly identical proceedings—involving the same claims, same alleged facts, and same parties (including a putative class of which Garber is a member)—will continue unabated in Delaware. The relief Garber seeks is not unique to him, but rather is the same class-wide relief sought by the plaintiffs in the Delaware cases. Because Garber is a member of the putative classes in those cases, his interests in the outcome of this dispute will remain adequately protected if this action is stayed. Indeed, there is "no reason to doubt that the federal plaintiffs' rights will be protected in the state court proceeding." *Jacobson v. City of Chicago*, 233 F. Supp. 2d 1001, 1008 (N.D. Ill. 2002). To the contrary, given the expertise of the Delaware courts in matters of Delaware law, the Delaware Chancery Court ably will protect Garber's rights in the litigation. The lack of prejudice and the presumptive adequacy of the Delaware court to adjudicate the litigation, moreover, demonstrates that the sixth factor of the *Colorado River* balancing analysis, the adequacy of the state-court action to protect the federal plaintiff's rights, also favors entry of a stay.

## **Conclusion**

For the foregoing reasons, the Defendants respectfully request that the Court grant their

motion for a stay of proceedings.

Dated: May 16, 2008                          Respectfully submitted,
      Chicago, Illinois

                              /s/ Matthew R. Kipp
                              Matthew R. Kipp
                              Donna L. McDevitt
                              Nick D. Campanario
                              William M. Rohner
                              SKADDEN ARPS SLATE
                               MEAGHER & FLOM LLP
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                              Counsel for Defendants

## CERTIFICATE OF SERVICE

Matthew R. Kipp, an attorney, hereby certifies that on May 16, 2008, he caused true and correct copies of the foregoing, *Defendants' Memorandum of Law in Support of Their Motion for a Stay of Proceedings*, to be served by the Court's CM-ECF system and served by messenger on Chicago counsel and by FedEx on out-of-state counsel at the addresses listed below:

LASKY & RIFKIND, LTD.
Leigh R. Lasky
Norman Rifkind
Amelia S. Newton
350 North LaSalle Street, Suite 1320
Chicago, Illinois 60610

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
Darren J. Robbins
Randall J. Baron
A. Rick Atwood, Jr.
655 West Broadway, Suite 1900
San Diego, California 92101

LAW OFFICES OF ALFRED G. YATES JR., PC
Alfred G. Yates, Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219


/s/ Matthew R. Kipp
Matthew R. Kipp

12

**INDEX OF EXHIBITS TO DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR A STAY OF PROCEEDINGS**

Exhibit A  Agreement and Plan of Merger Among Wm. Wrigley Jr. Company, Mars, Incorporated, New Uno Holdings Corporation, and New Uno Acquisition Corporation, dated April 28, 2008

Exhibit B  Wm. Wrigley Jr. Company News Release, "The Wrigley Company Agrees to Merger with Mars, Incorporated: Historic Combination Values Wrigley at $80 Per Share," dated April 28, 2008

Exhibit C  Verified Class Action Complaint in *Insulators & Asbestos Workers Local No. 14 v. Wrigley*, Case No. 3750 (Del. Ch.), filed May 8, 2008

Exhibit D  Verified Class Action Complaint in *Bennett v. Wrigley*, Case No. 3756 (Del. Ch.), filed May 8, 2008

Exhibit E  *Starr v. Levin*, No. 02 C 2258, 2002 WL 1941375 (N.D. Ill. Aug. 21, 2002)

Exhibit F  *Liebert Corp. v. Mazur*, No. 04 C 3737, 2004 WL 2095666 (N.D. Ill. Sept. 17, 2004)

Exhibit G  *Georgeson v. DuPage Surgical Consultants Ltd.*, No. 05 CV 1653, 2007 WL 914219 (N.D. Ill. Mar. 22, 2007)

# Exhibit A

---

AGREEMENT AND PLAN OF MERGER

AMONG

WM. WRIGLEY JR. COMPANY,

MARS, INCORPORATED,

NEW UNO HOLDINGS CORPORATION

AND

NEW UNO ACQUISITION CORPORATION

Dated as of April 28, 2008

---

# TABLE OF CONTENTS

**Page**

ARTICLE I THE MERGER ............................................................................ 1
    SECTION 1.1    The Merger ..................................................................... 1
    SECTION 1.2    Closing; Effective Time .................................................... 1
    SECTION 1.3    Effects of the Merger ....................................................... 2
    SECTION 1.4    Certificate of Incorporation; Bylaws ................................. 2
    SECTION 1.5    Directors and Officers ....................................................... 2
ARTICLE II EFFECT OF THE MERGER ON THE CAPITAL STOCK OF THE
                CONSTITUENT CORPORATIONS ................................................. 3
    SECTION 2.1    Conversion of Securities .................................................... 3
    SECTION 2.2    Treatment of Options, Restricted Shares, Stock Units, and
                Deferred Compensation Plans .......................................... 3
    SECTION 2.3    Surrender of Shares .......................................................... 5
    SECTION 2.4    Adjustments ..................................................................... 7
    SECTION 2.5    Dissenting Shares ............................................................. 7
ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY ......... 8
    SECTION 3.1    Organization and Qualification; Subsidiaries. ..................... 8
    SECTION 3.2    Certificate of Incorporation and Bylaws ............................. 9
    SECTION 3.3    Capitalization ................................................................... 9
    SECTION 3.4    Authority ......................................................................... 11
    SECTION 3.5    No Conflict; Required Filings and Consents ....................... 12
    SECTION 3.6    Compliance ...................................................................... 12
    SECTION 3.7    SEC Filings; Financial Statements; Undisclosed Liabilities ... 13
    SECTION 3.8    Absence of Certain Changes or Events ............................... 14
    SECTION 3.9    Absence of Litigation ....................................................... 15
    SECTION 3.10   Employee Benefit Plans .................................................... 15
    SECTION 3.11   Labor and Employment Matters ........................................ 18

| | | |
|---|---|---|
| SECTION 3.12 | Insurance | 18 |
| SECTION 3.13 | Properties | 18 |
| SECTION 3.14 | Tax Matters | 19 |
| SECTION 3.15 | Proxy Statement | 20 |
| SECTION 3.16 | Opinion of Financial Advisors | 21 |
| SECTION 3.17 | Brokers | 21 |
| SECTION 3.18 | Takeover Statutes; Rights Plans | 21 |
| SECTION 3.19 | Intellectual Property | 21 |
| SECTION 3.20 | Environmental Matters | 22 |
| SECTION 3.21 | Contracts | 23 |
| SECTION 3.22 | Affiliate Transactions | 24 |
| SECTION 3.23 | No Additional Representations | 24 |
| ARTICLE IV REPRESENTATIONS AND WARRANTIES OF HOLDINGS AND MERGER SUB | | 25 |
| SECTION 4.1 | Organization. | 25 |
| SECTION 4.2 | Authority | 25 |
| SECTION 4.3 | No Conflict; Required Filings and Consents | 25 |
| SECTION 4.4 | Absence of Litigation | 26 |
| SECTION 4.5 | Proxy Statement | 26 |
| SECTION 4.6 | Brokers | 26 |
| SECTION 4.7 | Financing | 26 |
| SECTION 4.8 | Operations of Holdings and Merger Sub | 28 |
| SECTION 4.9 | Solvency | 28 |
| SECTION 4.10 | Share Ownership | 28 |
| SECTION 4.11 | No Additional Representations | 28 |
| ARTICLE IVA REPRESENTATIONS AND WARRANTIES OF PARENT | | 28 |
| SECTION 4.1A | Authority | 28 |
| SECTION 4.2A | No Conflict | 29 |
| SECTION 4.3A | Consents | 29 |
| SECTION 4.4A | No Additional Representations | 29 |
| ARTICLE V CONDUCT OF BUSINESS PENDING THE MERGER | | 29 |
| SECTION 5.1 | Conduct of Business of the Company Pending the Merger | 29 |

SECTION 5.2   Conduct of Business of Holdings and Merger Sub Pending the Merger ............ 33
SECTION 5.3   No Control of Other Party's Business ............ 34
ARTICLE VI ADDITIONAL AGREEMENTS ............ 34
SECTION 6.1   Stockholders Meeting ............ 34
SECTION 6.2   Proxy Statement ............ 35
SECTION 6.3   Resignation of Directors ............ 35
SECTION 6.4   Access to Information; Confidentiality ............ 35
SECTION 6.5   Acquisition Proposals ............ 36
SECTION 6.6   Employment and Employee Benefits Matters ............ 39
SECTION 6.7   Directors' and Officers' Indemnification and Insurance ............ 40
SECTION 6.8   Further Action; Efforts ............ 41
SECTION 6.9   Public Announcements ............ 43
SECTION 6.10   Financing ............ 43
SECTION 6.11   Debt Tender Offers. ............ 46
SECTION 6.12   Notification of Certain Matters ............ 48
SECTION 6.13   Section 16 Matters ............ 48
SECTION 6.14   Filings ............ 48
SECTION 6.15   Anti-Takeover Statute ............ 49
SECTION 6.16   Stockholder Litigation ............ 49
SECTION 6.17   Name; Headquarters ............ 49
ARTICLE VII CONDITIONS OF MERGER ............ 50
SECTION 7.1   Conditions to Obligation of the Company, Holdings and Merger Sub to Effect the Merger ............ 50
SECTION 7.2   Conditions to Obligations of Holdings and Merger Sub ............ 50
SECTION 7.3   Conditions to Obligations of the Company ............ 51
ARTICLE VIII TERMINATION, AMENDMENT AND WAIVER ............ 51
SECTION 8.1   Termination ............ 51
SECTION 8.2   Effect of Termination ............ 53
SECTION 8.3   Expenses ............ 56
SECTION 8.4   Amendment ............ 56
SECTION 8.5   Waiver ............ 57
ARTICLE IX GENERAL PROVISIONS ............ 57

SECTION 9.1   Non-Survival of Representations, Warranties, Covenants and
                        Agreements                                                                                57
SECTION 9.2   Notices                                                                                            57
SECTION 9.3   Certain Definitions                                                                     58
SECTION 9.4   Severability                                                                                   60
SECTION 9.5   Entire Agreement; Assignment                                              60
SECTION 9.6   Parties in Interest                                                                       60
SECTION 9.7   Governing Law                                                                         61
SECTION 9.8   Headings                                                                                    61
SECTION 9.9   Counterparts                                                                             61
SECTION 9.10  Specific Performance                                                            61
SECTION 9.11  No Recourse                                                                          61
SECTION 9.12  Jurisdiction                                                                              62
SECTION 9.13  Interpretation                                                                         62
SECTION 9.14  WAIVER OF JURY TRIAL                                                     63

-iv-

INDEX OF DEFINED TERMS

| | | | |
|---|---|---|---|
| Acquisition Proposal | 36 | DGCL | 1 |
| Acquisition Proposal Documentation | 38 | Dissenting Shares | 7 |
| Actions | 15 | DOJ | 42 |
| affiliate | 58 | Effective Time | 2 |
| Agreement | 1 | employee benefit plan | 15 |
| Alternative Financing | 44 | Environmental Laws | 22 |
| Anti-Takeover Statutes | 21 | Environmental Permits | 23 |
| Antitrust Law | 42 | Equity Financing | 27 |
| Book-Entry Shares | 3 | Equity Financing Commitment Letters | 27 |
| business day | 58 | ERISA | 15 |
| Bylaws | 9 | ERISA Affiliate | 16 |
| Certificate of Incorporation | 9 | Exchange Act | 12 |
| Certificate of Merger | 2 | Filed SEC Reports | 13 |
| Certificates | 3 | Financial Advisors | 21 |
| Change of Recommendation | 34 | Financing | 27 |
| Class B Common Shares | 3 | Financing Commitment Letters | 27 |
| Class B Common Stock | 3 | Foreign Antitrust Laws | 12 |
| Closing | 1 | FTC | 42 |
| Closing Date | 2 | generally accepted accounting principles | 58 |
| Code | 16 | Governmental Entity | 12 |
| Common Shares | 3 | Holdings | 1 |
| Common Stock | 3 | Holdings Disclosure Schedule | 25 |
| Company | 1 | HSR Act | 12 |
| Company Common Stock | 3 | Indemnified Parties | 40 |
| Company Disclosure Schedule | 8 | Indenture | 11 |
| Company Employees | 15 | Infringe | 21 |
| Company Plan | 15 | Intellectual Property | 22 |
| Company Requisite Votes | 11 | IRS | 16 |
| Company Rights | 9 | knowledge | 59 |
| Company Securities | 10 | Law | 12 |
| Company Stock Plans | 4 | Leases | 19 |
| Company Termination Fee | 53 | Liability Limitation | 55 |
| Confidentiality Agreement | 36 | Licenses | 13 |
| Continuing Employee | 39 | Lien | 10 |
| Contract | 12 | Marketing Period | 44 |
| control | 58 | Material Adverse Effect | 8 |
| controlled | 58 | Material Contract | 24 |
| controlled by | 58 | Materials of Environmental Concern | 23 |
| Costs | 40 | Merger | 1 |
| D&O Insurance | 41 | Merger Consideration | 3 |
| Debt Financing | 27 | Merger Sub | 1 |
| Debt Financing Commitment Letters | 27 | Multiemployer Plan | 15 |
| Debt Tender Offer | 46 | Non-US Plans | 15 |
| Deferred Compensation Plans | 5 | Notes | 10 |
| Deferred Payment | 5 | Notice of Superior Proposal | 38 |

| | | | |
|---|---|---|---|
| Notice Period | 38 | Rights Plan | 9 |
| Option | 3 | Sarbanes-Oxley Act | 13 |
| Option Cash Payment | 4 | SEC | 13 |
| Order | 12 | SEC Reports | 13 |
| Owned Real Property | 19 | Securities Act | 12 |
| Parent | 1 | Senior Debt Commitment Letter | 27 |
| Parent Equity Commitment Letter | 27 | Shares | 3 |
| Parent Obligations | 55 | Stock Unit Payment | 4 |
| Paying Agent | 5 | Stock Units | 4 |
| PBGC | 17 | Stockholders Meeting | 34 |
| Permitted Liens | 59 | subsidiaries | 59 |
| person | 59 | subsidiary | 59 |
| Preferred Stock | 9 | Subsidiary Securities | 10 |
| Proxy Statement | 20 | Superior Proposal | 38 |
| Recommendation | 34 | Surviving Corporation | 1 |
| Related Persons | 55 | Surviving Corporation Plan | 39 |
| Release | 23 | Tax Return | 60 |
| Representatives | 36 | Taxes | 59 |
| Required Information | 46 | Termination Date | 52 |
| Restricted Shares | 4 | under common control with | 58 |
| Reverse Termination Fee | 54 | WARN | 18 |

-vi-

AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER, dated as of April 28, 2008 (this "Agreement"), among Wm. Wrigley Jr. Company, a Delaware corporation (the "Company"), Mars, Incorporated, a Delaware Corporation ("Parent"), New Uno Holdings Corporation, a Delaware corporation ("Holdings") and New Uno Acquisition Corporation, a Delaware corporation ("Merger Sub").

WHEREAS, the Board of Directors of the Company has unanimously (i) determined that it is in the best interests of the Company and the stockholders of the Company, and declared it advisable, to enter into this Agreement with Parent, Holdings and Merger Sub providing for the merger (the "Merger") of Merger Sub with and into the Company in accordance with the General Corporation Law of the State of Delaware (the "DGCL"), upon the terms and subject to the conditions set forth herein, (ii) approved this Agreement in accordance with the DGCL, upon the terms and subject to the conditions set forth herein, and (iii) resolved to recommend the adoption of this Agreement by the stockholders of the Company; and

WHEREAS, the Boards of Directors of Parent, Holdings and Merger Sub have each approved this Agreement and declared it advisable for Parent, Holdings and Merger Sub, respectively, to enter into this Agreement providing for the Merger in accordance with the DGCL, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements herein contained, and intending to be legally bound hereby, Parent, Holdings, Merger Sub and the Company hereby agree as follows:

## ARTICLE I

## THE MERGER

SECTION 1.1  The Merger.  Upon the terms and subject to the conditions of this Agreement and in accordance with the DGCL, at the Effective Time (as defined below), Merger Sub shall be merged with and into the Company.  As a result of the Merger, the separate corporate existence of Merger Sub shall cease and the Company shall continue as the surviving corporation of the Merger (the "Surviving Corporation").

SECTION 1.2  Closing; Effective Time.  Subject to the provisions of Article VII, the closing of the Merger (the "Closing") shall take place at the offices of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York, as soon as practicable, but in no event later than the third business day after the satisfaction or waiver of the conditions set forth in Article VII (excluding conditions that, by their terms, cannot be satisfied until the Closing, but the Closing shall be subject to the satisfaction or waiver of those conditions); provided, however, that notwithstanding the satisfaction or waiver of the conditions set forth in Article VII, Holdings and Merger Sub shall not be required to effect the Closing until the earlier of (a) a date during

the Marketing Period specified by Holdings on no less than three business days' notice to the Company and (b) the final day of the Marketing Period (or the Closing may be consummated at such other place or on such other date as Holdings and the Company may mutually agree).  The date on which the Closing actually occurs is hereinafter referred to as the "Closing Date".  At the Closing, the parties hereto shall cause the Merger to be consummated by filing a certificate of merger (the "Certificate of Merger") with the Secretary of State of the State of Delaware, in such form as required by, and executed in accordance with, the relevant provisions of the DGCL (the date and time of the filing of the Certificate of Merger with the Secretary of State of the State of Delaware, or such later time as is specified in the Certificate of Merger and as agreed to by the parties hereto, being hereinafter referred to as the "Effective Time") and shall make all other filings or recordings required under the DGCL or other applicable law in connection with the Merger.

SECTION 1.3    Effects of the Merger.  The Merger shall have the effects set forth herein and in the applicable provisions of the DGCL.  Without limiting the generality of the foregoing and subject thereto, at the Effective Time, all the property, rights, privileges, immunities, powers and franchises of the Company and Merger Sub shall vest in the Surviving Corporation and all debts, liabilities and duties of the Company and Merger Sub shall become the debts, liabilities and duties of the Surviving Corporation.

SECTION 1.4    Certificate of Incorporation; Bylaws.

(a)        At the Effective Time, the certificate of incorporation of the Company shall be amended as a result of the Merger so as to read in its entirety as set forth in Exhibit A hereto, and, as so amended, shall be the certificate of incorporation of the Surviving Corporation until thereafter amended in accordance with its terms and as provided by law.

(b)        At the Effective Time, the bylaws of the Company shall be amended so as to read in their entirety as set forth in Exhibit B hereto, and, as so amended, shall be the bylaws of the Surviving Corporation until thereafter amended in accordance with their terms, the certificate of incorporation of the Surviving Corporation and as provided by law.

SECTION 1.5    Directors and Officers.  The directors of the Company immediately prior to the Effective Time shall submit their resignations to be effective as of the Effective Time.  Upon the Effective Time, the directors of Merger Sub immediately prior to the Effective Time shall be the directors of the Surviving Corporation, each to hold office in accordance with the certificate of incorporation and bylaws of the Surviving Corporation.  The officers of the Company immediately prior to the Effective Time shall be the initial officers of the Surviving Corporation, each to hold office until the earlier of his or her resignation or removal.

## ARTICLE II

### EFFECT OF THE MERGER ON THE CAPITAL STOCK
### OF THE CONSTITUENT CORPORATIONS

SECTION 2.1   Conversion of Securities.   At the Effective Time, by virtue of the Merger and without any action on the part of any party hereto or the holders of any of the following securities:

(a)        Each share of Common Stock, no par value per share, of the Company (the "Common Stock") and Class B Common Stock, no par value per share, of the Company (the "Class B Common Stock" and together with the Common Stock, the "Company Common Stock") issued and outstanding immediately prior to the Effective Time, other than any shares of Common Stock ("Common Shares") or shares of Class B Common Stock ("Class B Common Shares" and together with the Common Shares, the "Shares") to be canceled pursuant to Section 2.1(b) or to remain outstanding pursuant to Section 2.1(c) and any Dissenting Shares, shall be converted into the right to receive $80.00 in cash (the "Merger Consideration") payable to the holder thereof, without interest, upon surrender of such Shares in the manner provided in Section 2.4, less any required withholding taxes.

(b)        Each Share held in the treasury of the Company or owned by Holdings or Merger Sub immediately prior to the Effective Time shall be canceled and shall cease to exist without any conversion thereof and no payment or distribution shall be made with respect thereto.

(c)        Each Share owned by any wholly-owned subsidiary of the Company immediately prior to the Effective Time shall remain outstanding following the Effective Time and no Merger Consideration shall be delivered with respect to such Shares.

(d)        Each share of common stock of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into one share of common stock of the Surviving Corporation.

(e)        Except as set forth in Sections 2.1(b) and (c) and Section 2.5, (i) at the Effective Time, all Shares (including Restricted Shares (as defined below)) shall cease to be outstanding, shall automatically be cancelled and shall cease to exist and (ii) the holders of certificates (the "Certificates") or book entry shares ("Book-Entry Shares") which immediately prior to the Effective Time represented such Shares (including Restricted Shares) shall cease to have any rights with respect thereto, except the right to receive, upon surrender of such Certificates or Book-Entry Shares in accordance with Section 2.3, the Merger Consideration.

SECTION 2.2   Treatment of Options, Restricted Shares, Stock Units, and Deferred Compensation Plans.

(a)        The Company shall take all action necessary so that, immediately prior to the Effective Time, each option to purchase Shares (an "Option") granted under the Company's 2007 Management Incentive Plan or the Company's 1997 Management Incentive Plan

-3-

(collectively, the "Company Stock Plans") that, in each case, is outstanding and unexercised as of the Effective Time (whether vested or unvested) shall be adjusted by the Company Stock Plan committee or the Compensation Committee of the Company's Board of Directors (pursuant to its authority under Section 1.7 of the Company's 2007 Management Incentive Plan and Section 1.6 of the Company's 1997 Management Incentive Plan) as of the Effective Time and shall be converted into the right of the holder to receive from the Surviving Corporation an amount in cash equal to the product of (A) the total number of Shares previously subject to such Option and (B) the excess, if any, of the Merger Consideration over the exercise price per Share set forth in such Option, less any required withholding taxes (the "Option Cash Payment") and as of the Effective Time shall cease to represent an option to purchase Shares, shall no longer be outstanding and shall automatically cease to exist, and each holder of an Option shall cease to have any rights with respect thereto, except the right to receive the Option Cash Payment. The Option Cash Payment shall be made promptly (and in any event within 15 business days) following the Effective Time.

(b)     The Company shall take all action necessary so that each Share granted subject to vesting or other lapse restrictions pursuant to any Company Stock Plan (collectively, "Restricted Shares") which is outstanding immediately prior to the Effective Time shall vest and become free of such restrictions as of the Effective Time and at the Effective Time the holder thereof shall, subject to this Article II, be entitled to receive the Merger Consideration pursuant to Section 2.1(a).

(c)     The Company shall take all action necessary so that, immediately prior to the Effective Time, each award of a right under any Company Stock Plan (other than awards of Options or Restricted Shares, the treatment of which is specified in Section 2.2(a) and Section 2.2(b), respectively) (including the Company's Long Term Stock Grant Program) entitling the holder thereof to Shares or cash equal to or based on the value of Shares (such awards, collectively, "Stock Units") that, in each case, is outstanding or payable as of the Effective Time pursuant to the applicable program under the Company's Stock Plan, shall be adjusted by the Company Stock Plan committee as of the Effective Time and shall be converted into the right of the holder to receive an amount in cash equal to the product of (A) the number of Shares subject to such Stock Unit, to the extent earned and satisfying the applicable performance conditions at the Effective Time in respect of the portion of the applicable performance or grant cycle that has elapsed through the Effective Time (or, in the case of Stock Units subject to time-based vesting conditions that, by the terms of the award documents, automatically vest in full or in part upon the Effective Time, the number of such Shares subject to such Stock Unit that so vest by such terms), and (B) the Merger Consideration, less any required withholding taxes (the "Stock Unit Payment"), and shall cease to represent a right to receive a number of Shares or cash equal to or based on the value of Shares. The Stock Unit Payment shall be made promptly (and in any case within 15 business days) following the Effective Time. The Company shall take all action necessary so that, as of the Effective Time, all Stock Units shall no longer be outstanding and shall automatically cease to exist, and each holder of a Stock Unit shall cease to have any rights with respect to Shares or cash equal to or based on the value of Shares, except the right to receive the Stock Unit Payment, and so that no portion of any outstanding performance or grant cycle shall continue after the Effective Time and no Stock Units shall be or become earned in respect thereof, and all unearned or unvested Stock Units shall be cancelled.

-4-

(d)      The Company shall take all action necessary so that all account balances (whether or not vested) under any Company Plan that provides for the deferral of compensation and represents amounts notionally invested in a number of Shares or otherwise provides for distributions or benefits that are calculated based on the value of a Share (collectively, the "Deferred Compensation Plans"), shall be adjusted by the applicable Company Plan committee as of the Effective Time, and shall be converted into a right of the holder to receive, at the time specified in the applicable Company Plan and related deferral documents, an amount in cash equal to the product of (A) the number of Shares previously deemed invested under or otherwise referenced by such account and (B) the Merger Consideration, less any required withholding taxes (the "Deferred Payment") and shall cease to represent a right to receive a number of Shares or cash equal to or based on the value of a number of Shares.  The Company shall take all action necessary so that, as of the Effective Time, each holder of any such account shall cease to have any rights with respect to Shares or cash equal to or based on the value of Shares, except the right to receive the Deferred Payment.

SECTION 2.3   Surrender of Shares.

(a)      Prior to the Effective Time, Holdings shall designate a paying agent (the "Paying Agent") reasonably acceptable to the Company for the payment of the Merger Consideration as provided in Section 2.1(a).  At or prior to the Closing, Holdings shall deposit (or cause to be deposited) with the Paying Agent, for the benefit (from and after the Effective Time) of the holders of Certificates or Book-Entry Shares, cash in an amount sufficient to make all payments pursuant to Section 2.3(b).  Such funds may be invested by the Paying Agent as directed by Holdings or, after the Closing, the Surviving Corporation; provided that (a) no such investment or losses thereon shall affect the Merger Consideration payable to the holders of Company Common Stock, and following any losses Holdings or the Surviving Corporation shall promptly deposit (or cause to be deposited) additional funds to the Paying Agent for the benefit of the stockholders of the Company in the amount of any such losses, and (b) such investments shall be in short-term obligations of the United States of America with maturities of no more than 30 days or guaranteed by the United States of America and backed by the full faith and credit of the United States of America or in commercial paper obligations rated A-1 or P-1 or better by Moody's Investors Service, Inc. or Standard & Poor's Corporation, respectively.  Any interest or income produced by such investments will be payable to the Surviving Corporation or Holdings, as Holdings directs.

(b)      Promptly after the Effective Time, the Surviving Corporation shall cause to be mailed to each record holder, as of the Effective Time, of a Certificate or a Book-Entry Share (other than Certificates or Book-Entry Shares representing Shares to be canceled pursuant to Section 2.1(b) or to remain outstanding pursuant to Section 2.1(c)), a letter of transmittal (which shall be in customary form and shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon proper delivery of the Certificates to the Paying Agent or, in the case of Book-Entry Shares, upon adherence to the procedures set forth in the letter of transmittal) and instructions for use in effecting the surrender of the Certificates or, in the case of Book-Entry Shares, the surrender of such Shares for payment of the Merger Consideration therefor.  Upon surrender to the Paying Agent of a Certificate or of Book-Entry Shares, together with such letter of transmittal, duly completed and validly executed in

-5-

accordance with the instructions thereto, and such other documents as may be required pursuant to such instructions, the holder of such Certificate or Book-Entry Shares shall be entitled to receive in exchange therefor cash in an amount equal to the Merger Consideration for each Share formerly represented by such Certificate or Book-Entry Shares (less any required withholding taxes) and such Certificate or Book-Entry Shares shall then be canceled. No interest shall be paid or accrued for the benefit of holders of the Certificates or Book-Entry Shares on the Merger Consideration payable in respect of the Certificates or Book-Entry Shares. If payment of the Merger Consideration is to be made to a person other than the person in whose name the surrendered Certificate or Book-Entry Share is registered, it shall be a condition of payment that the Certificate or Book-Entry Share so surrendered shall be properly endorsed or shall be otherwise in proper form for transfer and that the person requesting such payment shall have paid any transfer and other taxes required by reason of the payment of the Merger Consideration to a person other than the registered holder of the Certificate or Book-Entry Share surrendered or shall have established to the satisfaction of the Surviving Corporation that such tax either has been paid or is not applicable. Until surrendered as contemplated by, and in accordance with, this Section 2.3(b), each Certificate and each Book-Entry Share (other than Certificates or Book-Entry Shares representing Shares to be canceled pursuant to Section 2.1(b) or to remain outstanding pursuant to Section 2.1(c) or the Dissenting Shares) shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the applicable Merger Consideration as contemplated by this Article II.

(c)     At any time following the date that is twelve months after the Effective Time, the Surviving Corporation shall be entitled to require the Paying Agent to deliver to it any funds (including any interest received with respect thereto) which have been deposited with the Paying Agent and which have not been disbursed to holders of Certificates or Book-Entry Shares and thereafter such holders shall be entitled to look to the Surviving Corporation (subject to abandoned property, escheat or other similar laws) only as general creditors thereof with respect to the Merger Consideration payable (without interest) upon due surrender of their Certificates or Book-Entry Shares. The Surviving Corporation shall pay all charges and expenses, including those of the Paying Agent, in connection with the exchange of Shares for the Merger Consideration. None of Parent, Holdings, Merger Sub, the Company, Surviving Corporation or the Paying Agent shall be liable to any person in respect of any cash delivered to a public official pursuant to any applicable abandoned property, escheat or similar law. Any Merger Consideration remaining unclaimed as of a date which is immediately prior to such time as such amounts would otherwise escheat to or become property of any Governmental Entity shall, to the extent permitted by applicable law, become the property of the Surviving Corporation free and clear of any claims or interests of any person previously entitled thereto. The Merger Consideration paid in accordance with the terms of this Article II in respect of Certificates or Book-Entry Shares that have been surrendered in accordance with the terms of this Agreement shall be deemed to have been paid in full satisfaction of all rights pertaining to the Shares represented thereby.

(d)     After the Effective Time, the stock transfer books of the Company shall be closed and thereafter there shall be no further registration of transfers of Shares that were outstanding prior to the Effective Time. After the Effective Time, Certificates or Book-Entry Shares presented to the Surviving Corporation for transfer shall be canceled and exchanged for

the Merger Consideration provided for, and in accordance with the procedures set forth in, this Article II.

(e)        Notwithstanding anything in this Agreement to the contrary, Holdings, the Surviving Corporation and the Paying Agent shall be entitled to deduct and withhold from the consideration otherwise payable to any former holder of Shares, Options, Restricted Shares, Stock Units or accounts under a Deferred Compensation Plan pursuant to this Agreement any amount as may be required to be deducted and withheld with respect to the making of such payment under applicable Tax (as defined below) laws.  To the extent that amounts are so properly withheld by Holdings, the Surviving Corporation or the Paying Agent, as the case may be, and are paid over to the appropriate Governmental Entity in accordance with applicable law, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the Shares, Options, Restricted Shares, Stock Units or accounts under a Deferred Compensation Plan  in respect of which such deduction and withholding was made by Holdings, the Surviving Corporation or the Paying Agent, as the case may be.

(f)        In the event that any Certificate shall have been lost, stolen or destroyed, upon the holder's compliance with the replacement requirements established by the Paying Agent, including, if necessary, the posting by the holder of a bond in customary amount as indemnity against any claim that may be made against it with respect to the Certificate, the Paying Agent will deliver in exchange for the lost, stolen or destroyed Certificate the applicable Merger Consideration payable in respect of the Shares represented by such Certificate pursuant to this Article II.

SECTION 2.4    Adjustments.  Without limiting the other provisions of this Agreement, if at any time during the period between the date of this Agreement and the Effective Time, any change in the number of outstanding Shares (or securities convertible or exchangeable into or exercisable for Shares) shall occur as a result of a reclassification, recapitalization, stock split (including a reverse stock split), or combination, exchange or readjustment of shares, merger or any stock dividend or stock distribution with a record date during such period, the Merger Consideration shall be correspondingly adjusted to reflect such change.

SECTION 2.5    Dissenting Shares.

(a)        Notwithstanding anything in this Agreement to the contrary, Shares that are issued and outstanding immediately prior to the Effective Time and which are held by holders of Shares who have not voted such Shares in favor of adoption of the Merger Agreement and who have properly demanded and perfected their rights to be paid the fair value of such Shares in accordance with Section 262 of the DGCL (the "Dissenting Shares") shall not be converted into the right to receive the Merger Consideration, and the holders thereof shall be entitled to only such rights as are granted by Section 262 of the DGCL; provided, however, that if any such holder shall fail to perfect or shall effectively waive, withdraw or lose such holder's rights under Section 262 of the DGCL, such holder's Shares shall thereupon be deemed to have been converted, at the Effective Time, into the right to receive the Merger Consideration, as set forth in Section 2.1 of this Agreement, without any interest thereon.

(b)         The Company shall give Holdings (i) prompt notice of any appraisal demands received by the Company, withdrawals thereof and any other instruments served pursuant to Section 262 of the DGCL and received by the Company and (ii) the opportunity to participate in all negotiations and proceedings with respect to the exercise of appraisal rights (or offers or attempts to settle the same) under Section 262 of the DGCL.  The Company shall not, except with the prior written consent of Holdings, make any payment with respect to any such exercise of appraisal rights or offer to settle or settle any such rights.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to Holdings and Merger Sub that, (i) except as set forth on the Company Disclosure Schedule delivered by the Company to Holdings and  Merger Sub prior to the execution of this Agreement (the "Company Disclosure Schedule"), it being understood and agreed that each item in a particular section of the Company Disclosure Schedule applies only to such section and to any other section to which its relevance is reasonably apparent and (ii) other than with respect to Sections 3.3(a), 3.7(a), 3.7(b) and Section 3.8(a), except as disclosed in the Filed SEC Reports (as defined below) filed prior to the date of this Agreement (excluding any disclosures set forth in any section of a Filed SEC Report entitled "Risk Factor" or "Forward-Looking Statements" or any other disclosures included in such filings to the extent that they are cautionary, predictive or forward-looking in nature):

SECTION 3.1    Organization and Qualification; Subsidiaries.   Each of the Company and its subsidiaries is duly organized, validly existing and in good standing (with respect to jurisdictions that recognize the concept of good standing) under the laws of the jurisdiction of its organization and has all requisite corporate or similar power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, except, in the case of any subsidiary of the Company, where any such failure to be so organized, existing or in good standing or to have such power or authority would not, individually or in the aggregate, have a Material Adverse Effect (as defined below).  Each of the Company and its subsidiaries is duly qualified or licensed to do business in each jurisdiction where the character of its properties owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except for any such failure to be so qualified or licensed which would not, individually or in the aggregate, have a Material Adverse Effect.  "Material Adverse Effect" means any change, effect, event or circumstance that is, or would reasonably be expected to be, individually or in the aggregate, materially adverse to the business, condition (financial or otherwise) or results of operations of the Company and its subsidiaries taken as a whole, other than any change, effect or circumstance to the extent resulting from (i) changes in general economic, financial market or geopolitical conditions, (ii) general changes or developments in the industry in which the Company and its subsidiaries operate, (iii) the announcement of this Agreement and the transactions contemplated hereby, including any termination of, reduction in or similar negative impact on relationships, contractual or otherwise, with any customers, suppliers, distributors, partners or employees of the Company and its subsidiaries to the extent due to the announcement and performance of this Agreement or the

-8-

identity of Parent or Holdings, or the performance of this Agreement and the transactions contemplated hereby, including compliance with the covenants set forth herein (in each case, other than in respect of Section 3.5), (iv) any actions required under this Agreement to obtain any approval or authorization required under applicable antitrust or competition laws for the consummation of the Merger, (v) changes in any applicable laws or regulations or applicable accounting regulations or principles or interpretations thereof, (vi) any outbreak or escalation of hostilities or war or any act of terrorism or (vii) any failure by the Company to meet any published analyst estimates or expectations of the Company's revenue, earnings or other financial performance or results of operations for any period, in and of itself, or any failure by the Company to meet its internal or published projections, budgets, plans or forecasts of its revenues, earnings or other financial performance or results of operations, in and of itself (it being understood that the facts or occurrences giving rise or contributing to such failure that are not otherwise excluded from the definition of a "Material Adverse Effect" may be taken into account in determining whether there has been a Material Adverse Effect); provided that, in the case of the immediately preceding clauses (i), (ii), (v) and (vi), such changes, effects or circumstances do not affect the Company or its subsidiaries disproportionately relative to other companies operating in the same industry.

SECTION 3.2   Certificate of Incorporation and Bylaws.   The Company has heretofore furnished or otherwise made available to Holdings a complete and correct copy of the restated certificate of incorporation, as amended to date (the "Certificate of Incorporation"), and the bylaws (the "Bylaws") of the Company as currently in effect.  The Certificate of Incorporation and the Bylaws are in full force and effect and no other organizational documents are applicable to or binding upon the Company.  The Company is not in violation of any provisions of its Certificate of Incorporation or Bylaws.

SECTION 3.3   Capitalization

(a)        The authorized capital stock of the Company consists of (i) 1,000,000,000 Common Shares, (ii) 300,000,000 Class B Common Shares, and (iii) 20,000,000 shares of preferred stock, no par value per share (the "Preferred Stock"), of which (x) 1,000,000 of such shares are designated as Series A Junior Participating Preferred Stock and have been reserved for issuance upon the exercise of the rights distributed to the holders of Company Common Stock (the "Company Rights") pursuant to the Company's Rights Agreement, dated as of June 1, 2001 (the "Rights Plan"), between the Company and ComputerShare Trust Company N.A. (as successor to EquiServe, L.P.), as Rights Agent.  As of April 15, 2008, (i) 215,935,235 shares of Common Stock were issued and outstanding, all of which were validly issued, fully paid and nonassessable and were issued free of preemptive rights, (ii) 55,811,742 shares of Class B Common Stock were issued and outstanding, all of which were validly issued, fully paid and nonassessable and were issued free of preemptive rights, (iii) no shares of Preferred Stock were outstanding, (iv) an aggregate of 1,570,914 Common Shares were subject to or otherwise deliverable (including in the form of cash equal to or based on the value of Common Shares) in connection with outstanding Stock Units issued pursuant to the Company Stock Plans and (v) an aggregate of 14,434,460 Common Shares were issuable upon the exercise of outstanding Options issued pursuant to the Company Stock Plans, with a weighted average exercise price of $50.16 per share.  From the close of business on April 15, 2008 until the date of this Agreement, no

-9-

options to purchase shares of Company Common Stock or Preferred Stock have been granted and no shares of Company Common Stock or Preferred Stock have been issued, except for Shares issued pursuant to the exercise of Options in accordance with their terms (and the issuance of Company Rights attached to such Shares).  Except as set forth above, as of the date of this Agreement, (A) there are not outstanding or authorized any (I) shares of capital stock or other voting securities of the Company, (II) securities of the Company convertible into or exchangeable for shares of capital stock or voting securities of the Company (other than the Company Rights) or (III) options or other rights to acquire from the Company and no obligation of the Company to issue, any capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of the Company (other than the Company Rights)  (collectively, "Company Securities"), (B) there are no outstanding obligations of the Company to repurchase, redeem or otherwise acquire any Company Securities and (C) there are no other options, calls, warrants or other rights, agreements, arrangements or commitments of any character (or securities or other rights entitling the holder thereof to cash equal to or based on the value of capital stock of the Company) relating to the issued or unissued capital stock of the Company to which the Company is a party (other than the Company Rights).

(b)      All of the outstanding capital stock or equivalent equity interests of the Company's subsidiaries are owned by the Company or another wholly-owned subsidiary of the Company free and clear of all security interests, liens, claims, pledges, agreements, limitations in voting rights, charges or other encumbrances of any nature whatsoever (each, a "Lien").  Except for the Company's subsidiaries and except as set forth on Section 3.3(b)(i) of the Company Disclosure Schedule, the Company does not own any capital stock of or other equity interest in, or any interest convertible into or exercisable or exchangeable for any capital stock of or other equity interest in, any other person.  Each of the outstanding shares of capital stock of each of the Company's subsidiaries is duly authorized, validly issued, fully paid and nonassessable, except where any such failure to be duly authorized, validly issued, fully paid and nonassessable does not, individually or in the aggregate, have a Material Adverse Effect.  Section 3.3(b)(ii) of the Company Disclosure Schedule sets forth a true and complete list of each subsidiary of the Company and its jurisdiction of incorporation or organization.  There are no outstanding (i) options or other rights to acquire from the Company or any of its subsidiaries and no obligation of the Company or any of its subsidiaries to issue, any capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of any of the Company's subsidiaries (collectively, "Subsidiary Securities"), (ii) obligations of the Company or any of its subsidiaries to repurchase, redeem or otherwise acquire any Subsidiary Securities or (iii) other options, calls, warrants or other rights, agreements, arrangements or commitments of any character (or securities or other rights entitling the holder thereof to cash equal to or based on the value of capital stock of any subsidiary of the Company) relating to the issued or unissued capital stock of any subsidiary of the Company  to which the Company or any of its subsidiaries is a party.  No Shares are held by any subsidiary of the Company.

(c)      As of the date of this Agreement, the only principal amount of outstanding indebtedness for borrowed money of the Company and its subsidiaries (other than intercompany amounts or operating or capital leases) is $500,000,000 of the Company's 4.30% senior notes due July 15, 2010 and $500,000,000 of the Company's 4.65% senior notes due July 15, 2015 (collectively, the "Notes"), which in each case were issued pursuant to the Senior Indenture,

-10-

dated as of July 14, 2005, by and between the Company and J.P. Morgan Trust Company, National Association as trustee (the "<u>Indenture</u>").  As of the date of this Agreement, there is no amount outstanding under the $600,000,000 Credit Agreement, dated as of July 14, 2005, among the Company, the lenders thereto and JPMorgan Chase Bank, N.A., as administrative agent and there is $382,000,000 outstanding under the Issuing and Paying Agency Agreement, dated April 29, 2005, between the Company and JPMorgan Chase Bank, N.A.

(d)       Except as would not, individually or in the aggregate, have a Material Adverse Effect, each Option, Restricted Share and Stock Unit (i) was granted in compliance with (A) all applicable Laws and (B) the terms and conditions of the Company Stock Plan and applicable award document pursuant to which it was issued, (ii) qualifies for the tax and accounting treatment afforded to such Option, Restricted Share and Stock Unit in the Company's tax returns and the Company's financial statements, respectively and (iii) has a per share exercise price determined in accordance with the applicable Company Stock Plan and that was equal to the fair market value of a Share on the applicable date on which the related grant was by its terms to be effective.

SECTION 3.4   <u>Authority</u>.  The Company has all necessary corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action and no other corporate proceedings on the part of the Company are necessary to authorize the execution, delivery and performance of this Agreement or to consummate the transactions so contemplated (other than the adoption of this Agreement by the holders of (a) (i) not less than two-thirds of the outstanding Common Shares and (ii) not less than two-thirds of the outstanding Class B Common Shares, each voting as a separate class, (b) not less than two-thirds of all outstanding shares of capital stock of the Company of each class entitled to vote in the election of directors, voting together as a single class, and (c) not less than a majority in voting power of the outstanding capital stock of the Company entitled to vote thereon (the "<u>Company Requisite Votes</u>"), and the filing with the Secretary of State of the State of Delaware of the Certificate of Merger as required by the DGCL).  This Agreement has been duly and validly executed and delivered by the Company and, assuming the due authorization, execution and delivery hereof by Parent, Holdings and Merger Sub, constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).  The Board of Directors of the Company, by resolutions duly adopted prior to the execution of this Agreement, has unanimously (i) determined that the Merger is in the best interests of the Company and the stockholders of the Company, and declared advisable this Agreement and the transactions contemplated by this Agreement (including the Merger), (ii) approved this Agreement in accordance with the DGCL and (iii) resolved to recommend the adoption of this Agreement by the stockholders of the Company and to submit this Agreement for adoption by the stockholders of the Company.  The only votes of the stockholders of the Company required to adopt this Agreement and approve the transactions contemplated hereby are the Company Requisite Votes.

-11-

SECTION 3.5  No Conflict; Required Filings and Consents.

(a)        The execution, delivery and performance of this Agreement by the Company do not and will not (i) conflict with or violate the Certificate of Incorporation or Bylaws of the Company, (ii) assuming that all consents, approvals and authorizations contemplated by clauses (i) through (v) of subsection (b) below have been obtained, and all filings described in such clauses have been made, conflict with or violate any statute, treaty, directive, law, rule or regulation of any Governmental Entity, stock exchange or industry self-regulatory organization ("Law") or any order, writ, judgment, injunction, decree, stipulation or award by, of or subject to any Governmental Entity ("Order") applicable to the Company or any of its subsidiaries or by which its or any of their respective assets, rights or properties are bound or (iii) result in any breach or violation of or constitute a default (or an event which with or without notice or lapse of time or both would become a default) or result in the loss of a benefit under, or give rise to the creation of any Lien on any of the assets, rights or properties of the Company or its subsidiaries under, or any right of termination, cancellation, amendment or acceleration of, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit or other instrument or obligation (each, a "Contract") to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries or its or any of their respective assets, rights or properties are bound or affected, except, in the case of clauses (ii) and (iii), for any such conflict, violation, breach, default, loss, right or other occurrence which would not, individually or in the aggregate, (A) prevent, materially delay or materially impede the consummation of the transactions contemplated by this Agreement or (B) have a Material Adverse Effect.

(b)        The execution, delivery and performance of this Agreement by the Company and the consummation of the Merger by the Company do not and will not require any consent, approval, authorization or permit of, action by, filing with or notification to, any federal, state, local or foreign governmental or regulatory (including stock exchange) authority, agency, court, commission, or other governmental body (each, a "Governmental Entity"), except for (i) applicable requirements of the Securities Act of 1933, as amended (the "Securities Act") and the rules and regulations promulgated thereunder and the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the rules and regulations promulgated thereunder (including the filing of the Proxy Statement (as defined below)) and the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (ii) the applicable requirements of the New York Stock Exchange, (iii) the filing with the Secretary of State of the State of Delaware of the Certificate of Merger as required by the DGCL, (iv) the applicable requirements of antitrust or other competition laws of jurisdictions other than the United States or investment laws relating to foreign ownership ("Foreign Antitrust Laws") and (v) any consent, approval, authorization, permit, action, filing or notification the failure of which to make or obtain would not, individually or in the aggregate, (A) prevent, materially delay or materially impede the consummation of the transactions contemplated by this Agreement or (B) have a Material Adverse Effect.

SECTION 3.6  Compliance.  (a) Neither the Company nor any of its subsidiaries is (and has not been since January 1, 2006) in violation of any Law or Order applicable to the Company or any of its subsidiaries or by which its or any of their respective assets, rights or

-12-

properties are bound, except for any such violation which would not, individually or in the aggregate, have a Material Adverse Effect, and (b) the Company and its subsidiaries have all permits, licenses, certificates, authorizations, exemptions, orders, consents, approvals and franchises from Governmental Entities ("Licenses") required to conduct their respective businesses as now being conducted and all such Licenses are in full force and effect, except for any such Licenses the absence of which, or the failure of which to be in full force and effect, would not, individually or in the aggregate, have a Material Adverse Effect.

SECTION 3.7    SEC Filings; Financial Statements; Undisclosed Liabilities.

(a)    The Company has filed or otherwise transmitted all forms, reports, statements, certifications and other documents (including all exhibits, amendments and supplements thereto) required to be filed by it with the Securities and Exchange Commission (the "SEC") since January 1, 2005 (all such forms, reports, statements, certificates and other documents filed since January 1, 2005, collectively, the "SEC Reports" and all such SEC Reports filed by the Company and publicly available prior to the date of this Agreement, the "Filed SEC Reports").  No subsidiary of the Company is required to file, or files, any form, report or other document with the SEC.  Each of the SEC Reports, as amended prior to the date of this Agreement, complied in all material respects with the applicable requirements of the Securities Act and the rules and regulations promulgated thereunder and the Exchange Act and the rules and regulations promulgated thereunder, each as in effect on the date so filed.  None of the SEC Reports contained, when filed or, if amended prior to the date of this Agreement, as of the date of such amendment, any untrue statement of a material fact or omitted to state a material fact required to be stated or incorporated by reference therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(b)    The audited consolidated financial statements of the Company (including any related notes thereto) included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2007, have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and fairly present in all material respects the consolidated financial position of the Company and its subsidiaries at the respective dates thereof and the consolidated statements of operations, cash flows and stockholders' equity for the periods indicated.

(c)    Since the enactment of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), the Company, in all material respects, has been and is in compliance with (A) the applicable provisions of the Sarbanes-Oxley Act and (B) the applicable listing and corporate governance rules and regulations of the NYSE.

(d)    The Company has designed and implemented disclosure controls and procedures (as such terms are defined in Rule 13a-15(e) under the Exchange Act), as required by Rule 13a-15(a) under the Exchange Act to ensure that material information relating to the Company, including its subsidiaries, is made known to the chief executive officer and the chief financial officer of the Company by others within those entities.

-13-

(e)     The Company has disclosed, based on its most recent evaluation prior to the date of this Agreement, to the Company's auditors and the audit committee of the Company's Board of Directors (A) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect in any material respect the Company's ability to record, process, summarize and report financial information and (B) any fraud or allegation of fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting.

(f)     Except (a) as reflected, accrued or reserved against in the financial statements (including the notes thereto) included in the Company's Annual Report on Form 10-K filed prior to the date of this Agreement for the year ended December 31, 2007, (b) for liabilities or obligations incurred in the ordinary course of business consistent with past practice since December 31, 2007, (c) for liabilities or obligations which have been discharged or paid in full prior to the date of this Agreement and (d) for liabilities or obligations incurred pursuant to the transactions contemplated by this Agreement, neither the Company nor any of its subsidiaries has any liabilities, commitments or obligations, asserted or unasserted, known or unknown, absolute or contingent, whether or not accrued, matured or un-matured or otherwise, that would be required to be reflected or reserved against in a consolidated balance sheet of the Company and its consolidated subsidiaries prepared in accordance with generally accepted accounting principles, other than those which have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.8     Absence of Certain Changes or Events.

(a)     Since January 1, 2008, there has not been any change, effect, event or circumstance that has resulted in or constituted a Material Adverse Effect.

(b)     Since January 1, 2008, except as expressly contemplated by this Agreement and except as set forth on Section 3.8(b) of the Company Disclosure Schedule, the Company and its subsidiaries have conducted their business in all material respects in the ordinary course consistent with past practice and, without limiting the foregoing, since that date, there has not been: (i) prior to the date of this Agreement, any declaration, setting aside or payment of any dividend or other distribution in cash, stock, property or otherwise in respect of the Company's or any of its subsidiaries' capital stock, except for (x) regular quarterly cash dividends on Company Common Stock and (y) any dividend or distribution by a wholly-owned subsidiary of the Company; (ii) prior to the date of this Agreement, any redemption, repurchase or other acquisition of any shares of capital stock of the Company of any of its subsidiaries, other than pursuant to the Company's stock repurchase program disclosed in the Filed SEC Reports; (iii) prior to the date of this Agreement, any granting by the Company or any of its subsidiaries to any of their directors, executive officers or employees of any increase in compensation (including bonus opportunities) or fringe benefits, except for increases in the ordinary course of business with respect to employees who are not directors, executive officers or parties to a severance agreement with the Company, (y) any granting by the Company or any of its subsidiaries to any director, executive officer or employee of the right to receive any severance or termination pay, or (z) any entry by the Company or any of its subsidiaries into any

-14-

employment, consulting, change-in-control or severance agreement or arrangement with any director, officer, employee, consultant or contractor, except in the ordinary course of business to employees who are not directors or officers of the Company or any subsidiary, or any material amendment of any Company Plan; (iv) prior to the date of this Agreement, any material change by the Company in its accounting principles, except as may be required to conform to changes in statutory or regulatory accounting rules or generally accepted accounting principles or regulatory requirements with respect thereto; (v) prior to the date of this Agreement, any material Tax election made or revoked by the Company or any of its subsidiaries or any settlement or compromise of any material Tax liability by the Company or any of its subsidiaries; or (vi) prior to the date of this Agreement, any material change in tax accounting principles by the Company or any of its subsidiaries, except insofar as may have been required by applicable law.

SECTION 3.9  <u>Absence of Litigation</u>.  There are no suits, claims, actions, proceedings, arbitrations, mediations or investigations ("<u>Actions</u>") pending or, to the knowledge of the Company, threatened against the Company or any of its subsidiaries, other than any such Action that would not, individually or in the aggregate, have a Material Adverse Effect.  As of the date of this Agreement, there are no Actions pending, or to the knowledge of the Company, threatened against the Company or any of its subsidiaries that would prevent, materially delay or materially impede the consummation of the transactions contemplated by this Agreement.  Neither the Company nor any of its subsidiaries nor any of their respective assets, rights or properties is or are subject to any Order except for those that would not, individually or in the aggregate, have a Material Adverse Effect.  As of the date of this Agreement, neither the Company nor any of its subsidiaries nor any of their respective assets, rights or properties is or are subject to any Order that would prevent, materially delay or materially impede the consummation of the transactions contemplated by this Agreement.  As of the date of this Agreement, to the knowledge of the Company, there are no SEC inquiries or investigations, other governmental inquiries or investigations or internal investigations pending or, to the knowledge of the Company, threatened, in each case regarding any accounting practices of the Company or any of its subsidiaries or any malfeasance by any executive officer of the Company.

SECTION 3.10  <u>Employee Benefit Plans</u>.

(a)       Section 3.10(a) of the Company Disclosure Schedule contains a true and complete list, as of the date of this Agreement, of each material Company Plan; <u>provided</u>, <u>however</u>, that any such plan that is maintained primarily for the benefit of Company Employees based outside of the United States (referred to as "<u>Non-US Plans</u>") shall be identified and listed on the Company Disclosure Schedule within 20 business days following the date of this Agreement.  As used herein, the term "<u>Company Plan</u>" shall mean each "employee benefit plan" (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>")), including any plan that is a "multiemployer plan," as defined in Section 3(37) of ERISA ("<u>Multiemployer Plan</u>"), and each other equity incentive, compensation, severance, employment, change-in-control, retention, fringe benefit, collective bargaining, bonus, incentive, savings, retirement, deferred compensation, or other benefit plan, agreement, program, policy or arrangement, whether or not subject to ERISA (including any related funding mechanism), under which (i) any current or former employee, officer, director, contractor or consultant of the Company or any of its subsidiaries ("<u>Company Employees</u>") has any present or

-15-

future right to benefits and which are entered into, contributed to, sponsored by or maintained by the Company or any of its subsidiaries, or (ii) the Company or any of its subsidiaries has any present or future liability.

(b)       With respect to each material Company Plan, the Company has made available to Holdings a current, accurate and complete copy thereof (or, if a plan is not written, a written description thereof) and, to the extent applicable, (i) any related trust agreement or other funding instrument, (ii) the most recent determination letter, if any, received from the Internal Revenue Service (the "IRS"), (iii) any summary plan description and, with respect to retiree welfare arrangements, any other communication by the Company or any of its subsidiaries concerning the extent of such benefits, and (iv) for the most recent year (A) the Form 5500 and attached schedules, (B) audited financial statements and (C) actuarial valuation reports, if any; provided, however, that with respect to any material Non-U.S. Plans, the Company will make such material Non-U.S. Plans available to Holdings within twenty (20) business days following the date of this Agreement.

(c)       Except as would not, individually or in the aggregate, have a Material Adverse Effect:

(i)       Each Company Plan has been established and administered in accordance with its terms and in compliance with the applicable provisions of ERISA, the Internal Revenue Code of 1986, as amended (the "Code"), and other applicable laws, rules and regulations;

(ii)       Neither the Company nor any of its subsidiaries, nor any entity that is a member of their respective "controlled groups" (within the meaning of Section 414 of the Code (an "ERISA Affiliate")) has any liability with respect to, or has at any time contributed or had an obligation to contribute to, any Multiemployer Plan;

(iii)       Each Company Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a determination letter to that effect from the Internal Revenue Service and, to the knowledge of the Company, no circumstances exist which would reasonably be expected to adversely affect such qualification or exemption;

(iv)       Each Company Plan that is a "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) has been operated and administered in good faith compliance with Section 409A of the Code and related Treasury guidance thereunder;

(v)       No event has occurred and no condition exists that would subject the Company or any of its subsidiaries, either directly or by reason of their affiliation with any of their respective ERISA Affiliates, to any tax, fine, lien, penalty or other liability imposed by ERISA, the Code or other applicable Laws; no "reportable event" (as such term is defined in Section 4043 of ERISA), no nonexempt "prohibited transaction" (as such term is defined in Section 406 of ERISA and Section 4975 of the Code), and no "accumulated funding deficiency" or failure to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA and Section 412 of the Code (whether or not waived)) has occurred with respect to any Company

-16-

Plan; and there has been no determination that any Company Plan is, or is expected to be, in "at risk" status within the meaning of Title IV of ERISA;

(vi)    All contributions to Company Plans that were required to be made under such Company Plans have been made, and all benefits accrued under any unfunded Company Plan have been paid, accrued or otherwise adequately reserved to the extent required by, and in accordance with, generally accepted accounting principles, and the Company has performed all obligations required to be performed under all Company Plans; and with respect to each Company Plan that is funded wholly or partially through an insurance policy, all premiums required to have been paid under the insurance policy have been paid; and

(vii)    (A) Each Non-U.S. Plan has been operated in accordance, and is in compliance, in all respects, with all applicable laws and has been operated in accordance, and are in compliance, with its terms; (B) each Non-U.S. Plan that is required to be funded is funded to the extent required by applicable law, and with respect to all other Non-U.S. Plans, adequate reserves therefore have been established on the accounting statements of the applicable Company or subsidiary entity; and (C) no liability or obligation of the Company or any of its subsidiaries exists with respect to such Non-U.S. Plans that has not been disclosed on Section 3.10(c)(vii) of the Company Disclosure Schedule.

(d)    With respect to each Company Plan, (A) no Actions (other than routine claims for benefits in the ordinary course) are pending or, to the knowledge of the Company, threatened, (B) no facts or circumstances exist that could give rise to any such Actions, (C) no written or oral communication has been received from the Pension Benefit Guaranty Corporation (the "PBGC") (or comparable agency under non-U.S. Law) in respect of any Company Plan subject to Title IV of ERISA (or a comparable scheme under non-U.S. Law) concerning the funded status of any such plan or any transfer of assets and liabilities from any such plan in connection with the transactions contemplated herein, and (D) no administrative investigation, audit or other administrative proceeding (including amnesty proceedings) by the Department of Labor, the PBGC, the Internal Revenue Service or any other governmental agencies (U.S. or non-U.S.) are pending, threatened or in progress (including, without limitation, any routine requests for information from the PBGC).

(e)    Except as set forth on Section 3.10(e) of the Company Disclosure Schedule, the execution of, delivery of, or performance by the Company of its obligations in respect of the transactions contemplated by, this Agreement will not (either alone or in connection with any other event) (A) result in any severance pay or any increase in severance pay, (B) accelerate the time of payment, funding (through a grantor trust or otherwise), or vesting of any compensation or benefits, result in any payment or funding (through a grantor trust or otherwise) of any compensation or benefits, or increase the amount payable under or result in any other material obligation pursuant to any of the Company Plans, or (C) result in any prohibited transaction described in Section 406 of ERISA or Section 4975 of the Code for which an exemption is not available.

(f)    Except as identified on Section 3.10(f) of the Company Disclosure Schedule, there are no Company Plans and there are no other Contracts, plans, agreements or arrangements (written or otherwise) covering any current or former employee, director, officer,

-17-

consultant, stockholder or independent contractor of the Company or any of its subsidiaries that, individually or collectively, could give rise to the payment of any amount or benefit that would not be deductible pursuant to the terms of Section 280G of the Code, or that could give rise to the imposition of an excise tax under Section 4999 of the Code.

SECTION 3.11   Labor and Employment Matters.

(a)        Neither the Company nor any subsidiary is a party to any collective bargaining agreement with any labor organization or other representative of any Company Employees, nor is any such agreement presently being negotiated by the Company.  As of the date of this Agreement, to the knowledge of the Company, there are no union organizing activities concerning any Company Employees.  Except as would not, individually or in the aggregate, have a Material Adverse Effect, there are no unfair labor practice charges, grievances or complaints pending against the Company or any of its subsidiaries before the National Labor Relations Board or any other labor relations tribunal or authority, domestic or foreign.  Except as would not, individually or in the aggregate, have a Material Adverse Effect, there are no strikes, work stoppages, slowdowns, lockouts, arbitrations or grievances, or other labor disputes pending or, to the knowledge of the Company, threatened in writing against or involving the Company or any of its subsidiaries.

(b)        Except as would not, individually or in the aggregate, have a Material Adverse Effect, during the preceding two (2) years, the Company has not effectuated a "plant closing" (as defined in Worker Adjustment and Retraining Notification Act, "WARN") or a "mass lay-off" (as defined in WARN), in either case affecting any site of employment or facility of the Company, except in accordance with WARN.

SECTION 3.12   Insurance.   Except as would not, individually or in the aggregate, have a Material Adverse Effect, all material insurance policies of the Company and its subsidiaries (a) are in full force and effect and provide insurance in such amounts and against such risks as is sufficient to comply with applicable law, (b) neither the Company nor any of its subsidiaries is in breach or default, and neither the Company nor any of its subsidiaries has taken any action or failed to take any action which, with notice or the lapse of time, would constitute such a breach or default, or permit termination or modification of, any of such insurance policies, and (c) no notice of cancellation or termination has been received with respect to any such policy other than those received in the ordinary course of business.

SECTION 3.13   Properties.

(a)        Except as would not, individually or in the aggregate, have a Material Adverse Effect, the Company or one of its subsidiaries has good title to all the properties and assets reflected in the latest audited balance sheet included in the SEC Reports as being owned by the Company or one of its subsidiaries or acquired after the date thereof that are material to the Company's business on a consolidated basis (except properties sold or otherwise disposed of since the date thereof in the ordinary course of business consistent with past practice), free and clear of all Liens other than Permitted Liens.

-18-

(b)     Except as would not, individually or in the aggregate, have a Material Adverse Effect: (i) each lease, sublease or license pursuant to which the Company and its subsidiaries leases, subleases or licenses any real property (the "Leases") is a valid and binding obligation on the Company and each of its subsidiaries party thereto and, to the knowledge of the Company, each other party thereto and is in full force and effect and enforceable in accordance with its terms; (ii) there is no breach or default under any Lease by the Company or any of its subsidiaries or, to the knowledge of the Company, any other party thereto; (iii) no event has occurred that with or without the lapse of time or the giving of notice or both would constitute a breach or default under any Lease by the Company or any of its subsidiaries or, to the knowledge of the Company, any other party thereto; and (iv) the Company or one of its subsidiaries that is either the tenant, subtenant or licensee named under the Lease has a good and valid leasehold interest in each parcel of real property which is subject to a Lease and is in possession of the properties purported to be leased, subleased or licensed thereunder.

(c)     Except as would not, individually or in the aggregate, have a Material Adverse Effect: (i) the Company or one of its Subsidiaries has good and marketable fee simple title to all real property owned by the Company or any of its subsidiaries (the "Owned Real Property") and to all of the buildings, structures and other improvements thereon free and clear of all Liens other than Permitted Liens; (ii) neither the Company nor any of its subsidiaries has leased, subleased, licensed or otherwise granted any person the right to use or occupy the Owned Real Property which lease, license or grant is currently in effect or collaterally assigned or granted any other security interest in the Owned Real Property which assignment or security interest is currently in effect; (iii) there are no outstanding agreements, options, rights of first offer or rights of first refusal on the part of any party to purchase any Owned Real Property; and (iv) there is not pending or, to the knowledge of the Company, threatened any condemnation proceedings related to any of the Owned Real Property.

SECTION 3.14   Tax Matters.

(a)     Except as would not, individually or in the aggregate, have a Material Adverse Effect: (i) all Tax Returns required to be filed (taking into account applicable extensions) by the Company or any of its subsidiaries have been properly filed and all such Tax Returns are true, complete and accurate; (ii) all Taxes due from the Company or any of its subsidiaries have been timely paid (whether or not shown on any Tax Return) or, where payment is not yet due, the Company has made adequate provision for such Taxes in the Company's financial statements (in accordance with generally accepted accounting practices); (iii) there are no Liens for Taxes on any asset of the Company or any of its subsidiaries other than for current Taxes not yet due and payable or for Taxes that are being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with generally accepted accounting principles have been made in the Company's financial statements; and (iv) all amounts required to have been collected or withheld from any payment by the Company or any of its subsidiaries have been duly collected or withheld, and have been duly remitted or deposited in accordance with law.

(b)     Neither the Company nor any of its subsidiaries has received written notice of any claim with respect to any liability for Taxes of the Company or any of its

-19-

subsidiaries or with respect to any failure by the Company or any of its subsidiaries to properly prepare or file any Tax Returns, which claim remains unpaid or unsettled.  No unresolved written claim has been made by any Governmental Entity in any jurisdiction in which the Company or any subsidiary does not currently file Tax Returns that the Company or such subsidiary may be subject to Tax in that jurisdiction.  There is no pending or threatened action, audit, proceeding or investigation relating to Taxes of the Company or any of its subsidiaries or with respect to compliance with Tax Return requirements by the Company or any of its subsidiaries.

(c)    Neither the Company nor any of its subsidiaries (i) has been a member of a group filing Tax Returns on a consolidated, combined, unitary or similar basis (other than a consolidated group of which the Company was the common parent), (ii) has any liability for Taxes of any person (other than the Company, or any subsidiary of the Company) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise or (iii) is a party to, bound by or has any liability under any Tax sharing, allocation or indemnification agreement or arrangement.

(d)    There is no outstanding written request, with respect to the Company or any of its subsidiaries, for any extension of time within which to pay any Taxes or file or provide any Tax Returns.  There is no outstanding waiver, with respect to the Company or any of its subsidiaries, of any statute of limitations for the assessment or collection of any material Taxes.  There are no requests for rulings in respect of Taxes in relation to the Company or any of its subsidiaries that are pending with any Governmental Entity.  Neither the Company nor any of its subsidiaries have received a ruling from any Governmental Entity regarding Taxes which remains in effect.

(e)    Neither the Company nor any of its subsidiaries is required to include in income any adjustment under Section 481(a) of the Code or any similar provision of state, local or foreign Law by reason of a change in accounting method.

(f)    Since January 1, 2003, the Company has not been the "distributing corporation" (within the meaning of Section 355(e)(2) of the Code) with respect to a transaction described in Section 355 of the Code.

(g)    Neither the Company nor any of its subsidiaries has participated in a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b).

SECTION 3.15   Proxy Statement.  None of the information supplied or to be supplied by the Company for inclusion or incorporation by reference in the proxy statement to be sent to the stockholders of the Company in connection with the Stockholders Meeting (such proxy statement, as amended or supplemented, the "Proxy Statement") will, at the date it is first mailed to the stockholders of the Company and at the time of the Stockholders Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not misleading.  The Proxy Statement will, at the date it is first mailed to stockholders and at the time of the Stockholders Meeting, comply as to form in all material respects with the requirements of the Exchange Act and the rules and regulations promulgated thereunder.  Notwithstanding the foregoing, the Company makes no representation

-20-

or warranty with respect to any information supplied by Holdings or Merger Sub or any of their respective affiliates or representatives which is contained or incorporated by reference in the Proxy Statement.

SECTION 3.16    Opinion of Financial Advisors.  Each of Goldman, Sachs & Co. and William Blair & Company, L.L.C. (the "Financial Advisors") has delivered to the Board of Directors of the Company its written opinion (or an oral opinion to be confirmed in writing) that, as of the date of this Agreement, the Merger Consideration is fair, from a financial point of view, to the holders of the Common Stock and the Class B Common Stock (excluding Parent and its affiliates).

SECTION 3.17    Brokers.  No broker, finder or investment banker (other than the Financial Advisors) is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by and on behalf of the Company or any of its subsidiaries.  The Company has made available to Holdings complete and correct copies of the agreements between the Company and the Financial Advisors pursuant to which the Financial Advisors would be entitled to any payments relating to this Agreement, the Merger or the other transactions contemplated by this Agreement, and such agreements are the only agreements providing for the payment of any consideration to the Financial Advisors with respect to this Agreement, the Merger or the other transactions contemplated by this Agreement.

SECTION 3.18    Takeover Statutes; Rights Plans.

(a)    No "fair price", "moratorium", "control share acquisition", "business combination" or other similar antitakeover statute or regulation (including Section 203 of the DGCL) enacted under any federal, state, local or foreign laws applicable to the Company  (collectively, the "Anti-Takeover Statutes") or any anti-takeover provision in the Company's Certificate of Incorporation or Bylaws is applicable to this Agreement, the Merger or the other transactions contemplated hereby.

(b)    The Company has amended the Rights Plan, effective as of the execution of this Agreement, in accordance with its terms (i) to render the Rights Plan inapplicable to the transactions contemplated by this Agreement and (ii) so that the Company Rights will expire immediately prior to the Effective Time, provided that, in the case of this clause (ii), no Distribution Date (as defined in the Rights Plan) or Stock Acquisition Date (as defined in the Rights Plan) shall have occurred.

SECTION 3.19    Intellectual Property.

(a)    Except as would not, individually or in the aggregate, have a Material Adverse Effect, (i) the Company and its subsidiaries own or have the right to use all Intellectual Property used in their businesses as currently conducted, free and clear of all Liens (other than Permitted Liens) and will have the same rights after the Closing Date; (ii) all Intellectual Property registrations and applications owned by the Company and its subsidiaries are subsisting and unexpired, not cancelled or abandoned, and are valid; (iii) the conduct of the Company

-21-

and its subsidiaries' businesses does not infringe, dilute, misappropriate or violate ("Infringe") the Intellectual Property of any person and their Intellectual Property is not being Infringed by any person; (iv) the Company and its subsidiaries take commercially reasonable efforts to protect the confidentiality of their trade secrets; (v) no Action is pending, or to the knowledge of the Company, threatened (including "cease and desist" letters or invitations to take a patent license) against the Company or any of its subsidiaries with respect to Intellectual Property; and (vi) the Company and its subsidiaries use commercially reasonable efforts to cause all persons who contribute to material proprietary Intellectual Property owned by the Company or its subsidiaries to assign to the Company or its subsidiaries all of their rights therein that do not vest in the Company or its subsidiaries by operation of Law.

(b)        "Intellectual Property" means all intellectual property, including all (i) patents, utility models, inventions, proprietary technology and know-how; (ii) trademarks, trade names, trade dress, logos, corporate names, domain names, service marks and other source indicators, including all goodwill associated therewith; (iii) copyrights (including copyrights in software, databases, product artwork, website content and advertising and promotional materials); and (iv) trade secrets and confidential or proprietary recipes, processes, formulae, techniques, product research and information.

SECTION 3.20   Environmental Matters.

(a)        Except as would not, individually or in the aggregate, have a Material Adverse Effect: (i) the Company and each of its subsidiaries comply and have since January 1, 2006 complied with all applicable Environmental Laws (as defined below), and possess and comply with all applicable Environmental Permits (as defined below) required to carry on their businesses as they are now being conducted; (ii)  there are no Materials of Environmental Concern (as defined below) at, in or under or that have been Released (as defined below) to or from any property currently or, to the knowledge of the Company, formerly owned, leased or operated by the Company or any of its subsidiaries, under circumstances that have resulted in or would reasonably be expected to result in liability of the Company or any of its subsidiaries under any applicable Environmental Law; (iii) neither the Company nor any of its subsidiaries has received any unresolved written notification alleging that it is liable for any Release or threatened Release of Materials of Environmental Concern at any location; (iv) neither the Company nor any of its subsidiaries has received any written claim or complaint, or is subject to any proceeding, relating to noncompliance with Environmental Laws or any other liabilities pursuant to Environmental Laws, and no such matter has been threatened in writing to the knowledge of the Company; and (v) neither the Company nor any of its subsidiaries has agreed to indemnify or hold harmless or, to the knowledge of the Company, assumed responsibility for any person for any liability or obligation, arising under or relating to Environmental Laws.

(b)        For purposes of this Agreement, the following terms shall have the meanings assigned below:

"Environmental Laws" shall mean all foreign, federal, state, local or provincial, civil and criminal Laws and Orders relating to the protection of health (to the extent relating to exposure to Materials of Environmental Concern) or the environment (including air, soil, surface water or groundwater), worker health (to the extent relating to exposure to Materials of

-22-

Environmental Concern) or governing the handling, use, generation, treatment, storage, transportation, disposal, manufacture, distribution, formulation, packaging, labeling, or Release of or exposure to Materials of Environmental Concern.

"Environmental Permits" shall mean all permits, licenses, registrations, and other authorizations required under applicable Environmental Laws.

"Materials of Environmental Concern" shall mean petroleum, petroleum hydrocarbons or petroleum products, petroleum by-products, radioactive materials, asbestos or asbestos-containing materials, pesticides, radon, urea formaldehyde, toxic mold, lead or lead-containing materials, polychlorinated biphenyls; and any other chemicals, materials, substances or wastes in any amount or concentration which are included in the definition of "hazardous substances," "hazardous materials," "hazardous wastes," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "pollutants," "solid wastes," or "contaminants" or words of similar import under any applicable Environmental Law.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of a Material of Environmental Concern.

SECTION 3.21   Contracts.

(a)        Section 3.21(a) of the Company Disclosure Schedule lists the following Contracts to which, as of the date of this Agreement, the Company or any of its subsidiaries is a party or by which any of them is bound: (i) any Contract that is required to be filed by the Company as a "material contract" pursuant to Item 601(b)(10) of Regulation S-K; (ii) any Contract of the Company or any of its subsidiaries (other than purchase orders for the purchases of inventory, services or equipment in the ordinary course of business, this Agreement or Contracts subject to clause (iv) below) having an aggregate value per Contract, or involving payments by or to the Company or any of its subsidiaries, of more than $50,000,000 on an annual basis or $100,000,000 over the term of the Contract, except for any such Contract that may be canceled without penalty by the Company or any of its subsidiaries upon notice of 60 days or less; (iii) any Contract containing covenants binding upon the Company or any of its subsidiaries that restricts the ability of the Company or any of its subsidiaries (or which, following the consummation of the Merger, could restrict the ability of the Surviving Corporation or any of its affiliates) to compete in any business, or with any person or in any geographic area where, in each case, such restrictions are material to the Company and its subsidiaries, taken as a whole, except for any such Contract that may be canceled without penalty by the Company or any of its subsidiaries upon notice of 60 days or less; (iv) any Contract with respect to any joint venture, partnership or similar arrangements that is material to the Company and its subsidiaries, taken as a whole; (v) any Contract that prohibits the payment of dividends or distributions in respect of capital stock of the Company or any of its subsidiaries, prohibits the pledging of capital stock of the Company or any of its subsidiaries or prohibits the issuance of guarantees by the Company or any of its subsidiaries; (vi) any Contract pursuant to which any indebtedness for borrowed money with a principal amount in excess of $20,000,000 of the Company or any of its subsidiaries is outstanding or may be incurred, and all guarantees by the Company or any of its subsidiaries of any indebtedness for borrowed money with a

-23-

principal amount in excess of $20,000,000 of any person (other than the Company or any wholly-owned subsidiary of the Company); (vii) any Contract (or a related series of Contracts) for the acquisition or disposition by the Company or any of its subsidiaries of assets with a value of more than $20,000,000 or with respect to which the Company or any of its subsidiaries has continuing indemnification, "earn-out" or other contingent payment obligations, in each case, that would reasonably be expected to result in payments in excess of $50,000,000; and (viii) any Contract that would prevent, materially delay or materially impede the Company's ability to consummate the Merger or the other transactions contemplated by this Agreement.  Each such Contract described in clauses (i) through (viii) is referred to herein as a "Material Contract".

(b)      Each of the Material Contracts is valid and binding on the Company and each of its subsidiaries party thereto and is in full force and effect, except for such failures to be valid and binding or to be in full force and effect that would not, individually or in the aggregate, have a Material Adverse Effect. There is no breach or default under any Material Contract by the Company or any of its subsidiaries, or to the knowledge of the Company, any other party thereto and no event has occurred that with or without the lapse of time or the giving of notice or both would constitute a breach or default thereunder by the Company or any of its subsidiaries or, to the knowledge of the Company, any other party thereto, in each case except as would not, individually or in the aggregate, have a Material Adverse Effect.

SECTION 3.22   Affiliate Transactions.  No executive officer or director of the Company or any of its subsidiaries or any person owning 5% or more of the Common Shares or Class B Common Shares (or any of such person's immediate family members or affiliates or associates) is a party to any Contract with or binding upon the Company or any of its subsidiaries or any of their respective assets, rights or properties or has any interest in any property owned by the Company or any of its subsidiaries or has engaged in any transaction with any of the foregoing within the last twelve months, in each case, that is of the type that would be required to be disclosed under Item 404 of Regulation S-K under the Securities Act.

SECTION 3.23   No Additional Representations.  Except as otherwise expressly set forth in this Article III, neither the Company nor any of its subsidiaries nor any other person acting on their behalf makes any representations or warranties of any kind or nature, express or implied in connection with the transactions contemplated by this Agreement.  Neither the Company nor any of its subsidiaries has made or makes any representation or warranty with respect to any projections, estimates or budgets made available to Holdings, Merger Sub or their affiliates of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Company and its subsidiaries or the future business and operations of the Company and its subsidiaries unless any such information is expressly included in a representation or warranty contained in this Article III.

-24-

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF
HOLDINGS AND MERGER SUB

Holdings and Merger Sub hereby, jointly and severally, represent and warrant to the Company that, except as set forth on the Disclosure Schedule delivered by Holdings and Merger Sub to the Company prior to the execution of this Agreement (the "Holdings Disclosure Schedule"), it being understood and agreed that each item in a particular section of the Holdings Disclosure Schedule applies only to such section and to any other section to which its relevance is reasonably apparent:

SECTION 4.1   Organization.   Each of Holdings and Merger Sub is a corporation duly organized, validly existing and in good standing  under the laws of the jurisdiction in which it is incorporated and has the requisite corporate power and authority to own, operate or lease its properties and to carry on its business as it is now being conducted, except where the failure to be so organized, existing or in good standing or to have such power or authority would not prevent, materially delay or materially impede the consummation of the transactions contemplated by this Agreement.  As of the date of this Agreement, Holdings owns beneficially and of record all of the outstanding capital stock of Merger Sub free and clear of any Liens.

SECTION 4.2   Authority.   Each of Holdings and Merger Sub has all necessary corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement by each of Holdings and Merger Sub and the consummation by each of Holdings and Merger Sub of the transactions contemplated hereby have been duly and validly authorized by all necessary action by the respective Boards of Directors of Holdings and Merger Sub and, prior to the Effective Time, will be duly and validly authorized by all necessary action by Holdings as the sole stockholder of Merger Sub, and no other corporate proceedings on the part of Holdings or Merger Sub or their affiliates are necessary to authorize the execution, delivery and performance of this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Holdings and Merger Sub and, assuming the due authorization, execution and delivery hereof by the Company, constitutes a legal, valid and binding obligation of each of Holdings and Merger Sub enforceable against each of Holdings and Merger Sub in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

SECTION 4.3   No Conflict; Required Filings and Consents.

(a)         The execution, delivery and performance of this Agreement by Holdings and  Merger Sub do not and will not (i) conflict with or violate the respective certificates of incorporation or bylaws of Holdings or Merger Sub, (ii) assuming that all consents, approvals and authorizations contemplated by clauses (i) through (v) of subsection (b) below have been obtained, and all filings described in such clauses have been made, conflict with or violate any Law or Order applicable to Holdings or Merger Sub or by which either of them or any of their

-25-

respective assets, rights or properties are bound or (iii) result in any breach or violation of or constitute a default (or an event which with or without notice or lapse of time or both would become a default) or result in the loss of a benefit under, or give rise to any right of termination, cancellation, amendment or acceleration of, any Contracts to which Holdings or Merger Sub is a party or by which Holdings or Merger Sub or any of their respective assets, rights or properties are bound or affected, except, in the case of clauses (ii) and (iii), for any such conflict, violation, breach, default, acceleration, loss, right or other occurrence which would not prevent, materially delay or materially impede the consummation of the transactions contemplated hereby.

(b)    The execution, delivery and performance of this Agreement by each of Holdings and Merger Sub and the consummation of the transactions contemplated hereby by each of Holdings and Merger Sub do not and will not require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Entity, except for (i) the applicable requirements, if any, of the Exchange Act and the rules and regulations promulgated thereunder and the HSR Act, (ii) the applicable requirements of the New York Stock Exchange, (iii) the filing with the Secretary of State of the State of Delaware of the Certificate of Merger as required by the DGCL, (iv) the applicable requirements of Foreign Antitrust Laws and (v) any such consent, approval, authorization, permit, action, filing or notification the failure of which to make or obtain would not prevent, materially delay or materially impede the consummation of the transactions contemplated hereby.

SECTION 4.4    <u>Absence of Litigation</u>.  As of the date of this Agreement, there are no Actions pending or, to the knowledge of Holdings, threatened against Holdings or any of its subsidiaries, other than any such Action that would not prevent, materially delay or materially impede the consummation of the transactions contemplated hereby.  As of the date of this Agreement, neither Holdings nor any of its subsidiaries nor any of their respective assets, rights or properties is or are subject to any Order that would prevent, materially delay or materially impede the consummation of the transactions contemplated hereby.

SECTION 4.5    <u>Proxy Statement</u>.  None of the information supplied or to be supplied by Holdings or Merger Sub for inclusion or incorporation by reference in the Proxy Statement will, at the date it is first mailed to the stockholders of the Company and at the time of the Stockholders Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not misleading.  Notwithstanding the foregoing, Holdings and Merger Sub make no representation or warranty with respect to any information supplied by the Company or any of its representatives which is contained or incorporated by reference in the Proxy Statement.

SECTION 4.6    <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by and on behalf of Holdings or Merger Sub or any of their affiliates for which the Company could have any liability prior to the Effective Time.

SECTION 4.7    <u>Financing</u>.  Holdings has delivered to the Company true and complete fully executed copies of (i) the commitment letter, dated as of April 28, 2008, between

-26-

Holdings and Goldman Sachs Credit Partners L.P., including all exhibits, schedules and amendments to such letter in effect as of the date of this Agreement (the "Senior Debt Commitment Letter"), and the commitment letter, dated as of April 28, 2008, between Parent, JPMorgan Chase Bank, N.A. and J.P. Morgan Securities Inc., including all exhibits, schedules and amendments to such letter in effect as of the date of this Agreement (together with the Senior Debt Commitment Letter, the "Debt Financing Commitment Letters"), pursuant to which and subject to the terms and conditions thereof each of the parties thereto (other than Holdings and Parent) has agreed to lend the amounts set forth therein (the "Debt Financing") for the purpose of funding the transactions contemplated by this Agreement, and (ii) the equity commitment letter, dated as of April 28, 2008, by and between Holdings and Parent, including all exhibits, schedules and amendments to such letter in effect as of the date of this Agreement (the "Parent Equity Commitment Letter"), pursuant to which and subject to the terms and conditions thereof Parent has committed to invest the amount set forth therein, and the commitment letter, dated as of April 25, 2008, by Berkshire Hathaway Inc., including all exhibits, schedules and amendments to such letter in effect as of the date of this Agreement (together with the Parent Equity Commitment Letter, the "Equity Financing Commitment Letters" and together with the Debt Financing Commitment Letters, the "Financing Commitments Letters"), pursuant to which and subject to the terms and conditions thereof Berkshire Hathaway Inc. has committed to invest the amounts set forth therein (the "Equity Financing" and together with the Debt Financing, the "Financing"). None of the Financing Commitment Letters has been amended, restated or otherwise modified prior to the date of this Agreement, and the respective commitments contained in the Financing Commitment Letters have not been withdrawn, modified or rescinded in any respect prior to the date of this Agreement. As of the date of this Agreement, each of the Financing Commitment Letters is in full force and effect and constitutes the legal, valid and binding obligations of each of Holdings and Parent, as applicable, and, to the knowledge of Holdings, the other parties thereto. There are no conditions precedent (including pursuant to any "flex" provisions) related to the funding of the full amount of the Financing, other than as expressly set forth in the Financing Commitment Letters. Subject to the terms and conditions of the Financing Commitment Letters, assuming the accuracy of the Company's representations and warranties contained in Section 3.3 and Section 3.17 and assuming compliance by the Company with its covenants contained in Sections 5.1(b), (c), (d) and (h) herein, the aggregate proceeds to be disbursed pursuant to the agreements contemplated by the Financing Commitment Letters will be sufficient for Holdings and the Surviving Corporation to pay the aggregate Merger Consideration and to pay all related fees and expenses, including payment of all amounts under Article II of this Agreement. As of the date of this Agreement, (i) assuming the accuracy of the Company's representations and warranties contained in Section 3.8(a) hereof, no event has occurred which would constitute a breach or default (or an event which with notice or lapse of time or both would constitute a default), in each case, on the part of Holdings or Parent under the Financing Commitment Letters or, to the knowledge of Holdings and Merger Sub, any other party to the Financing Commitment Letters, and (ii) subject to the satisfaction of the conditions contained in Sections 7.1 and 7.2, Holdings does not have any reason to believe that any of the conditions to the Financing will not be satisfied or that the Financing will not be available to Holdings on the Closing Date. Holdings and Parent have fully paid all commitment fees or other fees required to be paid prior to the date of this Agreement pursuant to the Financing Commitment Letters.

SECTION 4.8   Operations of Holdings and Merger Sub.  Each of Holdings and Merger Sub has been formed solely for the purpose of engaging in the transactions contemplated hereby and prior to the Effective Time will have engaged in no other business activities and will have incurred no liabilities or obligations other than as contemplated herein.

SECTION 4.9   Solvency.  As of the Effective Time, assuming (A) satisfaction of the conditions to Holdings' and Merger Sub's obligation to consummate the Merger, or waiver of such conditions, (B) the accuracy of the representations and warranties of the Company set forth in Article III hereof (for such purposes, such representations and warranties shall be true and correct in all material respects without giving effect to any "knowledge", materiality or "Material Adverse Effect" qualification or exception), and (C) any estimates, projections or forecasts provided by the Company to Holdings prior to the Effective Time have been prepared in good faith on assumptions that were and continue to be reasonable, immediately after giving effect to the transactions contemplated by this Agreement (including the Financing, the payment of the Merger Consideration, the funding of any obligations of the Surviving Corporation or its subsidiaries which become due or payable by the Surviving Corporation or its subsidiaries in connection with, or as a result of, the Merger, and the payment of all related fees and expenses), (i) the Surviving Corporation will not have incurred debts beyond its ability to pay such debts as they mature or become due, (ii) the then present fair saleable value of the assets of the Surviving Corporation and its subsidiaries will exceed the amount that will be required to pay their existing debts (including the probable amount of all contingent liabilities) as such debts become absolute and matured, (iii) the assets of the Surviving Corporation and its subsidiaries at a fair valuation will exceed their debts (including the probable amount of all contingent liabilities) and (iv) the Surviving Corporation will not have unreasonably small capital to carry on its business as proposed to be conducted following the Closing Date.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby, in either case, with the intent to hinder, delay or defraud either present or future creditors of Holdings, Merger Sub, the Company or any subsidiary of the Company.

SECTION 4.10   Share Ownership.  As of the date of this Agreement, except as set forth in Section 4.10 of the Holdings Disclosure Schedule, Holdings, Merger Sub and their respective affiliates do not beneficially own, within the meaning of Rule 13d-3 of the Exchange Act, any Shares.

SECTION 4.11   No Additional Representations.  Except as otherwise expressly set forth in this Article IV, neither Holdings, Merger Sub nor any other person acting on behalf of Holdings or Merger Sub makes any representations or warranties of any kind or nature, express or implied, in connection with the transactions contemplated by this Agreement.

## ARTICLE IVA

## REPRESENTATIONS AND WARRANTIES OF PARENT

Parent hereby represents and warrants to the Company that:

SECTION 4.1A   Authority.  Parent has all necessary corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  The

execution and delivery of this Agreement by Parent and the performance of its obligations hereunder have been duly and validly authorized by all necessary action by the Board of Directors of Parent, and no other corporate proceedings on the part of Parent is necessary to authorize the execution or delivery of this Agreement or the performance of its obligations hereunder by Parent.  This Agreement has been duly and validly executed and delivered by Parent and, assuming due authorization, execution and delivery hereof by the Company, constitutes a legal, valid and binding obligation of Parent enforceable against Parent in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

SECTION 4.2A  <u>No Conflict</u>.  The execution, delivery and performance of this Agreement by Parent do not and will not (i) conflict with or violate the certificate of incorporation or bylaws of Parent, (ii) conflict with or violate any Law or Order applicable to Parent or by which it or any of its assets, rights or properties are bound or (iii) result in any breach or violation of or constitute a default (or an event which with or without notice or lapse of time or both would become a default) or result in the loss of a benefit under, or give rise to any right of termination, cancellation, amendment or acceleration of, any Contracts to which Parent is a party or by which Parent or any of its assets, rights or properties are bound or affected.

SECTION 4.3A  <u>Consents</u>.  The execution, delivery and performance of this Agreement by Parent do not and will not require any consent, approval, authorization or permit of, action by, filing with or notification to, any Governmental Entity.

SECTION 4.4A  <u>No Additional Representations</u>.  Except as otherwise expressly set forth in this Article IVA, neither Parent nor any other person acting on behalf of Parent makes any representations or warranties of any kind or nature, express or implied, in connection with the transactions contemplated by this Agreement.

ARTICLE V

CONDUCT OF BUSINESS PENDING THE MERGER

SECTION 5.1  <u>Conduct of Business of the Company Pending the Merger</u>.  The Company covenants and agrees that, during the period from the date of this Agreement until the Effective Time, except as expressly contemplated by this Agreement or as required by Law, or unless Holdings shall otherwise consent in writing, the business of the Company and its subsidiaries shall only be conducted in its ordinary course of business consistent with past practice, and the Company shall use its commercially reasonable efforts to preserve substantially intact its and its subsidiaries' business organization, to keep available the services of its and its subsidiaries' current officers and employees, to preserve its and its subsidiaries' present relationships with customers, suppliers, distributors and other persons with which it has material business relations.  Without limiting the generality of the foregoing, between the date of this Agreement and the Effective Time, except as otherwise expressly contemplated by this

-29-

Agreement, as set forth in Section 5.1 of the Company Disclosure Schedule or as required by Law, neither the Company nor any of its subsidiaries shall, directly or indirectly, without the prior written consent of Holdings:

(a)  amend or otherwise change its Certificate of Incorporation or Bylaws or any similar governing instruments;

(b)  except for transactions solely between the Company and its wholly-owned subsidiaries, or between wholly-owned subsidiaries of the Company (other than such transactions that would be reasonably expected to result in a material increase in the net Tax liability of the Company and its subsidiaries, taken as a whole), issue, deliver, sell, pledge, dispose of, grant, award or encumber any shares of capital stock, ownership interests or voting securities, or any options, warrants, convertible securities or other rights of any kind to acquire or receive any shares of capital stock, any other ownership interests or any voting securities (including restricted stock units, stock appreciation rights, phantom stock or similar instruments), of the Company or any of its subsidiaries (except for (A) the issuance of Shares upon the exercise of Options or in respect of the settlement of Stock Units, in each case outstanding as of the date of this Agreement and as required by the terms of any Company Plan, or (B) issuances in accordance with the Rights Plan), or take any action to cause to be exercisable any otherwise unexercisable options outstanding as of the date of this Agreement;

(c)  declare, authorize, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock (except for (i) regular quarterly cash dividends on Company Common Stock in the ordinary course of business consistent with past practice with declaration, record and payment dates substantially the same as, but no earlier than, such dates for the comparable quarterly period in the fiscal year ended December 31, 2007, not to exceed, in the case of any such quarterly dividend, $0.335 per Share) or (ii) any dividend or distribution by a subsidiary of the Company to the Company or wholly-owned subsidiary of the Company); provided that no quarterly dividend shall be declared with respect to the fiscal quarter in which the Effective Time occurs unless the Effective Time will occur after the record date which would be the record date for such regularly quarterly dividend in the ordinary course of business consistent with past practice;

(d)  adjust, recapitalize, reclassify, combine, split, subdivide, redeem, purchase or otherwise acquire any shares of capital stock of the Company or any subsidiary that is not wholly-owned (other than the acquisition of Shares tendered by employees or former employees in connection with a cashless exercise of Options or in order to pay taxes, or for the Company to satisfy withholding obligations in respect of such taxes, in connection with the exercise of Options or the lapse of restrictions in respect of Restricted Stock or Stock Units, in each case pursuant to the terms of a Company Plan), or adjust, recapitalize, reclassify,

combine, split or subdivide any capital stock or other ownership interests of any of the Company's wholly-owned subsidiaries;

(e) (i) acquire (whether by merger, consolidation or acquisition of stock or assets or otherwise) any corporation, partnership or other business organization or division thereof or any assets if the aggregate amount of the consideration paid in connection with all such transactions, would exceed $50,000,000, other than purchases of inventory in the ordinary course of business consistent with past practice or pursuant to a Contract set forth on Section 5.1(e)(i) of the Company Disclosure Schedule, and for the avoidance of doubt, other than capital expenditure permitted pursuant to clause (iii) of this paragraph; (ii) sell, assign, transfer, lease, license or otherwise dispose of (whether by merger, consolidation or acquisition of stock or assets or otherwise) or mortgage or pledge, or suffer to exist any Lien on, any corporation, partnership or other business organization or division thereof or any other assets if the value of the assets included in any such transaction would exceed $25,000,000, or the aggregate value of the assets included in all such transactions would exceed $50,000,000, other than sales or dispositions of inventory in the ordinary course of business consistent with past practice; (iii) other than capital expenditures, in the aggregate, not to exceed $10,000,000, authorize or make any capital expenditures (A) during fiscal year 2008 in excess of the amount reflected in the Company's capital expenditure budget attached to Section 5.1(e)(iii) of the Company Disclosure Schedule or (B) during fiscal year 2009, or portion thereof, in excess of an amount equal to the portion of fiscal year 2009 that has elapsed multiplied by the amount of capital expenditures for fiscal year 2008 as reflected in the Company's capital expenditure budget attached to Section 5.1(e)(iii) of the Company Disclosure Schedule; or (iv) enter into any new line of business;

(f) make any loans, advances or capital contributions to, or investments in, any other person in excess of $15,000,000 in the aggregate, other than by the Company or any wholly-owned subsidiary of the Company to or in the Company or any wholly-owned subsidiary of the Company;

(g) (i) enter into, amend in any material respect, modify in any material respect, or terminate any Contract that is a Material Contract or would have been a Material Contract if it had been in effect on the date of this Agreement, other than in the ordinary course of business consistent with past practice, (ii) enter into, amend in any respect, modify in any respect or terminate or engage in any transactions with any executive officer or director of the Company, any person owning 5% or more of the Common Shares or Class B Common Shares or any relative of any such person or any entity directly or indirectly controlled by such person;

(h) incur or modify in any material respect the terms of any indebtedness for borrowed money, or assume, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any person, other than a

-31-

wholly-owned subsidiary of the Company and other than pursuant to the Company's existing commercial paper program so long as the borrowings outstanding under such program do not exceed $432,000,000 at any time;

(i)  except (i) as set forth in Section 5.1(i) of the Company Disclosure Schedule or (ii) to the extent required under any Company Plan as in effect on the date of this Agreement or as required by applicable law, (a) increase the compensation (including bonus opportunities) or fringe benefits of any of its directors, executive officers or employees (except in the ordinary course of business consistent with past practice with respect to employees who are not directors, executive officers or parties to a severance agreement with the Company), (b) grant any severance or termination pay, (c) enter into any employment, consulting, change-in-control or severance agreement or arrangement with any of its present or former directors, executive officers, or employees (except in the ordinary course of business consistent with past practice with respect to employees who are not directors, executive officers or parties to a severance agreement with the Company), (d) establish, adopt, enter into, freeze or amend in any material respect or terminate any Company Plan; (e) pay, accrue or certify performance level achievements at levels in excess of actually achieved performance in respect of any component of an incentive-based award, or take any affirmative action to amend or waive any performance or vesting criteria or accelerate vesting, exercisability, distribution, settlement or funding under any Company Plan; (f) take any action with respect to salary, compensation, benefits or other terms and conditions of employment that would result in the holder of a change in control or similar agreement having "good reason" to terminate employment and collect severance payments and benefits pursuant to such agreement; or (g) terminate the employment of any holder of a change in control or similar agreement other than for "cause" (within the meaning of such agreement);

(j)  make any material change in any accounting principles, except as may be required by changes in statutory or regulatory accounting rules or generally accepted accounting principles or regulatory requirements with respect thereto;

(k)  except as required by applicable law, (i) prepare or file any material Tax Return inconsistent with past practice or, on any such Tax Return, take any position, make any election, or adopt any method of accounting that is materially inconsistent with positions taken, elections made or methods of accounting used in preparing or filing similar Tax Returns in prior periods; (ii) enter into any settlement or compromise of any material Tax liability; (iii) file any material amended Tax Return; (iv) change any annual Tax accounting period; (v) enter into any closing agreement relating to any material amount of Taxes or consent to any material claim or audit relating to Taxes; or (vi) surrender any right to claim any material Tax refund;

(l)  subject to Section 6.16, settle or compromise any Action other than settlements or compromises of any matter where (x) the amount paid in settlement

-32-

or compromise of such matter, in each case, does not exceed $2,000,000 (less the amount reserved for such matters by the Company and any insurance coverage applicable thereto) and (y) such settlement or compromise only involves monetary relief;

(m)  release or permit the release of any person from, waive or permit the waiver of any right under, fail to enforce any provision of, or grant any consent or make any election under, any confidentiality, "standstill" or similar agreement to which the Company or any subsidiary thereof is a party or take any action to redeem the Company Rights or render the Company Rights inapplicable to an Acquisition Proposal or the transactions contemplated thereby or take any action to exempt any person other than Merger Sub and its affiliates from the restrictions on "business combinations" contained in Section 203 of the DGCL, except, in each case, to the extent the Board of Directors of the Company shall have determined in good faith, after consultation with its outside legal counsel, that failure to take such action would be inconsistent with its fiduciary duties under applicable law, but in such case only after providing Holdings with prior written notice of such determination;

(n)  fail to use reasonable best efforts to renew or maintain material existing insurance policies or comparable replacement policies, other than in the ordinary course of business consistent with past practice;

(o)  (i) adopt or enter into any plan of complete or partial liquidation or dissolution of the Company or (ii) adopt or enter into any plan of complete or partial liquidation or dissolution of any subsidiaries of the Company if, in the case of this clause (ii), such liquidation or dissolution would (A) cause any material amount of assets of any subsidiary of the Company to be held by any person other than the Company or any of the Company's wholly-owned subsidiaries or (B) be reasonably expected to result in a material increase in the net Tax liability of the Company and its subsidiaries, taken as a whole;

(p)  take any action that would, or would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impede the consummation of the Merger or the other transactions contemplated by this Agreement; or

(q)  agree to take (whether by Contract or otherwise) or authorize any of the actions described in Sections 5.1(a) through 5.1(p).

SECTION 5.2  <u>Conduct of Business of Holdings and Merger Sub Pending the Merger</u>.  Each of Holdings and Merger Sub agrees that, between the date of this Agreement and the Effective Time, it shall not, directly or indirectly, take any action (including requesting the Company to waive conditions to the Debt Tender Offers or make changes to the Debt Tender Offers contemplated by Section 6.11(a)), if the taking of such action would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impede the consummation of the Merger or the other transactions contemplated by this Agreement.

-33-

SECTION 5.3   No Control of Other Party's Business.  Nothing contained in this Agreement shall give Holdings, directly or indirectly, the right to control or direct the Company's or its subsidiaries' operations prior to the Effective Time, and nothing contained in this Agreement shall give the Company, directly or indirectly, the right to control or direct Holdings' or its subsidiaries' operations prior to the Effective Time.  Prior to the Effective Time, each of the Company and Holdings shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its subsidiaries' respective operations.

ARTICLE VI

ADDITIONAL AGREEMENTS

SECTION 6.1   Stockholders Meeting.  As soon as reasonably practicable following the date of this Agreement, the Company, acting through its Board of Directors, shall (a) take all action necessary to duly call, give notice of, convene and hold a meeting of its stockholders for the purpose of adopting this Agreement (the "Stockholders Meeting"), (b) include in the Proxy Statement (i) that the Board of Directors of the Company has determined that the Merger is in the best interests of the Company and the stockholders of the Company, and declared advisable this Agreement and the transactions contemplated by this Agreement (including the Merger), (ii) that the Board of Directors of the Company has approved this Agreement in accordance with the DGCL, (iii) that the Board of Directors of the Company recommends the adoption of this Agreement by the stockholders of the Company (such recommendation described in this clause (iii), the "Recommendation") (except to the extent that the Company has effected a Change of Recommendation in accordance with this Section 6.1) and (iv) subject to the consent of each of the Financial Advisors, as applicable, the written opinions of the Financial Advisors, dated as of the date of this Agreement, that, as of such date, the Merger Consideration is fair, from a financial point of view, to the holders of the Company Common Stock and (c) use its reasonable best efforts to obtain the Company Requisite Votes (except to the extent that the Company has effected a Change of Recommendation in accordance with this Section 6.1).  The Company will use reasonable best efforts to solicit from its stockholders proxies in favor of the adoption of this Agreement and will take all other action reasonably necessary or advisable to secure the Company Requisite Votes (except to the extent that the Company has effected a Change of Recommendation in accordance with this Section 6.1).  The Company shall keep Holdings and Merger Sub updated with respect to proxy solicitation results as reasonably requested by Holdings or Merger Sub.  Neither the Board of Directors of the Company nor any committee thereof shall, directly or indirectly, withdraw (or modify or qualify in a manner adverse to Holdings or Merger Sub), or publicly propose to withdraw (or modify or qualify in a manner adverse to Holdings or Merger Sub), the Recommendation (any such action being referred to as a "Change of Recommendation"); it being understood that any "stop, look and listen" or similar communication of the type contemplated by Rule 14d-9(f) of the Exchange Act shall not be deemed to be a Change of Recommendation); provided, that at any time prior to obtaining the Company Requisite Votes, the Board of Directors of the Company may effect a Change of Recommendation if (i) the Board of Directors shall have determined in good faith, after consultation with its outside legal counsel,

-34-

that such action is necessary in order for the Board of Directors to act in a manner consistent with its fiduciary duties under applicable law, and (ii) the Company has provided Holdings with at least three business days' prior written notice of such Change of Recommendation.  Notwithstanding anything to the contrary contained in this Agreement, unless this Agreement is terminated in accordance with Section 8.1, the obligation of the Company to call, give notice of, convene and hold the Stockholders Meeting as promptly as practicable after the date of this Agreement shall not be limited or otherwise affected by the commencement, disclosure, announcement or submission to it of any Acquisition Proposal or by a Change of Recommendation.

SECTION 6.2   Proxy Statement.  As soon as reasonably practicable following the date of this Agreement, the Company shall prepare and file with the SEC the Proxy Statement.  Holdings, Merger Sub and the Company will cooperate and consult with each other in the preparation of the Proxy Statement.  Without limiting the generality of the foregoing, each of Holdings and Merger Sub will furnish to the Company the information relating to it required by the Exchange Act and the rules and regulations promulgated thereunder to be set forth in the Proxy Statement.  The Company shall not file the preliminary Proxy Statement, or any amendment or supplement thereto, without providing Holdings a reasonable opportunity to review and comment thereon (which comments shall be reasonably considered by the Company).  The Company shall use its reasonable best efforts to resolve all SEC comments with respect to the Proxy Statement as promptly as practicable after receipt thereof and to cause the Proxy Statement in definitive form to be cleared by the SEC and mailed to the Company's stockholders as promptly as reasonably practicable following filing with the SEC.  The Company agrees to consult with Holdings prior to responding to SEC comments with respect to the preliminary Proxy Statement.  Each of Holdings, Merger Sub and the Company agree to correct any information provided by it for use in the Proxy Statement which shall have become false or misleading.  The Company shall as soon as reasonably practicable (i) notify Holdings of the receipt of any comments from the SEC with respect to the Proxy Statement and any request by the SEC for any amendment to the Proxy Statement or for additional information and (ii) provide Holdings with copies of all written correspondence between the Company and its Representatives, on the one hand, and the SEC, on the other hand, with respect to the Proxy Statement.

SECTION 6.3   Resignation of Directors.  At the Closing, the Company shall deliver to Holdings evidence reasonably satisfactory to Holdings of the resignation of all directors of the Company and, as specified by Holdings reasonably in advance of the Closing, all directors of each subsidiary of the Company, in each case, effective at the Effective Time.

SECTION 6.4   Access to Information; Confidentiality.

(a)        From the date of this Agreement to the Effective Time or the earlier termination of this Agreement, upon reasonable prior written notice, the Company shall, and shall cause its subsidiaries, officers, directors, employees and Representatives to, afford the officers, employees and Representatives of Holdings and its financing sources (and their Representatives) reasonable access, consistent with applicable law, at all reasonable times to its officers, employees, Representatives, properties, offices, and other facilities and to all books and

-35-

records, and shall furnish Holdings with all financial, operating and other data and information as Holdings, through its officers, employees or Representatives, may from time to time reasonably request in writing.  Notwithstanding the foregoing, any such investigation or consultation shall be conducted in such a manner as not to interfere unreasonably with the business or operations of the Company or its subsidiaries or otherwise result in any significant interference with the prompt and timely discharge by such employees of their normal duties.  Neither the Company nor any of its subsidiaries shall be required to provide access to or to disclose information where such access or disclosure would jeopardize the attorney-client privilege of the Company or its subsidiaries or contravene any Law or Order (it being agreed that the parties shall use their reasonable best efforts to cause such information to be provided in a manner that would not result in such jeopardy or contravention).

(b)       Each of Holdings and Merger Sub will hold and treat and will cause its officers, employees and Representatives to hold and treat in confidence all documents and information concerning the Company and its subsidiaries furnished to Holdings or Merger Sub or their affiliates in connection with the transactions contemplated by this Agreement in accordance with the Confidentiality Agreement, dated April 18, 2008, between the Company and Parent (the "Confidentiality Agreement") which Confidentiality Agreement shall remain in full force and effect in accordance with its terms.

SECTION 6.5   Acquisition Proposals.

(a)       The Company agrees that (i) it and its officers and directors shall not, (ii) its subsidiaries and its subsidiaries' officers and directors shall not and (iii) it shall use reasonable best efforts to ensure that its and its subsidiaries' investment bankers, attorneys, accountants, agents and other representatives ("Representatives") shall not, (A) directly or indirectly, initiate, solicit or knowingly encourage or facilitate any inquiries or the making of any proposal or offer with respect to (x) a tender offer or exchange offer, proposal for a merger, consolidation or other  business combination involving the Company and/or any of its material subsidiaries or (y) any proposal or offer to acquire in any manner an equity interest representing a 20% or greater economic or voting interest in the Company or any of its material subsidiaries or the assets, securities or other ownership interests of or in the Company or any of its subsidiaries representing 20% or more of the consolidated assets or net income of the Company and its subsidiaries, other than the transactions contemplated by this Agreement (any such proposal or offer being hereinafter referred to as an "Acquisition Proposal"), or (B) directly or indirectly, engage in any negotiations or discussions concerning, or provide access to its properties, books and records or any confidential information or data to, any person relating to an Acquisition Proposal.  The Company agrees that it will, and it will cause its subsidiaries and Representatives to, immediately cease and cause to be terminated any existing activities, discussions or negotiations with any persons conducted heretofore with respect to any Acquisition Proposal.  The Company shall (I) promptly (and in no event later than forty-eight (48) hours after receipt) notify Holdings in writing of the receipt of any Acquisition Proposal (or any request for information or other inquiry or request that could reasonably be expected to lead to an Acquisition Proposal) after the date of this Agreement, which notice shall include the identity of the person making such Acquisition Proposal and set forth in reasonable details the material terms and conditions thereof, (II) keep Holdings reasonably informed on a current basis

-36-

(and in any event within forty-eight (48) hours of the occurrence of any material changes, developments, discussions or negotiations, unless any such material changes, developments, discussions or negotiations are received by the Company in writing, then such time period shall be reduced to twenty-four (24) hours) of the status and details (including any change to the financial or other material terms thereof) of any such Acquisition Proposal, inquiry or request and (III) provide Holdings as soon as practicable (and in any event within 24 hours) after receipt thereof copies of any written Acquisition Proposal, inquiry or request (including any amendments, modifications or supplements thereto).  Notwithstanding the foregoing, nothing contained in this Agreement shall prevent the Company or its Board of Directors from: (i) taking and disclosing to its stockholders a position contemplated by Rule 14d-9 and Rule 14e-2(a) promulgated under the Exchange Act (or any similar communication to stockholders in connection with the making or amendment of a tender offer or exchange offer) or from making any legally required disclosure to stockholders with regard to an Acquisition Proposal (provided that neither the Company nor its Board of Directors may make any Change of Recommendation unless permitted by Section 6.1); (ii) prior to obtaining the Company Requisite Votes, providing access to its properties, books and records and providing information or data (provided that, to the extent not previously given to Holdings, such access, information or data is also given to Holdings promptly after providing access thereto to any person in accordance with this Section 6.5(a), unless providing such access, information or data to Holdings would reasonably be expected to make it more difficult in any material respect to obtain all requisite clearances, approvals and authorizations for the transactions contemplated by this Agreement under the HSR Act or other Antitrust Law) in response to a request therefor by a person who has made an unsolicited bona fide written Acquisition Proposal if the Board of Directors receives from the person so requesting such information an executed confidentiality agreement on terms no more favorable to such person than those contained in the Confidentiality Agreement (except for such changes specifically necessary in order for the Company to be able to comply with its obligations under this Agreement); (iii) prior to obtaining the Company Requisite Votes, contacting or engaging in any discussions with any person who has made an unsolicited bona fide written Acquisition Proposal solely for the purpose of clarifying such Acquisition Proposal and any material terms thereof and the conditions to consummation so as to determine whether such Acquisition Proposal would reasonably be expected to lead to a Superior Proposal; and (iv) prior to obtaining the Company Requisite Votes, contacting or engaging in any negotiations or discussions with any person who has made an unsolicited bona fide written Acquisition Proposal (which negotiations and discussions are not solely for clarification purposes), if and only to the extent that in connection with the foregoing clauses (ii) or (iv), (1) the Company has not breached its obligations under this Section 6.5(a), (2) the Board of Directors of the Company shall have determined in good faith, after consultation with its outside legal counsel and its financial advisors that, (x) such Acquisition Proposal constitutes, or would reasonably be expected to constitute or result in, a Superior Proposal, and (y) that the failure to take such action would be inconsistent with its fiduciary duties under applicable law and (3) prior to taking such action, the Company shall provide written notice to Holdings of such matter.  The Company shall not, and shall cause its subsidiaries not to, enter into any confidentiality or similar agreement with any person which prohibits the Company from providing to Holdings any of the information required to be provided to Holdings under this Section 6.5 within the time periods contemplated hereby.

-37-

(b)         Neither the Board of Directors of the Company nor any committee thereof shall (i) recommend, adopt or approve, or propose publicly to recommend, adopt or approve, any Acquisition Proposal or Acquisition Proposal Documentation (as defined below) or (ii) execute (or allow the Company or any of its subsidiaries to execute) any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement, option agreement, joint venture agreement, partnership agreement or other similar agreement constituting an Acquisition Proposal (other than a confidentiality agreement pursuant to Section 6.5(a)) (any such documentation, "Acquisition Proposal Documentation").  Notwithstanding the foregoing or any other provision of this Section 6.5 to the contrary, if, at any time prior to obtaining the Company Requisite Votes (but after the expiration of the Notice Period (as defined below)), the Company's Board of Directors determines, in response to an Acquisition Proposal that was unsolicited and that did not otherwise result from a breach of Section 6.5(a) in any material respect, that such Acquisition Proposal is a Superior Proposal (after giving effect to all of the adjustments to this Agreement which may be offered by Holdings prior to or during the Notice Period), (1) the Company may terminate this Agreement, (2) the Company's Board of Directors may approve or recommend such Superior Proposal to its stockholders (it being understood that any such approval or recommendation shall constitute a Change of Recommendation) and/or (3) immediately prior to or concurrently with the termination of this Agreement, the Company may enter into or execute any Acquisition Proposal Documentation with respect to such Superior Proposal; provided, however, that the Company may not terminate this Agreement pursuant to this Section 6.5(b), and any such termination shall be void and of no force or effect, unless the Company prior to or concurrently with such termination pays to Holdings the fee payable pursuant to Section 8.2(b); and provided, further, that the Company may not terminate this Agreement pursuant to this Section 6.5(b) unless (x) the Company has provided a written notice to Holdings (a "Notice of Superior Proposal") advising Holdings that the Company has received a Superior Proposal and specifying the identity of the person making such Superior Proposal and the material terms thereof, together with copies of any written offer or proposal in respect of such Superior Proposal (it being understood that neither the delivery of a Notice of Superior Proposal nor any subsequent public announcement thereof, in each case in and of itself, shall entitle Holdings to terminate this Agreement pursuant to Section 8.1(e)(ii)), and (y) Holdings does not, within four business days following its receipt of the Notice of Superior Proposal (the "Notice Period"), make an offer that, as determined by the Board of Directors of the Company, results in the applicable Acquisition Proposal no longer being a Superior Proposal (provided that, during the Notice Period, the Company shall, if so requested by Holdings, negotiate in good faith with Holdings with respect to any revised proposal from Holdings in respect of the terms of the transactions contemplated by this Agreement), it being further understood and agreed that any amendment to the financial terms or other material terms of such Superior Proposal shall require the delivery to Holdings of a new Notice of Superior Proposal and a new Notice Period.

(c)         For purposes of this Agreement, "Superior Proposal" shall mean any Acquisition Proposal for more than 80% of the outstanding equity interests in the Company or more than 80% of the consolidated assets of the Company and its subsidiaries, taken as a whole, on terms that the Board of Directors of the Company determined in good faith, after consultation with the Company's outside legal and financial advisors (taking into account such factors as the Board of Directors of the Company considers to be appropriate including the conditionality,

-38-

timing and likelihood of consummation of such Acquisition Proposal) are more favorable to the Company's stockholders from a financial point of view than the transactions contemplated by this Agreement.

(d)      Without limiting any other rights of Holdings under this Agreement, neither any Change of Recommendation nor any termination of this Agreement shall have any effect on any of the approvals or other actions referred to herein for the purpose of causing the Anti-Takeover Statutes to be inapplicable to this Agreement and the transactions contemplated hereby.

SECTION 6.6   Employment and Employee Benefits Matters.

(a)      The Surviving Corporation and each of its subsidiaries, for the period commencing at the Effective Time and ending on the second anniversary thereof, shall (i) maintain, for any employee of the Company or any of its subsidiaries (including but not limited to inactive employees on short-term disability or paid or unpaid leave of absence status, including medical family leave) who remains employed by the Surviving Corporation or one of its subsidiaries, for so long as such employee remains so employed following the Effective Time (each a "Continuing Employee"), annual base salary or wages and annual cash target bonus opportunities that are, in the aggregate, no less favorable than those in effect immediately prior to the Effective Time, (ii) maintain employee benefits (excluding equity-based programs) for Continuing Employees providing welfare and retirement benefits that are, in the aggregate, no less favorable than those provided to such Continuing Employees immediately prior to the Effective Time and (iii) establish a long-term cash incentive bonus program for the benefit of Continuing Employees who received equity-based awards under any of the Company Stock Plans, which shall provide such employees with a bonus opportunity that is designed to be no less favorable than the bonus opportunity provided to similarly situated employees of Parent or any of its subsidiaries; provided, however, subject to the foregoing, nothing herein shall prevent the amendment or termination of any Company Plan or interfere with the Surviving Corporation's or any Company subsidiary's right or obligation to make such changes as are necessary to conform with applicable law.

(b)      As of and after the Effective Time, the Surviving Corporation will give Continuing Employees full credit for purposes of eligibility to participate and vesting and benefit accruals, under any employee benefit plans maintained for the benefit of Continuing Employees as of and after the Effective Time by the Surviving Corporation (each, a "Surviving Corporation Plan") for the Continuing Employees' service with the Company, its subsidiaries and their predecessor entities to the same extent recognized by the Company in connection with the Company Plans immediately prior to the Effective Time (except to the extent this credit would result in a duplication of benefit accruals for the same period of service under any defined benefit pension plans).  With respect to each Surviving Corporation Plan that is a "welfare benefit plan" under Section 3(1) of ERISA which are made available to Continuing Employees in the plan year in which the Effective Time occurs, the Surviving Corporation or its subsidiaries shall (i) cause there to be waived any pre-existing condition or eligibility limitations and (ii) give effect, in determining any deductible and maximum out-of-pocket limitations, to claims incurred

-39-

and amounts paid by, and amounts reimbursed to, Company Employees under similar plans maintained by the Company and its subsidiaries immediately prior to the Effective Time.

(c)     The provisions of this Section 6.6 are solely for the benefit of the respective parties to this Agreement and nothing in this Section 6.6, express or implied, shall confer upon any Company Employee, or legal representative or beneficiary thereof, any rights or remedies, including any right to employment or continued employment for any specified period, or compensation or benefits of any nature or kind whatsoever under this Agreement. Nothing in this Section 6.6, expressed or implied, shall be construed to prevent the Surviving Corporation or any of its affiliates from terminating or modifying to any extent or in any respect any benefit plan that the Surviving Corporation or any of its affiliates may establish or maintain.

SECTION 6.7  Directors' and Officers' Indemnification and Insurance.

(a)     Without limiting any additional rights that any employee may have under any employment agreement or Company Plan, from the Effective Time through the sixth anniversary of the date on which the Effective Time occurs, Holdings and the Surviving Corporation shall, jointly and severally, indemnify and hold harmless each present (as of the Effective Time) and former officer or director of the Company and its subsidiaries in their capacity as such (the "Indemnified Parties"), against all claims, losses, liabilities, damages, judgments, inquiries, fines and reasonable fees, costs and expenses, including attorneys' fees and disbursements (collectively, "Costs"), incurred in connection with any Action, whether civil, criminal, administrative or investigative (including with respect to matters existing or occurring at or prior to the Effective Time (including this Agreement and the transactions and actions contemplated hereby)), arising out of or pertaining to the fact that the Indemnified Party is or was an officer, director, fiduciary or agent of the Company or any of its subsidiaries, whether asserted or claimed prior to, at or after the Effective Time, to the fullest extent permitted under applicable law. In the event of any such Action, (x) each Indemnified Party will be entitled to advancement of expenses incurred in the defense of any Action from Holdings or the Surviving Corporation within ten business days of receipt by Holdings from the Indemnified Party of a request therefor; provided that any person to whom expenses are advanced provides an undertaking, if and only to the extent required by the DGCL or the Company's Certificate of Incorporation or Bylaws, to repay such advances if it is ultimately determined that such person is not entitled to indemnification, (y) neither Holdings nor the Surviving Corporation shall settle, compromise or consent to the entry of any judgment in any proceeding or threatened Action (and in which indemnification could be sought by such Indemnified Party hereunder), unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all liability arising out of such Action or such Indemnified Party otherwise consents, and (z) the Surviving Corporation shall cooperate in the defense of any such matter.

(b)     The certificate of incorporation and bylaws of the Surviving Corporation shall contain provisions no less favorable with respect to indemnification, advancement of expenses and exculpation of former or present directors and officers than are presently set forth in the Company's Certificate of Incorporation and Bylaws, which provisions shall not be amended, repealed or otherwise modified for a period of six years from the Effective Time in any manner that would adversely affect the rights thereunder of any such individuals.

(c)      The Surviving Corporation shall maintain, at no expense to the beneficiaries, for a period of not less than six years after the Effective Time for the persons who, as of the date of this Agreement, are covered by the Company's directors' and officers' liability insurance policies, directors' and officers' liability insurance policies that provide coverage for events occurring at or prior to the Effective Time (the "D&O Insurance") that are no less favorable in both amount and terms and conditions of coverage than the existing policies of the Company (true and complete copies of which have previously been made available to Holdings) or, if substantially equivalent insurance coverage is unavailable, the best available coverage, in either case from insurance carriers with financial strength ratings equal to or greater than the financial strength ratings of the Company's existing directors' and officers' liability insurance carriers; provided, however, that, in lieu of the foregoing, the Company or the Surviving Corporation may, or if requested by Holdings, the Company shall, purchase a six-year "tail" coverage (provided that only the cost of the Side A coverage for Indemnified Parties where the existing policies also include coverage for the Company shall be taken into account for purposes of calculating the 300% threshold below) that is no less favorable in both amount and terms and conditions of coverage than the existing policies of the Company from insurance carriers with financial strength ratings equal to or greater than the financial strength ratings of the Company's existing directors' and officers' liability insurance carriers; provided further that in no event shall the Surviving Corporation be required to, and the Company shall not be permitted to, pay aggregate premiums for insurance under this Section 6.7(c) in excess of 300% of the amount of the aggregate premiums paid by the Company in respect of such coverage for its most recently completed fiscal year; provided, further, that if the aggregate premiums of such insurance coverage exceed such amount, the Surviving Corporation shall be obligated to obtain policies with the greatest coverage available for a cost not exceeding such amount.

(d)      Notwithstanding anything herein to the contrary, if any Action (whether arising before, at or after the Effective Time) is brought against any Indemnified Party on or prior to the sixth anniversary of the Effective Time, the provisions of this Section 6.7 shall continue in effect until the final disposition of such Action.

(e)      This covenant is intended to be for the benefit of, and shall be enforceable by, each of the Indemnified Parties and their respective heirs and legal representatives.  The indemnification provided for herein shall not be deemed exclusive of any other rights to which an Indemnified Party is entitled, whether pursuant to law, contract or otherwise.

(f)      In the event that the Surviving Corporation or Holdings or any of their respective successors or assigns (i) consolidates with or merges into any other person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers or conveys all or a majority of its assets and properties to any person, then, and in each such case, proper provision shall be made so that the successors and assigns of the Surviving Corporation or Holdings, as the case may be, shall succeed to the obligations set forth in this Section 6.7.  In addition, the Surviving Corporation shall not distribute, sell, transfer or otherwise dispose of any of its assets in a manner that would reasonably be expected to render the Surviving Corporation unable to satisfy its obligations under this Section 6.7.

SECTION 6.8   Further Action; Efforts.

-41-

(a)        Subject to the terms and conditions of this Agreement, each party will use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate the Merger and the other transactions contemplated by this Agreement and to cause the conditions to Closing to be satisfied as promptly as practicable.  In furtherance and not in limitation of the foregoing, each party hereto agrees to make an appropriate filing of a Notification and Report Form pursuant to the HSR Act and all Foreign Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and in any event prior to the expiration of any applicable legal deadline (provided that the filing of a Notification and Report Form pursuant to the HSR Act will be made within 20 business days of the date of this Agreement) and to supply as promptly as reasonably practicable any additional information and documentary material that may be requested pursuant to the HSR Act or any other Antitrust Law and to use its reasonable best efforts to cause the expiration or termination of the applicable waiting periods under the HSR Act and the receipt of the requisite clearances, approvals and authorizations under any other Antitrust Law.

(b)        Each of Holdings and Merger Sub, on the one hand, and the Company, on the other hand, shall, in connection with the efforts referenced in Section 6.8(a) to obtain all requisite clearances, approvals and authorizations for the transactions contemplated by this Agreement under the HSR Act or any other Antitrust Law, use its reasonable best efforts to (i) cooperate in all respects with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) keep the other party reasonably informed of any communication received by such party from, or given by such party to, the Federal Trade Commission (the "FTC"), the Antitrust Division of the Department of Justice (the "DOJ") or any other U.S. or foreign Governmental Entity and of any communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated hereby; and (iii) permit the other party to review any communication given by it to, and consult with each other in advance of any meeting or conference with, the FTC, the DOJ or any other Governmental Entity or, in connection with any proceeding by a private party, with any other person, and to the extent permitted by the FTC, the DOJ or such other applicable Governmental Entity or other person, give the other party the opportunity to attend and participate in such meetings and conferences.  For purposes of this Agreement, "Antitrust Law" means the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, as amended, the Federal Trade Commission Act, as amended, and all other federal, state and foreign, if any, Laws and Orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

(c)        In the event that any administrative or judicial action or proceeding is instituted (or threatened to be instituted) by a Governmental Entity or private party challenging the Merger or any other transaction contemplated by this Agreement, or any other agreement contemplated hereby, the Company shall cooperate in all respects with Holdings and Merger Sub and shall use its reasonable best efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed or overturned any Order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the transactions contemplated by this Agreement.  Notwithstanding anything in this Agreement

-42-

to the contrary, none of Holdings, Merger Sub or any of their affiliates shall be required to defend, contest or resist any action or proceeding, whether judicial or administrative, or to take any action to have vacated, lifted, reversed or overturned any Order, in connection with the transactions contemplated by this Agreement.

(d)     Notwithstanding anything in this Agreement to the contrary, none of Holdings, Merger Sub or any of their affiliates shall be required to, and the Company may not, without the prior written consent of Holdings, become subject to, consent to, or offer or agree to, or otherwise take any action with respect to, any requirement, condition, limitation, understanding, agreement or order to (i) sell, license, assign, transfer, divest, hold separate or otherwise dispose of any assets, business or portion of business of the Company, the Surviving Corporation, Holdings, Merger Sub or any of their respective affiliates, (ii) conduct, restrict, operate, invest or otherwise change the assets, business or portion of business of the Company, the Surviving Corporation, Holdings, Merger Sub or any of their respective affiliates in any manner, or (iii) impose any restriction, requirement or limitation on the operation of the business or portion of the business of the Company, the Surviving Corporation, Holdings, Merger Sub or any of their respective affiliates; provided that, if requested by Holdings, the Company will become subject to, consent to, or offer or agree to, or otherwise take any action with respect to, any such requirement, condition, limitation, understanding, agreement or order so long as such requirement, condition, limitation, understanding, agreement or order is only binding on the Company in the event the Closing occurs.

(e)     Notwithstanding the foregoing or any other provision of this Agreement, nothing in this Section 6.8 shall limit a party's right to terminate this Agreement pursuant to Section 8.1(b) so long as such party has, prior to such termination, complied in all material respects with its obligations under this Section 6.8.

SECTION 6.9    Public Announcements.    The initial press release with respect to this Agreement and the transactions contemplated hereby shall be a release mutually agreed to by the Company and Holdings.  Thereafter, each of the Company, Holdings and Merger Sub agrees that no public release or announcement concerning the transactions contemplated hereby shall be issued by any party without the prior written consent of the Company and Holdings (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by law or the rules or regulations of any applicable United States securities exchange or regulatory or governmental body to which the relevant party is subject, wherever situated, in which case the party required to make the release or announcement shall use its reasonable best efforts to provide the other party reasonable time to comment on such release or announcement in advance of such issuance.

SECTION 6.10    Financing.

(a)     (i)     Holdings shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and obtain the Financing on the terms and conditions described in the Financing Commitment Letters (or on revised terms no less favorable in any material respect to Holdings (as determined in the reasonable judgment of Holdings)) which terms do not contain any provisions which would reasonably be expected to prevent, materially delay or materially

-43-

impede the consummation of the Financing or the transactions contemplated by this Agreement, including using reasonable best efforts to (A) maintain in effect the Financing Commitment Letters, (B) satisfy on a timely basis all conditions applicable to Holdings and Merger Sub obtaining the Debt Financing that are within their control, (C) negotiate definitive agreements with respect thereto on the terms and conditions contained in the Financing Commitment Letters (including any "flex" provisions) and (D) consummate the Financing at or prior to the Closing; provided that in no circumstance shall Holdings, Merger Sub or any of their affiliates be required to commence litigation or bring any other Action against the lenders and other persons providing Financing to seek to enforce Holdings', Merger Sub's or any of their affiliates' rights under the Financing Commitment Letters or otherwise. Holdings shall not, and shall not permit Merger Sub to, agree to or permit any amendment, replacements, supplement or other modification of, or waive any of its material rights under, any Financing Commitment Letters or any definitive agreements related to the Financing Commitment Letters (including any and all fee letters), in each case, without the Company's prior written consent (which consent shall not be unreasonably withheld or delayed), except any such amendment, replacement, supplement or other modification to or waiver of any provision of the Financing Commitment Letters or any definitive agreements relating thereto, including any and all fee letters, that amends the Financing in a manner that would not reasonably be expected to prevent, materially delay or materially impede the consummation of the Financing or the transactions contemplated by this Agreement; and provided that, for the avoidance of doubt, Holdings and Merger Sub may replace and amend the Debt Financing Commitment Letters to add lenders, lead arrangers, book runners, syndication agents or similar entities who had not executed Debt Financing Commitment Letters as of the date of this Agreement so long as any such addition would not reasonably be expected to prevent, materially hinder or materially delay the consummation of the Debt Financing or the transactions contemplated by this Agreement. Upon any such amendment, replacement, supplement or modification of any of the Financing Commitment Letters in accordance with this Section 6.10(a), the term "Financing Commitment Letters" shall mean the Financing Commitment Letters as so amended, replaced, supplemented or modified in accordance with this Section 6.10(a) and, in the event that Holdings or Merger Sub obtains Alternative Financing in accordance with this Section 6.10(a), the term "Financing Commitment Letters" shall mean the commitment letter or letters (as amended, replaced, supplemented or modified in accordance with this Section 6.10(a)) related to the Alternative Financing.

       (ii)       In the event all or any portion of the Debt Financing becomes unavailable on the terms and conditions described in or contemplated by the Debt Financing Commitment Letters for any reason, Holdings shall use its reasonable best efforts to arrange to obtain, as promptly as practicable following the occurrence of such event but no later than the final day of the Marketing Period, alternative financing from alternative sources (the "Alternative Financing") in an amount sufficient to consummate the transactions contemplated by this Agreement which would not involve terms that are less favorable in any material respect to Holdings (as determined in the reasonable judgment of Holdings) and which would not contain any provisions which would reasonably be expected to prevent, materially delay or materially impede the consummation of the Financing or the transactions contemplated by this Agreement. In the event that Alternative Financing shall be obtained pursuant to this Section 6.10(a)(ii), Holdings shall comply with its covenants in Section 6.10(a)(i) with respect to such Alternative Financing. For purposes of this Agreement, "Marketing Period" shall mean the first period of 30

-44-

consecutive days throughout and at the end of which (A) Holdings shall have (and its financing sources shall have access to) the Required Information that the Company is required to provide to Holdings pursuant to Section 6.10(b), (B) the conditions set forth in Section 7.1 shall be satisfied or, solely in the event that the Marketing Period has not commenced prior to March 30, 2009, then only the condition set forth in Section 7.1(a) need be satisfied throughout such 30 consecutive days (it being understood that all of the conditions set forth in Section 7.l shall nevertheless be required to be satisfied at the end of such 30 consecutive day period) and (C) nothing has occurred and no condition exists that would cause any of the conditions set forth in Section 7.2(a), 7.2(b) or 7.2(c) to fail to be satisfied assuming the Closing were to be scheduled for any time during such 30 consecutive day period; provided that (i) if the Marketing Period has not ended on or prior to August 14, 2008, the Marketing Period shall commence no earlier than September 2, 2008, (ii) if the Marketing Period has not ended on or prior to December 16, 2008, the Marketing Period shall commence no earlier than January 3, 2009 and (iii) the Marketing Period shall not be deemed to have commenced if Ernst & Young LLP shall have withdrawn its audit opinion with respect to any financial statements contained in the Filed SEC Reports unless and until a new unqualified audit opinion is issued with respect to the consolidated financial statements for the applicable periods by Ernst & Young LLP or another independent registered accounting firm reasonably acceptable to Holdings.

(iii)     Holdings shall give the Company prompt written notice of any material breach by any party of any of the Financing Commitment Letters (or commitments for any Alternative Financing obtained in accordance with this Section 6.10(a)) of which Holdings becomes aware or any termination of any of the Financing Commitment Letters (or commitments for any Alternative Financing obtained in accordance with this Section 6.10(a)).  Holdings shall keep the Company informed on a reasonably current basis in reasonable detail of the status of its efforts to arrange and consummate the Financing (or Alternative Financing obtained in accordance with this Section 6.10(a)).

(b)     Prior to the Closing, the Company shall provide to Holdings and Merger Sub, and shall cause its subsidiaries to, and shall use its reasonable best efforts to cause the respective officers, employees and Representatives of the Company and its subsidiaries to, provide to Holdings and Merger Sub all cooperation reasonably requested by Holdings that is necessary or reasonably required in connection with the Financing, including the following: (i) using reasonable best efforts to cause the Company's senior officers and other Representatives to participate in meetings, presentations, road shows, due diligence sessions (including accounting due diligence sessions), drafting sessions and sessions with rating agencies; (ii) assisting with the preparation of appropriate and customary materials for rating agency presentations, offering documents, bank information memoranda (including the delivery of customary representation letters as contemplated by the Senior Debt Commitment Letter) and similar documents reasonably required in connection with the Financing; (iii) using its reasonable best efforts to assist with the preparation of any pledge and security documents, any loan agreement, currency or interest hedging agreement, other definitive financing documents on terms satisfactory to Holdings, or other certificates, legal opinions or documents as may be reasonably requested by Holdings (including a certificate from the person who will be the Chief Financial Officer of the Surviving Corporation that the Surviving Corporation and its subsidiaries, on a consolidated basis, will be solvent as of the Closing (after giving effect to the Debt Financing and the other

-45-

transactions contemplated by this Agreement)), provided that no obligation of the Company or any of its subsidiaries under any such document or agreement shall be effective until the Effective Time; (iv) using reasonable best efforts to facilitate the pledging of collateral, provided that no pledge shall be effective until the Effective Time; (v) using reasonable best efforts to furnish on a confidential basis to Holdings and Merger Sub and their financing sources, as promptly as practicable, with financial and other pertinent information regarding the Company as may be reasonably requested by Holdings, including all financial statements and other financial data required by the Debt Financing Commitment Letters (the "Required Information"); (vi) providing monthly financial statements (excluding footnotes) to the extent the Company customarily prepares such financial statements within the time such statements are customarily prepared; and (vii) using reasonable best efforts to cause its independent accountants to cooperate with and assist Holdings in preparing customary and appropriate information packages and offering materials as the parties to the Debt Financing Commitment Letters may reasonably request for use in connection with the offering and/or syndication of debt securities, loan participations and other matters contemplated by the Debt Financing Commitment Letters; provided that nothing in this Agreement shall require such cooperation to the extent it would, in the Company's reasonable judgment, interfere unreasonably with the business or operations of the Company or any of its subsidiaries; provided further that notwithstanding anything in this Agreement to the contrary, until the Effective Time occurs, neither the Company nor any of its subsidiaries shall (1) be required to pay any commitment or other similar fee, (2) have any liability or obligation under any loan agreement or any related document or any other agreement or document related to the Financing (or Alternative Financing) or (3) be required to incur any other liability in connection with the Financing contemplated by the Financing Commitment Letters (or any Alternative Financing).  Parent shall, promptly upon written request by the Company, reimburse the Company for all reasonable and documented out-of-pocket costs to the extent such costs are incurred by the Company or its subsidiaries in connection with such cooperation provided by the Company, its subsidiaries, their respective officers, employees and other Representatives pursuant to the terms of this Section 6.10(b) or in connection with compliance with its obligations under this Section 6.10(b) and Parent shall indemnify and hold harmless the Company and its subsidiaries and their respective officers, employees and Representatives from and against any and all liabilities or losses suffered or incurred by them in connection with the arrangement of the Financing and any information utilized in connection therewith (other than arising from information provided by the Company or its subsidiaries), except in the event such liabilities or losses arose out of or result from the willful misconduct of the Company, any of its subsidiaries or any of their respective Representatives.  The Company hereby consents to the use of its and its subsidiaries' logos in connection with the Debt Financing; provided that such logos are used solely in a manner that is not intended or reasonably likely to harm or disparage the Company or any of its subsidiaries or the reputation or goodwill of the Company or any of its subsidiaries and its or their marks.

SECTION 6.11   Debt Tender Offers.

(a)       As soon as reasonably practicable after the receipt of any written request by Holdings to do so, the Company shall use its reasonable best efforts to commence offers to purchase any or all of the outstanding aggregate amount and all other amounts due of either or both series of the Notes, on such terms and conditions, including pricing terms, that are

-46-

specified, from time to time, by Holdings (each a "Debt Tender Offer" and collectively, the "Debt Tender Offers") and Holdings shall assist the Company in connection therewith; provided that the Company's counsel shall provide normal and customary legal opinions (excluding with respect to federal securities laws) required in connection with the Debt Tender Offers.  Notwithstanding the foregoing, the closing of the Debt Tender Offers shall be conditioned on the occurrence of the Closing, and the parties shall use their reasonable best efforts to cause the Debt Tender Offers to close on the Closing Date.  Subject to the preceding sentence, the Company shall provide, and shall cause its subsidiaries to, and shall use its reasonable best efforts to cause their respective Representatives to, provide all cooperation reasonably requested by Holdings in connection with the Debt Tender Offers.  The Company (i) shall waive any of the conditions to the Debt Tender Offers (other than the occurrence of the Closing) and make any change to the Debt Tender Offers, in each case, as may be reasonably requested by Holdings and (ii) shall not, without the written consent of Holdings, waive any condition to the Debt Tender Offers or make any changes to the Debt Tender Offers.  Holdings shall ensure that at the Effective Time the Surviving Corporation has all funds necessary to pay for the Notes that have been properly tendered and not withdrawn pursuant to the Debt Tender Offers.

(b)       The dealer manager, solicitation agent, information agent, depositary or other agent retained in connection with the Debt Tender Offers shall be selected by Holdings.  The Company shall enter into customary agreements (including indemnities) with such parties so selected and on terms and conditions acceptable to Holdings.

(c)       With respect to any series of Notes, if requested by Holdings in writing on a timely basis, in lieu of commencing a Debt Tender Offer for such series (or in addition thereto), the Company shall, to the extent permitted by the Indenture governing such series of Notes, (A) issue a notice of redemption providing for the redemption on a date agreed with Holdings not more than 30 days after the delivery of such notice of redemption (or such later time required by the Indenture) for all of the outstanding aggregate principal amount of Notes of such series pursuant to the requisite provisions of the Indenture, and/or (B) take any actions reasonably requested by Holdings that are reasonably necessary to facilitate the defeasance, satisfaction and/or discharge of such series pursuant to the applicable section of the Indenture, and shall redeem, defease or satisfy and/or discharge, as applicable, such series in accordance with the terms of the Indenture at the Effective Time; provided, that the Company's counsel shall provide such legal opinions as may be reasonably requested in connection with any such redemption or satisfaction and discharge.  Holdings shall ensure that at the Effective Time the Surviving Corporation has all funds necessary in connection with any such redemption or satisfaction and discharge.

(d)       Parent shall, promptly upon written request by the Company, reimburse the Company for all reasonable and documented out-of-pocket costs to the extent such costs are incurred by the Company or its subsidiaries in connection with it complying with its obligations under this Section 6.11, and Parent shall indemnify and hold harmless the Company and its subsidiaries and Representatives from and against any and all liabilities or losses suffered or incurred by them to the extent such liabilities or losses arose out of the actions taken by the Company pursuant to this Section 6.11 (other than arising from information provided by the Company or its subsidiaries), except in the event such liabilities or losses arose out of or result

-47-

from the willful misconduct of the Company, any of its subsidiaries or any of their respective Representatives.

SECTION 6.12   Notification of Certain Matters.  The Company shall give prompt written notice to Holdings, and Holdings shall give prompt written notice to the Company, upon obtaining knowledge of (i) any notice or other communication received by such party from any Governmental Entity in connection with this Agreement, the Merger or the transactions contemplated hereby, or from any person alleging that the consent of such person is or may be required in connection with the Merger or the transactions contemplated hereby, (ii) any Actions commenced or, to such party's knowledge, threatened against, relating to or involving or otherwise affecting such party or any of its subsidiaries which relate to this Agreement, the Merger or the transactions contemplated hereby, and (iii) any fact, event or circumstance known to it that (a) in the case of the Company, individually or taken together with all other facts, events and circumstances known to it, has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (b) would cause or constitute, or would reasonably be expected to cause or constitute, a breach in any material respect of any of such person's representations, warranties, covenants or agreements contained herein, (c) would cause, or would reasonably be expected to cause, the failure of any condition precedent to Holdings' or the Company's obligations under this Agreement or (d) would reasonably be expected to prevent, materially delay or materially impede the consummation of the transactions contemplated hereby; provided, however, that (x) the delivery of any notice pursuant to this Section 6.12 shall not limit or otherwise affect any remedies available to Holdings or the Company, as applicable, or prevent or cure any misrepresentations, breach of warranty or breach of covenant or the conditions to the obligations of the parties under this Agreement, and (y) disclosure by the Company or Holdings shall not be deemed to amend or supplement the Company Disclosure Schedule or the Holdings Disclosure Schedule, as applicable, or constitute an exception to any representation or warranty.  This Section 6.12 shall not constitute a covenant or agreement for purposes of Section 7.2(b) or Section 7.3(b).

SECTION 6.13   Section 16 Matters.  Prior to the Effective Time, the Company will take all such steps as may be required to cause to be exempt under Rule 16b-3 promulgated under the Exchange Act any dispositions of Shares (including derivative securities with respect to Shares) that are treated as dispositions under such rule and result from the transactions contemplated by this Agreement by each director or officer of the Company who is subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to the Company.

SECTION 6.14   Filings.  Until the Effective Time, the Company will timely file with the SEC each form, report and document required to be filed by the Company under the Exchange Act and will promptly make available to Holdings copies of each such report filed with the SEC.  As of their respective dates, none of such reports shall contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The audited consolidated financial statements and unaudited interim financial statements of the Company included in such reports shall be prepared in accordance with generally accepted accounting principles applied on a consistent basis (except to the extent indicated in the notes thereto) and shall fairly present, in all material respects, the financial

-48-

position of the Company and its subsidiaries as at the dates thereof and the results of their operations and changes in financial position for the periods then ended in accordance with generally accepted accounting principles.

SECTION 6.15  Anti-Takeover Statute.  If any Anti-Takeover Statute is or may become applicable to this Agreement (including the Merger and the other transactions contemplated hereby), each of the Company, Holdings and Merger Sub and their respective Boards of Directors shall grant all such approvals and take all such actions as are necessary so that such transactions may be consummated as promptly as practicable hereafter on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of such statute or regulation on such transactions.

SECTION 6.16  Stockholder Litigation.  The Company shall give Holdings the opportunity to participate in, but not control, the defense or settlement of any stockholder litigation against the Company and/or any of its directors or officers relating to this Agreement, the Merger or any of the transactions contemplated hereby, and no such settlement of any stockholder litigation shall be agreed to without Holdings' prior written consent (which shall not be unreasonably withheld or delayed).

SECTION 6.17  Name; Headquarters.

(a)  Following the Effective Time, the name of the Surviving Corporation shall remain Wm. Wrigley Jr. Company.

(b)  Following the Effective Time, Parent intends to combine its operations and business associated with the manufacture, marketing and distribution of the Skittles® and Starburst® product lines with and into the Surviving Corporation.  The Surviving Corporation, as so constituted, will conduct its business and operations as a separate, stand-alone business unit operating under Parent.

(c)  Following the Effective Time, the current Executive Chairman of the Company shall be designated the Executive Chairman (and senior most executive officer) of the Surviving Corporation, reporting directly to the chief executive officer of Parent, and with responsibility for the business and operations of the Surviving Corporation.

(d)  Following the Effective Time, the Surviving Corporation shall continue with civic and charitable activities and contributions that, in the aggregate, are at the level and of the general nature consistent with past practice of the Company.

(e)  In connection with the public announcement of the transactions contemplated by this Agreement, the Company and Holdings will publicly disclose the matters set forth in this Section 6.17.

ARTICLE VII

CONDITIONS OF MERGER

SECTION 7.1   Conditions to Obligation of the Company, Holdings and Merger Sub to Effect the Merger.  The respective obligations of the Company, Holdings and Merger Sub to effect the Merger shall be subject to the satisfaction or waiver at or prior to the Effective Time of the following conditions:

(a)         this Agreement shall have been adopted by the stockholders of the Company by the Company Requisite Votes;

(b)         no federal, state, local or foreign Law or Order (whether temporary, preliminary or permanent) shall have been enacted, entered, promulgated or enforced by any Governmental Entity which prohibits, restrains or enjoins the consummation of the Merger; provided, however, that prior to invoking this condition each party agrees to comply with Section 6.8; and

(c)         (i) the waiting period (and any extension thereof) applicable to the Merger under the HSR Act shall have been terminated or expired, (ii) all required approvals by the European Commission applicable to the Merger under applicable Law shall have been obtained or any applicable waiting period thereunder shall have been terminated or expired and (iii) all required approvals under any Antitrust Laws applicable to the Merger in the jurisdictions listed on Section 7.1(c) of the Company Disclosure Schedule shall have been obtained or any applicable waiting period thereunder shall have been terminated or expired.

SECTION 7.2   Conditions to Obligations of Holdings and Merger Sub.  The obligations of Holdings and Merger Sub to effect the Merger shall be further subject to the satisfaction or waiver at or prior to the Effective Time of the following conditions:

(a)         (i) the representations and warranties of the Company set forth in Section Section 3.4 and Section 3.8(a) shall be true and correct in all respects as of the Effective Time as though made on and as of such time, (ii) the representations and warranties of the Company set forth in Section 3.3(a) (except for decreases and except for increases of not more than 0.01% in the number of the Company's outstanding Shares (including Shares issuable upon exercise of Options) disclosed in Section 3.3(a)) shall be true and correct as of the Effective Time as though made on and as of such time and (iii) the representations and warranties of the Company set forth in this Agreement, other than those specified in the foregoing clauses (i) and (ii), shall be true and correct as of the Effective Time as though made on and as of such date except where the failure of any such representations and warranties to be so true and correct (without giving effect to any "materiality" or "Material Adverse Effect" or similar qualifiers set forth therein), individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided that, for the purposes of clauses (i), (ii) and (iii), any representation or warranty of the Company set forth in this Agreement that is made only as of a specified date shall be required to be true and correct (subject to the standard specified in clause (i), (ii) or (iii), as applicable) only as of such date;

-50-

(b)      the Company shall have performed in all material respects the obligations, and complied in all material respects with the agreements and covenants, required to be performed by, or complied with by, it under this Agreement at or prior to the Effective Time;

(c)      Holdings shall have received a certificate of the Executive Chairman, Chief Executive Officer or the Chief Financial Officer of the Company, certifying that the conditions set forth in Sections 7.2(a) and (b) have been satisfied; and

(d)      all required approvals under any Antitrust Laws applicable to the Merger in the jurisdictions listed on Section 7.2(d) of the Holdings Disclosure Schedule shall have been obtained or any applicable waiting period thereunder shall have been terminated or expired.

SECTION 7.3   Conditions to Obligations of the Company.  The obligation of the Company to effect the Merger shall be further subject to the satisfaction or waiver at or prior to the Effective Time of the following conditions:

(a)      the representations and warranties of Holdings and Merger Sub set forth in Section 4.2 shall be true and correct in all respects as of the Effective Time as though made on and as of such time and (ii) the representations and warranties of Holdings and Merger Sub set forth in this Agreement (other than Section 4.2) shall be true and correct as of the Effective Time as though made on and as of such date except where the failure of any such representations and warranties to be so true and correct (without giving effect to any "materiality" or "Material Adverse Effect" or similar qualifiers set forth therein), individually or in the aggregate, does not, and would not reasonably be expected to, prevent, materially delay or materially impede the consummation of the transactions contemplated hereby;

(b)      each of Holdings and Merger Sub shall have performed in all material respects the obligations, and complied in all material respects with the agreements and covenants, required to be performed by or complied with by it under this Agreement at or prior to the Effective Time; and

(c)      the Company shall have received a certificate of a senior executive officer of each of Holdings and Merger Sub, certifying that the conditions set forth in Sections 7.3(a) and (b) have been satisfied.

ARTICLE VIII

TERMINATION, AMENDMENT AND WAIVER

SECTION 8.1   Termination.  This Agreement may be terminated and the Merger contemplated hereby may be abandoned at any time prior to the Effective Time, notwithstanding approval thereof by the stockholders of the Company:

(a)      by mutual written consent of Holdings, Merger Sub and the Company;

-51-

(b)        by Holdings or the Company if any Governmental Entity shall have issued a final order, decree or ruling or taken any other final action restraining, enjoining or otherwise prohibiting the Merger and such order, decree, ruling or other action is or shall have become final and nonappealable;

(c)        by either Holdings or the Company if the Effective Time shall not have occurred on or before April 30, 2009 (the "Termination Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 8.1(c) shall not be available to the party seeking to terminate if any action of such party or the failure of such party to perform any of its obligations under this Agreement required to be performed at or prior to the Effective Time has been the cause of, or resulted in, the failure of the Effective Time to occur on or before the Termination Date and such action or failure to perform constitutes a breach of this Agreement;

(d)        by the Company:

(i)        if there shall have been a breach of any representation, warranty, covenant or agreement on the part of Holdings or Merger Sub contained in this Agreement such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied and, in either such case, such breach is incapable of being cured by the Termination Date; provided that the Company shall have given Holdings at least 30 days written notice prior to such termination stating the Company's intention to terminate this Agreement pursuant to this Section 8.1(d)(i); and provided further that the Company shall not have the right to terminate this Agreement pursuant to this Section 8.1(d)(i) if the Company is then in material breach of any of its covenants or agreements contained in this Agreement;

(ii)        if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than those conditions that by their terms are to be satisfied at the Closing but which conditions would be satisfied if the Closing Date were the date of such termination) and Holdings has failed to consummate the Merger on or prior to the final day of the Marketing Period;

(iii)        prior to obtaining the Company Requisite Votes, pursuant to (and subject to the terms and conditions of) Section 6.5(b);

(e)        by Holdings:

(i)        if there shall have been a breach of any representation, warranty, covenant or agreement on the part of the Company contained in this Agreement such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied and, in either such case, such breach is incapable of being cured by the Termination Date; provided that Holdings shall have given the Company at least 30 days written notice prior to such termination stating Holdings' intention to terminate this Agreement pursuant to this Section 8.1(e)(i); provided, further that Holdings shall not have the right to terminate this Agreement pursuant to this Section 8.1(e)(i) if Holdings or Merger Sub is then in material breach of any of its covenants or agreements contained in this Agreement; or

(ii)        if the Board of Directors of the Company or any committee thereof (A) shall have made a Change of Recommendation or (B) shall have recommended, adopted or approved, or proposed publicly to recommend, adopt or approve, any Acquisition Proposal or Acquisition Proposal Documentation; or

(f)        by either Holdings or the Company if, upon a vote taken thereon at the Stockholders Meeting or any postponement or adjournment thereof, this Agreement shall not have been adopted by the Company Requisite Votes.

SECTION 8.2    Effect of Termination.

(a)        In the event of the termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of any party hereto, except with respect to Section 6.4(b), the penultimate sentence of Section 6.10(b), Section 6.11(d), this Section 8.2, Section 8.3, Section 8.4, Section 8.5 and Article IX, which shall survive such termination; provided, however, that, subject to Section 8.2(c)(ii), Section 8.2(c)(iii) and Section 9.11, nothing herein shall relieve any party from liability for any willful and material breach of any of its obligations under this Agreement or fraud.

(b)        Company Termination Fee.

(i)        In the event that this Agreement is terminated by the Company pursuant to Section 8.1 (d)(iii) or by Holdings pursuant to Section 8.1(e)(ii), then the Company shall pay $690,000,000 (the "Company Termination Fee") to, or as directed by, Holdings, at or prior to the termination in the case of a termination pursuant to Section 8.1(d)(iii) or  as promptly as reasonably practicable (and, in any event, within two business days following such termination)  in the case of a termination pursuant to Section 8.1(e)(ii), by wire transfer of same day funds; and

(ii)        In the event that this Agreement is terminated by either Holdings or the Company pursuant to Section 8.1(c) or Section 8.1(f) or by Holdings pursuant to Section 8.1(e)(i) and (A) at any time after the date of this Agreement and prior to such termination (in the case of a termination pursuant to Section 8.1(c)), or prior to the breach giving rise to Holdings' right to terminate under Section 8.1(e)(i) (in the case of a termination pursuant to Section 8.1(e)(i)) or prior to the taking of a vote to adopt this Agreement at the Stockholders Meeting or any postponement or adjournment thereof (in the case of a termination pursuant to Section 8.1(f)), an Acquisition Proposal shall have been made or communicated to the senior management or the Board of Directors of the Company or shall have been publicly announced or publicly made known to the stockholders of the Company and shall not have been withdrawn prior to such termination (in the case of a termination pursuant to Section 8.1(c)), prior to the breach giving rise to Holdings' right to terminate under Section 8.1(e)(i) (in the case of a termination pursuant to Section 8.1(e)(i)) or prior to the taking of a vote to adopt this Agreement at the Stockholders Meeting or any postponement or adjournment thereof (in the case of a termination pursuant to Section 8.1(f)), and (B) within twelve months after such termination, the Company shall have entered into a definitive agreement with

respect to any Acquisition Proposal, or any Acquisition Proposal shall have been consummated (in each case, whether or not such Acquisition Proposal is the same as the original Acquisition Proposal made, communicated, publicly made known or publicly announced), then, in any such event, the Company shall pay to, or as directed by, Holdings the Company Termination Fee, such payment to be made upon the earlier of the Company entering into an agreement providing for such Acquisition Proposal or the consummation of such Acquisition Proposal, by wire transfer of same day funds.  For the purpose of this Section 8.2(b), all references in the term Acquisition Proposal to "20% or more" or "20% or greater" will be deemed to be references to "more than 50%".  In no event shall Holdings be entitled to receive the Company Termination Fee on more than one occasion.

   (c)   <u>Reverse Termination Fee</u>.

     (i)   In the event that this Agreement is terminated:

       (A)   by the Company pursuant to Section 8.1(d)(i) (if at the time of such termination there is no state of facts or circumstances (other than a state of facts or circumstances caused by or arising out of a breach of Holdings' and Merger Sub's representations, warranties, covenants or other agreements set forth in this Agreement) that would reasonably be expected to cause the conditions set forth in Section 7.1 and Section 7.2 not to be satisfied on or prior to the Termination Date);

       (B)   by the Company pursuant to Section 8.1(d)(ii); or

       (C)   by the Company or Holdings pursuant to (x) Section 8.1(c) for the failure to satisfy the conditions set forth in Section 7.1(b), Section 7.1(c) or Section 7.2(d) (subject to the right of Holdings to waive the condition set forth in Section 7.2(d)) due to the failure to receive any required consent or clearance under applicable Antitrust Laws from a Governmental Entity of competent jurisdiction or any action by any Governmental Entity of competent jurisdiction to prevent the Merger for antitrust reasons or (y) Section 8.1(b) due to the denial of any approval required under applicable Antitrust Laws or the taking of any other action by any antitrust or competition Governmental Entity of competent jurisdiction if, in each of clauses (x) and (y), at the time of such termination all other conditions to Closing set forth in Sections 7.1 and 7.2 (other than those conditions that by their terms are to be satisfied at the Closing but which conditions would be satisfied if the Closing Date were the date of such termination) have been satisfied,

-54-

then in the case of a termination under the circumstances described in clauses (A), (B) or (C) above, Parent shall pay $1,000,000,000 (the "<u>Reverse Termination Fee</u>") to, or as directed by, the Company, as promptly as reasonably practicable (and, in any event, within two business days following such termination) by wire transfer of same day funds. In no event shall the Company be entitled to the Reverse Termination Fee on more than one occasion.

      (ii)     The Company's right to receive payment of the Reverse Termination Fee from Parent shall be the sole and exclusive remedy of the Company and its affiliates against Parent, Holdings, Merger Sub or any of their respective former, current or future directors, officers, employees, agents, stockholders, representatives, affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, representative, affiliate or assignee of any of the foregoing (collectively, the "<u>Related Persons</u>") for any loss or damage suffered as a result of the failure of the Merger to be consummated or for a breach or failure to perform under this Agreement or otherwise and upon payment of such amount, none of Parent, Holdings, Merger Sub or any of their respective Related Persons shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated by this Agreement (except that Holdings shall also be obligated with respect to Section 6.4(b) and Parent shall also be obligated with respect to the penultimate sentence of Section 6.10(b), Section 6.11(d) and the second sentence of Section 8.2(d)).

      (iii)     Notwithstanding anything herein to the contrary, the Company agrees that, to the extent it has incurred losses or damages in connection with this Agreement, (i) the maximum aggregate liability of Parent, Holdings and Merger Sub for such losses or damages shall not exceed the Liability Limitation (as defined below), <u>provided</u> that the sole obligations of Parent under and in respect of this Agreement and the transactions contemplated hereby shall be limited to the express payment and/or indemnification obligations of Parent to (A) pay the Reverse Termination Fee, if required, from Parent pursuant to Section 8.2(c)(i), (B) reimburse amounts or provide indemnification pursuant to the penultimate sentence of Section 6.10(b) or Section 6.11(d) and (C) reimburse amounts due from Parent pursuant to the second sentence of Section 8.2(d) (such payment and indemnification obligations, collectively, the "<u>Parent Obligations</u>"), (ii) in no event shall the Company or any of its affiliates seek to recover any money damages or any other recovery, judgment or damages of any kind, including rescissory, consequential, indirect, or punitive damages, in connection with this Agreement or the transactions contemplated hereby against Parent (other than for satisfaction of the Parent Obligations) or against, individually or in the aggregate, Parent, Holdings or Merger Sub in excess of the Liability Limitation and (iii) in no event shall the Company or any of its affiliates seek to recover any money damages or any other recovery, judgment or damages of any kind, including rescissory, consequential, indirect, or punitive damages, in connection with this Agreement or the transactions contemplated hereby against any of Parent's, Holdings' or Merger Sub's respective Related Persons.

"Liability Limitation" means an amount equal to $1,000,000,000 (inclusive of any payment of the Reverse Termination Fee) plus any amounts to be reimbursed and indemnification payments pursuant to the penultimate sentence of Section 6.10(b) or Section 6.11(d) and the second sentence of Section 8.2(d).

(iv)    The Company acknowledges and agrees that it has no right of recovery against, and no personal liability shall attach to, any of Parent, Holdings, Merger Sub or their respective Related Persons, through Holdings, Merger Sub or otherwise, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by or through a claim by or on behalf of Holdings or Merger Sub against Parent or any of their or Parent's respective Related Persons, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any Law or otherwise, except for its right to recover from Holdings or Merger Sub (but not any of Holding's or Merger Sub's respective Related Persons) to the extent provided in this Agreement, and its right to receive payment and/or indemnification from Parent pursuant to the Parent Obligations (as limited by the provisions herein), and subject to the Liability Limitation and the other limitations described herein.  Notwithstanding anything that may be expressed or implied in this Agreement or any document or instrument delivered in connection herewith, the Company hereby agrees and acknowledges that the Company's right to receive payment and/or indemnification from Parent pursuant to the Parent Obligations (as limited by the provisions herein) shall be the sole and exclusive remedy of the Company and all of its affiliates against Parent and its Related Persons (other than Holdings and Merger Sub to the extent, and subject to the limitations, contained in this Agreement) in respect of any liabilities or obligations arising under, or in connection with, this Agreement, the Financing Commitment Letters or the transactions contemplated hereby or thereby.

(d)    Each of the Company, Parent, Holdings and Merger Sub acknowledges that the agreements contained in this Section 8.2 are an integral part of the transactions contemplated by this Agreement.  In the event that the Company shall fail to pay the Company Termination Fee when due or Parent shall fail to pay the Reverse Termination Fee when due, the Company or Parent, as the case may be, shall reimburse the other party for all reasonable costs and expenses actually incurred or accrued by such other party (including reasonable fees and expenses of counsel) in connection with any action (including the filing of any lawsuit) taken to collect payment of such amounts, together with interest on such unpaid amounts at the prime lending rate prevailing during such period as published in The Wall Street Journal, calculated on a daily basis from the date such amounts were required to be paid to the date of actual payment.

SECTION 8.3    Expenses.  Except as otherwise specifically provided herein, each party shall bear its own expenses in connection with this Agreement and the transactions contemplated hereby; provided, however, that the Surviving Corporation shall pay any transfer Taxes imposed in connection with the Merger.

SECTION 8.4    Amendment.  This Agreement may be amended by Holdings, Merger Sub and the Company by action taken by or on behalf of their respective Boards of Directors at any time prior to the Effective Time, whether before or after adoption of this Agreement by the stockholders of the Company; provided, however, that, after adoption of this

Agreement by the stockholders of the Company, no amendment may be made which by Law requires the further approval of the stockholders of the Company without such further approval.  This Agreement may not be amended except by an instrument in writing signed by each of Holdings, Merger Sub and the Company.

SECTION 8.5   <u>Waiver</u>.  At any time prior to the Effective Time, any party hereto may (i) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (ii) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto and (iii) subject to the requirements of applicable law, waive compliance with any of the agreements or conditions contained herein.  Any such extension or waiver shall be valid if set forth in an instrument in writing signed by the party or parties to be bound thereby.  The failure or delay of any party to assert any rights or remedies shall not constitute a waiver of such rights or remedies.

## ARTICLE IX

## GENERAL PROVISIONS

SECTION 9.1   <u>Non-Survival of Representations, Warranties, Covenants and Agreements</u>.  None of the representations, warranties, covenants and agreements in this Agreement or in any instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations, warranties, covenants and agreements, shall survive the Effective Time, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Effective Time and (ii) this Article IX.

SECTION 9.2   <u>Notices</u>.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by facsimile or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified by like notice):

(a)  if to Parent, Holdings or Merger Sub:

Mars, Incorporated
6885 Elm Street
McLean, VA 22101
Attention:  Peter M. Seka, General Counsel, Tax and Benefits
Facsimile:  703-448-9678

-57-

with an additional copy (which shall not constitute notice) to:

> Simpson Thacher & Bartlett LLP
> 425 Lexington Avenue
> New York, NY 10017
> Attention: John G. Finley, Esq.
>                    Kathryn King Sudol, Esq.
> Facsimile: 212-455-2502

(b)  if to the Company:

> Wm. Wrigley Jr. Company
> 410 N. Michigan Avenue
> Chicago, IL 60611
> Attention: Howard Malovany, Senior Vice President, Secretary and
>                    General Counsel
> Facsimile: 312-645-3533

with an additional copy (which shall not constitute notice) to:

> Skadden, Arps, Slate, Meagher & Flom LLP
> 333 W. Wacker Drive
> Chicago, IL 60606
> Attention: William R. Kunkel, Esq.
>                    L. Byron Vance III, Esq.
> Facsimile: 312-407-8514

SECTION 9.3    Certain Definitions.  For purposes of this Agreement, the term:

(a)  "affiliate" of a person means a person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first mentioned person;

(b)  "business day" means any day on which the principal offices of the SEC in Washington, D.C. are open to accept filings or, in the case of determining a date when any payment is due, any day on which banks are not required or authorized by law to close in New York, New York;

(c)  "control" (including the terms "controlled", "controlled by" and "under common control with") means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the management policies of a person, whether through the ownership of stock, as trustee or executor, by contract or credit arrangement or otherwise;

(d)  "generally accepted accounting principles" means the accounting principles generally accepted in the United States;

(e) "knowledge" (i) with respect to the Company means the actual knowledge of any of the persons listed in Section 9.3(e) of the Company Disclosure Schedule and (ii) with respect to Holdings or Merger Sub means the actual knowledge of any of the persons listed in Section 9.3(e) of the Holdings Disclosure Schedule;

(f) "Permitted Liens" means: (A) zoning restrictions, easements, rights-of-way or other restrictions on the use of real property (provided that such liens and restrictions were incurred prior to the date hereof and do not, individually or in the aggregate, materially interfere with the use of such real property or the Company's or its subsidiaries' operation of their respective businesses as currently operated); (B) pledges or deposits by the Company or any of its subsidiaries under workmen's compensation Laws, unemployment insurance Laws or similar legislation, or good faith deposits in connection with bids, tenders, Contracts (other than for the payment of indebtedness) or leases to which such entity is a party, or deposits to secure public or statutory obligations of such entity or to secure surety or appeal bonds to which such entity is a party, or deposits as security for contested Taxes, in each case incurred or made in the ordinary course of business consistent with past practice; (C) Liens imposed by Law, including carriers', warehousemen's, landlords' and mechanics' liens, in each case incurred in the ordinary course of business consistent with past practice for sums not yet due or being contested in good faith by appropriate proceedings (provided appropriate reserves required pursuant to applicable generally accepted accounting principles have been made in respect thereof); and (D) Liens for Taxes, assessments or other governmental charges not yet subject to penalties for non-payment or which are being contested in good faith by appropriate proceedings (provided appropriate reserves required pursuant to applicable generally accepted accounting principles have been made in respect thereof);

(g) "person" means an individual, corporation, partnership, limited liability company, association, trust, unincorporated organization, other entity or group (as defined in Section 13(d)(3) of the Exchange Act);

(h) "subsidiary" or "subsidiaries" of the Company, the Surviving Corporation, Holdings, Merger Sub or any other person means any corporation, partnership, joint venture or other legal entity of which the Company, the Surviving Corporation, Holdings, Merger Sub or such other person, as the case may be (either alone or through or together with any other subsidiary), owns, directly or indirectly, 50% or more of the stock or other equity interests the holder of which is generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity;

(i) "Taxes" shall mean any taxes of any kind, including but not limited to those on or measured by or referred to as income, gross receipts, capital, sales, use, ad valorem, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, alternative or add-on minimum, transfer, premium,

-59-

value added, property or windfall profits taxes, customs, duties or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Entity, domestic or foreign; and

       (j)  "Tax Return" shall mean any return, report or statement (including information returns) required to be filed with or provided to any Governmental Entity, domestic of foreign, or other person, or maintained, with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

      SECTION 9.4   Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

      SECTION 9.5   Entire Agreement; Assignment.  This Agreement, the Company Disclosure Schedule, the Holdings Disclosure Schedule and the Confidentiality Agreement constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof.  This Agreement shall not be assigned by operation of Law or otherwise without the prior written consent of each of the other parties, except that Holdings and Merger Sub may, prior to the Company Requisite Votes, assign all or any of their respective rights and obligations hereunder to (i) any direct or indirect wholly-owned subsidiary of Holdings or (ii) to a lender as collateral, in each case after providing written notice thereof to the Company prior to such assignment; provided, however, that no such assignment shall relieve the assigning party of its obligations hereunder.

      SECTION 9.6   Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement, other than (a) with respect to the provisions of Section 6.7, Section 8.2(c)(ii), Section 8.2(c)(iii) and Section 8.2(c)(iv) and Section 9.11 which shall inure to the benefit of the persons or entities benefiting therefrom who are intended to be third-party beneficiaries thereof and (b) after the Effective Time, and subject to Section 9.11, the rights of the holders of Company Common Stock to receive the Merger Consideration in accordance with the terms and conditions of Article II of this Agreement and (c) after the Effective Time, and subject to Section 9.11, the rights of the holders of Options, Restricted Shares and Stock Units to receive the payments contemplated by the applicable provision of Sections 2.2(a), 2.2(b) and 2.2(c).

SECTION 9.7    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware (without giving effect to choice of law principles that would cause the laws of another jurisdiction to apply).

SECTION 9.8    <u>Headings</u>.  The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

SECTION 9.9    <u>Counterparts</u>.  This Agreement may be executed and delivered (including by facsimile or other electronic transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

SECTION 9.10    <u>Specific Performance</u>.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by the Company in accordance with their specific terms or were otherwise breached by the Company.  It is accordingly agreed that, prior to the termination of this Agreement pursuant to Section 8.1, Holdings and Merger Sub shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by the Company and to enforce specifically the terms and provisions of this Agreement against the Company, this being in addition to any other remedy to which either such party is entitled at law or in equity.  The Company acknowledges and agrees that it shall not be entitled to an injunction or injunctions to prevent any breaches of this Agreement by Parent, Holdings or Merger Sub or to enforce specifically the terms and provisions of this Agreement or otherwise to obtain any equitable relief or remedy against Parent, Holdings or Merger Sub and that the Company's sole and exclusive remedies with respect to any such breach shall be the remedies set forth in Section 8.2(c); <u>provided</u>, <u>however</u>, that the Company shall be entitled to any injunction or injunctions solely to prevent any breach by Holdings or Merger Sub of Section 6.4(b).

SECTION 9.11    <u>No Recourse</u>.  This Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto (subject to the next succeeding sentence), and no past, present or future affiliate, director, officer, employee, incorporator, stockholder, agent, attorney or Representative of any party hereto shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.  The Company acknowledges and agrees that (a) Parent's obligations under and in respect of this Agreement and the transactions contemplated hereby are limited to the Parent Obligations (as limited by the provisions hereof), (b) Parent has no obligation to pay (or to cause Holdings or Merger Sub to pay) any Merger Consideration or other amounts payable under Section 1.2 or Article II hereof, and (c) Holdings and Merger Sub have no assets other than cash in a de minimis amount and that no additional funds are expected to be contributed to Holdings or Merger Sub unless and until the Closing occurs.  The Company further acknowledges and agrees that the Parent Obligations shall terminate, and Parent shall have no further obligation or liability under this Agreement or in respect of the transactions contemplated hereby, as of the earliest of (i) the Effective Time, (ii)

-61-

satisfaction of the Parent Obligations, (iii) the termination of this Agreement in accordance with its terms by mutual consent of Holdings, Merger Sub and the Company or under circumstances in which, in accordance with the terms of this Agreement, Parent would not have any payment or indemnification obligations pursuant to the Parent Obligations, and (iv) 90 days after any termination of this Agreement in accordance with its terms under circumstances in which Parent would have any payment or indemnification obligations pursuant to the Parent Obligations, except as to a claim for payment or indemnification presented by the Company to Parent on or prior to such 90th day; provided, that such claim shall set forth in reasonable detail the basis for such claim.  Notwithstanding the foregoing, in the event that the Company or any of its affiliates asserts in any litigation or other proceeding relating to this Agreement or the transactions contemplated hereby that the provisions contained in this Agreement limiting Parent's obligations to the Parent Obligations or limiting Parent's maximum aggregate liability to the Liability Limitation or that any other provisions in this Agreement limiting the obligations and liability of Parent and its Related Persons are illegal, invalid or unenforceable in whole or in part, or asserts any theory of liability against Parent or any of its Related Persons with respect to this Agreement, the Equity Financing Commitment Letters or the transactions contemplated by this Agreement other than Parent's payment or indemnification obligations pursuant to the Parent Obligations under this Agreement (as limited by the provisions hereof) then (A) all obligations of Parent under this Agreement shall terminate *ab initio* and shall thereupon be null and void, (B) if Parent has previously made any payments or provided indemnification under this Agreement, it shall be entitled to recover such payments from the Company, and (C) neither Parent nor any of its Related Persons shall have any liability to the Company or any of its Affiliates with respect to this Agreement, the Equity Financing Commitment Letters or the transactions contemplated hereby or thereby.

SECTION 9.12   Jurisdiction.  Each of the parties hereto (i) consents to submit itself to the personal jurisdiction of the Court of Chancery of the State of Delaware or, if under applicable law exclusive jurisdiction over such matter is vested in the federal courts, any court of the United States located in the State of Delaware, in the event any dispute arises out of this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (iii) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the Court of Chancery of the State of Delaware or, if under applicable law exclusive jurisdiction over such matter is vested in the federal courts, any court of the United States located in the State of Delaware and (iv) consents to service being made through the notice procedures set forth in Section 9.2.  Each party hereto hereby agrees that, to the fullest extent permitted by law, service of any process, summons, notice or document by U.S. registered mail to the respective addresses set forth in Section 9.2 shall be effective service of process for any suit or proceeding in connection with this Agreement or the transactions contemplated hereby.

SECTION 9.13   Interpretation.  When reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The words "hereof," "herein," "hereby" and "hereunder" and words of similar import when used in this Agreement shall refer

-62-

to this Agreement as a whole and not to any particular provision of this Agreement.  The word "or" shall not be exclusive.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted.

        SECTION 9.14  <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY HERETO IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT THEREOF.

[*Remainder of Page Left Blank Intentionally*]

-63-

IN WITNESS WHEREOF, the Company, Parent, Holdings and Merger Sub have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

WM. WRIGLEY JR. COMPANY

By:    /s/ Wm. Wrigley Jr.
        Name:    Wm. Wrigley Jr.
        Title:    Executive Chairman and Chairman of the Board

MARS, INCORPORATED

By:    /s/ Stuart Guthrie-Brown
        Name:    Stuart Guthrie-Brown
        Title:    General Counsel Corporate Development

NEW UNO HOLDINGS CORPORATION

By:    /s/ Valerie Anne Mars
        Name:    Valerie Anne Mars
        Title:    Vice President

NEW UNO ACQUISITION CORPORATION

By:    /s/ Valerie Anne Mars
        Name:    Valerie Anne Mars
        Title:    Vice President

[*Merger Agreement Signature Page*]

# Exhibit B



Print Page   Close Window

# News Release

« Back

## The Wrigley Company Agrees to Merger with Mars, Incorporated

*Historic Combination Values Wrigley at $80 Per Share*

CHICAGO, April 28 /PRNewswire-FirstCall/ -- The Wm. Wrigley Jr. Company (NYSE: WWY) today announced that it had reached an agreement to merge with Mars, Incorporated, one of the world's leading confectionery and consumer goods companies. As a result of this transaction, Wrigley will become a private company and part of one of the world's premier family-owned companies. The combined organization will have a product portfolio containing some of the world's most recognizable and well-loved confectionery brands -- including Orbit(R), Extra (R), Doublemint(R), M&M's(R), Snickers(R) and Mars(R) -- as well as leading food, beverage and pet care brands, totaling over $27 billion in global sales.

Mars, Incorporated has agreed to pay $80 cash for each share of Common Stock and Class B Common Stock of the Wrigley Company in a transaction valued at approximately $23 billion. The terms of the transaction have been unanimously approved by the Wrigley Board of Directors. Based on Wrigley's closing share price of $62.45 on April 25, 2008, and its three-month weighted average share price of $59.88, this price represents a premium of 28 percent and 34 percent, respectively, to the Company's stockholders. This price also represents 4.3 times Wrigley's 2007 net sales and over 35 times Wrigley's 2007 earnings per share.

Mars, Incorporated, will acquire 100 percent of Wrigley's outstanding shares and all of its outstanding options will be cashed out. The Wrigley Company will operate as a separate, stand-alone subsidiary, keeping its headquarters in Chicago and continuing its civic and philanthropic involvement, both locally and in its communities around the world. Additionally, Bill Wrigley, Jr. will continue serving as the Company's Executive Chairman. As part of the transaction, Mars' non-chocolate sugar brands -- including Starburst(R) and Skittles(R) -- will be added to Wrigley's confectionery portfolio, joining such well-known brands as Lifesavers(R) and Altoids (R).

"First and foremost, this is a great transaction at a great price that provides tremendous value to Wrigley stockholders," noted Bill Wrigley, Jr., Executive Chairman and Chairman of the Board. "Additionally, in terms of Wrigley's ongoing business, the true value of this transaction arises primarily from enhanced growth opportunities, including the potential for cross-pollination of people, ideas and brands, and significant enhancements of sales, marketing and distribution infrastructures. We see this as an historic opportunity to preserve what is special about the Wrigley Company in terms of values and culture, while continuing to grow and develop our associates, invest in our brands and drive long-term generational growth. So, from every perspective, I strongly support the transaction."

"Mars and Wrigley have much more in common than multi-generational family leadership and significant global footprints," commented Paul S. Michaels, Mars Global president. "We share common values and ways of doing business, including an emphasis on ethics and respect for people, focus on generational growth, and expertise in obtaining consumer insights and building enduring brands. This is not about being bigger -- it's about being the best, and providing leadership and innovation across the full range of confectionery categories."

The merger unites two outstanding confectionery traditions. With the Wrigley Company being founded in 1891 and Mars, Incorporated being established in 1911, the combined enterprise will have over two centuries of experience in producing outstanding confectionery products, delighting consumers, and building great brands and strong businesses around the world.

"This combination brings together two strong, complementary confectionery organizations," noted Bill Perez, President and Chief Executive Officer. "A big part of what attracted Mars to Wrigley was our proven track record in the marketplace and the talent of our people. As a stand-alone subsidiary of Mars, with our strong, global leadership team in place, we will have the opportunity to accelerate our already strong growth trajectory."

Funding for the transaction includes approximately $11 billion from Mars, a $5.7 billion committed senior debt

facility from Goldman, Sachs, and $4.4 billion of subordinated debt from Berkshire Hathaway, Inc. At closing, Berkshire Hathaway has committed to purchase a minority equity interest for $2.1 billion in the Wrigley Company subsidiary at a discount to the share price being paid to the stockholders of Wrigley.

"Those of you who know me, know that I have been a big fan of Wrigley's business model for many years, and I love their products," said Warren E. Buffett, Chairman and Chief Executive Officer of Berkshire Hathaway. "When you think of a business that's easy to understand, with favorable long-term economics, and able and trustworthy management -- you think of Wrigley. Bringing together these iconic, world-class companies combines Wrigley's strengths with the deep resources and proven brand-building savvy of Mars and will result in a powerful force for innovation and growth in the global confectionery marketplace."

The proposed transaction is subject to customary closing conditions, including stockholder approval and certain governmental regulatory clearances. Both parties are committed to working to close the transaction as soon as possible, with the merger expected to be completed within six to twelve months.

For this transaction, Goldman, Sachs acted as the Wrigley Company's financial advisor and also as placement agent for the securities to Berkshire Hathaway; William Blair Incorporated acted as a financial advisor and provided an independent fairness opinion; and Skadden, Arps, Slate, Meagher & Flom, LLP served as legal advisor.

SPECIAL NOTE: As a result of this significant event, Bill Wrigley, Jr. sent the following e-mail to all Wrigley associates worldwide:

From the Office of Bill Wrigley, Jr.
TO: All Wrigley Associates
FROM: Bill Wrigley, Jr.
DATE: April 28, 2008
SUBJECT: Important Announcement Regarding Our Future

Dear Wrigley Associates,

Today, the Wrigley Company is making a momentous and exciting announcement about our future as a global confectionery company. We have signed an agreement to merge with Mars, Incorporated, a global, $22 billion private family-owned company. If approved, the Wrigley Company will become a separate, stand-alone subsidiary of Mars, with me serving as Executive Chairman of the Wrigley Company, our current leadership team in place, and an understanding that we will manage our company as a stand-alone entity. We will continue to do what we do best, while having access to taking full advantage of the worldwide talent, innovation, and experiences of Mars, Incorporated.

Obviously, this is an historic decision, and one that, no doubt, will come as a great surprise to all of you. Frankly, it's not something that even I had envisioned, until this extremely compelling opportunity was presented to us.

The Mars family approached us with an all-cash offer to merge with their company. While the Board of Directors did not seek out the Mars offer, we had a fiduciary responsibility to consider it and, after thorough deliberations, determined that the opportunity is in the best interest of the Company's stockholders, many of whom are Wrigley associates. Funding for the purchase includes cash from Mars and subordinated debt financing from Warren Buffett's company, Berkshire Hathaway -- which will hold an equity interest in the Wrigley Company subsidiary. Our stockholders will vote on the merger at a special stockholders' meeting later this year.

The stockholder benefits of this opportunity are clearly apparent. What I find especially motivating and compelling, however, is what it means for the future generational growth of our company and our people. This combination has the potential to bring together two strong, complementary confectionery organizations, both committed to driving long-term dynamic growth. At the same time, it frees us from some of the costs -- as well as the constraints and short-term results pressure -- that come with being a public company.

I want you to know that I strongly support this decision, and I will remain fully involved in the organization and the business going forward as Executive Chairman of the Wrigley Company. I also want to emphasize that Mars recognizes that our success has been fueled by the energy, imagination and hard work of our strong leadership team and remarkably talented associates around the world. Their intent is for us to run as a separate entity with a high degree of autonomy -- which they have done successfully with other mergers. Bill Perez and I, along with Paul S. Michaels, Mars Global president, fully expect our Executive Leadership Team and the global leadership

of our company to remain in place as active leaders of the business.

I've spent a considerable amount of time with their leadership team and Mars family members, and I do take them at their word on this. Mars understands our business, our values and our culture, as well as our operating philosophy and the way we invest long-term in our brands and our people, and they have no intention to change the way we operate or our unique culture. In fact, our people, our ability to drive growth, iconic brands, geographic reach, and extensive supply chain and innovation expertise are all things that attracted them to Wrigley. In addition, we will maintain our headquarters in Chicago and continue our community involvement, both in the areas of the world where do business as well as through the Wm. Wrigley Jr. Company Foundation.

Since its founding in 1911, Mars has been a private company, so you might not be very familiar with the size and breadth of their organization. Although best known for M&Ms(R), and Snickers(R), Mars is a major, global consumer goods company with interests in confectionery and snacks, as well as other food, beverage, and pet care products including Dove(R), Uncle Ben's(R), Pedigree(R), Whiskas(R), Royal Canin(R), and Banfield Pet Hospitals(R). Like us, they invest in their brands and build for the long-term. In fact, a significant majority of their business comes from a relatively small number of brands -- which is an important indication of their commitment to building and sustaining brand strength.

The true value of this combination arises primarily from enhanced prospects for growth. The merger will generate a new world of opportunities for our people, in addition to the potential for cross-pollination of ideas and brands and further enhancements of sales, marketing and distribution infrastructures. One immediate advantage is that Mars' non-chocolate sugar brands -- including Starburst(R) and Skittles(R) -- will be added to Wrigley's confectionery portfolio upon consummation of the merger.

The intent is for the Wrigley Company to be a stand-alone entity in order to avoid distracting the associates of both companies and possibly diminishing the outstanding business momentum currently in place. Our objective is to allow our strengths and assets to complement each other, providing even more opportunity for growth and career development.

Overall, I am confident that there are more opportunities to grow this business in a private environment than there are as a publicly-held company. Together, we will be a company with over $27 billion in sales and more than 64,000 associates worldwide. This combined entity will be, among other things, the world's leading confectionery company, with the resources and critical mass to explore new geographies and categories that might have been beyond our reach in the past.

Of course, this represents a significant change for us -- a change that is emotional for me, as I imagine it will be for you. As we assessed this opportunity, however, I thought a lot about something you've heard me say many times. We must respect the past, but, at all times, do what's right for the future. Every generation of Wrigley leadership has had to make decisions that are in the best long-term interests of our stockholders and our associates. We have a long legacy of preserving what makes us special, while always doing what it takes to be dynamic, competitive, and forward-looking. Being a public company has given us the financial security to grow with the support of our stockholders. Today, however, we have an opportunity to grow as a private company, while preserving our values, our heritage, and the unique culture that has inspired our success. Rest assured, one thing that will never change is the way we treat our associates, both in terms of acting with trust, dignity and respect and in terms of rewarding you appropriately for your hard work and dedication.

I also want to emphasize that we remain committed to an operating philosophy of driving generational growth, and that this opportunity will be, in fact, an enabler of generational growth. I have always believed that generational growth means the responsibility and the privilege of passing on to future associates a company that is stronger and better poised for growth than the one we received. It is about building a legacy of opportunity and shared success ... and that legacy is much more than the Wrigley family, it is about all of our associates who have made and will continue to make that growth possible. This is our chance to create a legacy of opportunity and long-term future success.

So, we envision this to be a win-win-win for our stockholders, the company and our people. We have the opportunity to be a privately-held company, add significant confectionery brands to our portfolio, and combine ideas, resources and energy with one of the best consumer product companies in the world.

While the potential of this combination is exciting on many levels, we need to remember that the merger is contingent on stockholder approval and various regulatory reviews. Of course, to help the entire Wrigley world understand the implications and opportunities involved in being part of a larger organization, we will be reaching

out to you in the weeks ahead with additional updates and town hall meetings about what this means to the Company and its future, as well as what it means to all of you as individuals.

If there were one thing I could change about this opportunity, it would be the "hurry up and wait" nature of this process. I wish the timing and the pace of the announcement could have been slower, allowing you more time to analyze, discuss and adjust to this news. But as a still publicly-traded company, we are legally obligated to disclose this kind of information as quickly and broadly as possible. That said, I wish the interim period between now and the close could go faster, eliminating the stretches of time when we are in a "wait-and-see" mode and getting us to the point where we can really drive the combined business as soon as possible. Our intent is to close the transaction in the next 6-12 months.

Bill Perez, the Executive Leadership Team and I want to emphasize that we need to continue to do what we do best - winning consumers, servicing customers, and delivering great products and results. All of our energy needs to be focused on our aspirations for growth and delivering our 2008 plan - and we're off to a great start. By maintaining business momentum - at both companies - we will be in the optimal position to capitalize on the opportunities that will be available to the combined organization.

Undoubtedly, there will be a risk of distraction during this transition. Given the tremendous opportunity that lies before us, we must work together to harness our energy and talent and strengthen our already growing and dynamic organization. I have total confidence in this team's ability to stay focused, resilient and committed, because you have proven yourselves time and time again.

We all need to look to the future with optimism. I am certain that this merger will bring new opportunities for growth and tremendously exciting possibilities for all of us. I can't wait to be part of this dynamic future, and I hope you will feel the same way.

With best regards,

Bill Wrigley, Jr.

ADDITIONAL NOTE: In a separate release, also issued this morning, the Wrigley Company announced a 17% increase in quarterly earnings per share on record first quarter sales that were up 16% from a year ago.

About Wrigley

The Wm. Wrigley Jr. Company is a recognized leader in confections with a wide range of product offerings including gum, mints, hard and chewy candies, lollipops, and chocolate. The Company has global sales of $5.4 billion and distributes its world-famous brands in more than 180 countries. Three of these brands -- Wrigley's Spearmint(R), Juicy Fruit(R), and Altoids(R) -- have heritages stretching back more than a century. Other well-loved brands include Doublemint(R), Life Savers(R), Big Red(R), Boomer(R), Pim Pom(R), Winterfresh(R), Extra (R), Freedent(R), Hubba Bubba(R), Orbit(R), Excel(R), Creme Savers(R), Eclipse(R), Airwaves(R), Solano(R), Sugus(R), P.K.(R), Cool Air(R) and 5(TM).

About Mars

Mars, Incorporated is a family owned company that produces some of the world's leading confectionery, food and petcare products and has growing beverage and health & nutrition businesses. Headquartered in McLean, Virginia, Mars, Incorporated operates in more than 66 countries and employs more than 48,000 associates worldwide. The company's global sales are $22 billion annually. Founded in 1911, the company manufactures and markets a variety of products under many of the world's most recognizable trademarks, including DOVE(R), MILKY WAY(R), M&M'S(R), SNICKERS(R), MARS(R), UNCLE BEN'S(R) Rice, ROYAL CANIN(R) and PEDIGREE(R) and WHISKAS(R) petcare products.

Additional Information and Where to Find It

In connection with the above-described transactions, the Company will file with the U.S. Securities and Exchange Commission a preliminary proxy statement and a definitive proxy statement. The proxy statement will be sent to the Company's stockholders, who are urged to read the proxy statement and other relevant materials when they become available, because they will contain important information about the above-described transactions. Wrigley investors and security holders may obtain free copies of these documents (when they are available) and

other documents filed with the SEC at its web site at www.sec.gov. In addition, investors and security holders may obtain free copies of the documents filed with the SEC by the Company by going to the Company's Investors page on its corporate website at www.wrigley.com or by directing a request to Wm. Wrigley Jr. Company, 410 North Michigan Avenue, Chicago, Illinois 60611 -- Attention: Investor Relations.

The Company and its directors and executive officers may be deemed to be participants in the solicitation of proxies from the stockholders of the Company in connection with the above-described transactions. Information about the Company and its directors and officers can be found in the Company's Proxy Statements and Annual Reports on Form 10-K filed with the SEC, as well as on the Company's Investors page on its corporate website at http://www.wrigley.com. Additional information regarding the interests of those persons may be obtained by reading the proxy statement when it becomes available.

Cautionary Statement Regarding Forward-Looking Information


This press release contains statements which may be considered forward- looking statements within the meaning of the Securities Exchange Act of 1934, including, without limitation, statements regarding operating strategies, future plans and financial results. Forward-looking statements may be accompanied by words such as "anticipate", "believe", "could", "estimate", "expect", "forecast", "intend", "may", "possible", "predict", "project" or similar words, phrases or expressions. The Company does not undertake any obligation to update the information contained herein, which speaks only as of the date of this press release. A variety of factors could cause actual results to differ materially from the anticipated results or expectations expressed including, without limitation, the occurrence of any event, change or circumstance that could give rise to the termination of the merger agreement and the possibility that the Company would be required to pay any termination fee in connection therewith; the outcome of any legal proceedings that may be instituted against the Company and others following the announcement of the merger agreement; risks that the required regulatory approvals will not be obtained in a timely manner, if at all; inability to complete the merger due to the failure to obtain stockholder approval or failure to satisfy the other conditions to the completion of the merger; risks that the proposed transaction disrupts current plans and operations; the availability or retention of retail space; the availability of raw materials; changes in demographics and consumer preferences; changes in foreign currency and market conditions; increased competition and discounting and other competitive actions; underutilization of or inadequate manufacturing capacity and labor stoppages; governmental regulations; and the outcome of integrating acquired businesses. These factors, and other important factors that could affect these outcomes are set forth in the Company's most recently filed Annual Report on Form 10-K and the Company's other SEC filings, in each case under the heading "Forward-Looking Statements" and/or "Risk Factors". Such discussions regarding risk factors and forward-looking statements are incorporated herein by reference.

CONTACT:
Christopher Perille, Senior Director - External Relations
+1-312-645-4077
Susan Henderson, Vice President - Corporate Communications
+1-312-645-3469
Both of Wm. Wrigley Jr. Company

Exhibit C

**EFiled: May 8 2008 10:47AM EDT**
**Transaction ID 19742966**
**Case No. 3750-**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| INSULATORS AND ASBESTOS WORKERS LOCAL No. 14, individually and on behalf of all similarly situated, | :    C.A. No. _____ <br> : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | : <br> : |
| WILLIAM WRIGLEY, JR., WILLIAM D. PEREZ, JOHN F. BARD, HOWARD B. BERNICK, THOMAS A. KNOWLTON, JOHN RAU, STEVEN B. SAMPLE, ALEX SHUMATE, RICHARD K. SMUCKER, MELINDA R. RICH, WM. WRIGLEY JR. COMPANY, and MARS, INCORPORATED, | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants. | : <br> : |

## VERFIED CLASS ACTION COMPLAINT

Plaintiff, Insulators and Asbestos Workers Local No. 14, through its counsel, alleges upon information and belief, except for allegations pertaining to plaintiff, which are based upon personal knowledge, as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this shareholder class action on behalf of itself and all other holders of Class A Common Stock of Wm. Wrigley Jr. Company ("Wrigley" or the "Company") for injunctive and other appropriate relief in connection with a proposed sale of the Company (the "Proposed Buyout") to Mars, Incorporated ("Mars") via an unfair process and at the inadequate and unfair price of $80.00 per share.

2.     The consideration that Mars has stated it will offer to holders of Wrigley Class A common stock, and that Wrigley's Board has accepted in signing an Agreement and Plan of Merger dated as of April 28, 2008 (the "Merger Agreement"), is unfair and inadequate because, among other things, the intrinsic value of Wrigley common stock is materially higher than the amount offered, giving due consideration to the Company's growth and anticipated operating results, new asset value, and future profitability. Further, although Wrigley will be sold to Mars, the Merger Agreement is not the product of a value-maximizing process.

## THE PARTIES

3.     Plaintiff is a current holder of shares of Wrigley Class A Common Stock and has owned Wrigley stock continuously since before the Proposed Buyout was announced.

4.     Defendant William Wrigley, Jr. ("Bill Wrigley") is the Executive Chairman of the Company, as well as the Chairman of its Board. He also served as President and Chief Executive Officer of the Company from 1999 to 2006, Vice President of the Company from 1991 to 1999 and Assistant to the President from 1985 to 1992. He is the Company's controlling stockholder with approximately 40% voting control over the Company due to his ownership of Class A Common Stock and super-voting Class B Common Stock. He stands to receive in excess of $26 million in change of control benefits as a result of the Proposed Buyout.

5.     Defendant William D. Perez ("Perez") is a director and President and Chief Executive Officer of the Company. He stands to receive over $15 million in change of control benefits as a result of the Proposed Buyout.

6.     Defendant John F. Bard is a director of the Company and has been since 1999. Bard previously served as Senior Vice President of the Company from 1991 until 1999 and

2

Executive Vice President from 1999 until 2000. He received in excess of $160,000 in 2007 for service on the Board.

7. Defendant Howard B. Bernick is a director of the Company, and has been since 2001. He received in excess of $160,000 in 2007 for service on the Board.

8. Defendant Thomas A. Knowlton is a director of the Company and has been since 1996. He received in excess of $170,000 in 2007 for service on the Board.

9. Defendant John Rau is a director of the Company and has been since 2005. He received nearly $150,000 in 2007 for service on the Board.

10. Defendant Steven B. Sample is a director of the Company and has been since 1997. He received in excess of $160,000 in 2007 for service on the Board.

11. Defendant Alex Shumate is a director of the Company and has been since 1998. He received in excess of $160,000 in 2007 for service on the Board.

12. Defendant Richard K. Smucker is a director of the Company and has been since 1988. He received in excess of $170,000 in 2007 for service on the Board.

13. Defendant Melinda R. Rich is a director of the Company and has been since 1999. She received in excess of $170,000 in 2007 for service on the Board.

14. The Defendants named in ¶¶ 4-13 are sometimes collectively referred to herein as the "Individual Defendants."

15. Defendant Wrigley is incorporated in the state of Delaware with its principal place of business located at 410 North Michigan Avenue, Chicago, Illinois 60611. The company manufactures and markets chewing gum, including Extra and Orbit gum, and other confectionery products worldwide, including Altoids and LifeSavers. Wrigley, whose products are sold in over 180 countries, reported sales of $5.4 billion in 2007. As of April 15, 2008, Wrigley had

3

approximately 215,935,235 shares of Class A Common Stock and 55,811,742 shares of Class B Common Stock outstanding.

16.     Defendant Mars is incorporated in the State of Delaware with its principal place of business located at 6885 Elm Street, McLean, Virginia 22101. Mars is a privately owned company, and had approximately \$22 billion in revenues in 2007. The company manufactures and markets M&M's, Snickers, the Mars bar, 3 Musketeers, Dove, Milky Way, Skittles, Twix, and Starburst sweets; Combos and Kudos snacks; Uncle Ben's rice; and pet food under the names Pedigree, Sheba, and Whiskas. Mars also provides office beverage services and makes drink vending equipment.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action individually and as a class action, pursuant to Rule 23 of the Rules of the Court of Chancery, on behalf of the following class (the "Class"):

All record and beneficial owners of Wrigley Class A Common Stock (excluding defendants herein and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the defendants and their successors in interest) as of April 28, 2008 and their successors-in-interest, transferees and assigns.

18.     This action is properly maintainable as a class action.

a.     The Class is so numerous that joinder of all Class members is impracticable. There are approximately 215,935,235 shares of Wrigley Class A Common Stock outstanding.

b.     There are questions of law and fact that are common to the Class including, *inter alia*, the following:

(i)     whether the Proposed Buyout is unfair to the Class;

(ii)     whether the Proposed Buyout inadequately values Wrigley;

4

(iii)    whether defendants have initiated and/or timed the Proposed Buyout to unfairly benefit Wrigley's management at the expense of Wrigley's public shareholders;

(iv)    whether the Individual Defendants breached their fiduciary duties to members of the Class to maximize shareholder value in a sale of the Company;

(v)    whether defendant Mars aided and abetted breaches of fiduciary duties of the Individual Defendants; and

(vi)    whether plaintiff and the other members of the Class will be irreparably damaged by the wrongs complained of herein.

c.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff will fairly and adequately represent the Class.

d.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and establish incompatible standards of conduct for the party opposing the Class.

e.    Defendants have acted and are about to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## FACTUAL BACKGROUND

### Background to the Proposed Buyout

19.    As Chairman Bill Wrigley noted at the Company's annual meeting on March 12, 2008, Wrigley is one of a few select companies able to profit in the current economic

5

environment: "While no business is recession-proof, [the characteristics of Wrigley] do help make ours more recession-resistant." This has been evident in the Company's recent results.

20. On February 4, 2008, the Company announced that its 2007 net sales climbed 15 percent from the prior year to a new annual sales record of $5.4 billion. The Company also announced net earnings per share of $2.28 for the year 2007, a 20 percent increase from 2006.

21. Analysts also recognized Wrigley's positive prospects. In a March 20, 2008 article published by Wall Street Strategies entitled "Wrigley Shares Ready to Pop," Wrigley's growth prospects were described as follows::

> While shares of most publicly traded companies have hit the skids this year, those of consumer staples have maintained an upward bias. One such firm that falls under this umbrella is gum manufacturer William Wrigley Jr. Co. (WWY), which is about as resistant to economic downturns as could be found.
>
> We issued an upgrade of our rating on Wrigley shares upon preliminary analysis of the 4Q'07 financials February 4, citing a potential bottom in operating margins and strong price increases enacted in 2H'07.
>
> Having revisited our analysis, we believe a more aggressive posture is warranted given the volatility associated with many sectors of the U.S. economy and attributes of Wrigley's business. On this basis, we are particularly optimistic on Wrigley's earnings potential in 2H'08 as a result of price increases, new gum launches, the cycling of retail trade adjustments that hurt volume in 2007, and exposure to robust international growth trends.
>
> Valuation relative to other packaged food companies is not cheap by any stretch of the imagination, but in our opinion the premiums are justified by Wrigley's positioning as a best in class consumer staple enterprise.

22. As predicted, Wrigley's earnings have continued to grow substantially. In a press release dated April 28, 2008 (the same day that the Company announced the Proposed Buyout), Wrigley announced record quarterly results:

6

**Wrigley Reports 17% Earnings Per Share Increase on Double-Digit Gain to New First Quarter Record.**

The Wm. Wrigley Jr. Company (NYSE: WWY) today announced record first quarter sales of $1.45 billion, up 16 percent from the year-ago quarter. The sales increase reflected the positive impact of currency translation and price/mix, in combination with worldwide shipment growth.

Net earnings for the quarter of $0.61 per diluted share were up 17 percent or $0.09 from the year ago period. On a non-GAAP basis, excluding the negative impact of the supply chain restructuring and a one-time gain from the sale of a corporate asset in the year-ago period, first quarter earnings per share were up $0.11 or 22 percent from the same quarter last year....

"In addition to delivering strong first quarter results, we are taking the necessary steps to strengthen our brands, our marketplace position, and some key financial metrics. Gross margins are up, operating expenses as a percentage of sales are down, and we continue to make strategic, incremental investments in brand support," noted President and Chief Executive Officer, Bill Perez. "We are focused on growth, particularly in the U.S., where we remain pleased with the continued strong performance of 5(TM) and are excited about the potential of our new product and packaging initiatives currently rolling out into the marketplace, both in the U.S. and around the world."

Bill Wrigley, Executive Chairman and Chairman of the Board, added, "The strong results this quarter are a reflection of our broad global base of operations, in particular, the vigor of our business operations in fast-growing marketplaces across the developing geographies of East Europe and Asia. The overall confectionery category remains strong despite the economic turbulence so far this year, and we continue to make significant investments in sales capabilities, innovation and brand building to take full advantage of long-term business opportunities."

Sales and Gross Margins

First quarter sales of $1.45 billion increased by $198 million, or 16 percent, over the same quarter last year. The positive impact of currency, due to translation of international sales into a relatively weaker U.S. dollar, accounted for approximately half of the increase. The balance of the gain was due to a combination of price/mix and a one percent growth in shipments. ...

In Asia/Pacific, sales increased by $63 million or 25 percent to $317 million on volume growth of over 13 percent. Currency benefit accounted for the vast majority of the remaining gain, which also included a two percent contribution from price/mix. Growth in the region was driven by strong double-digit gains in China, Australia and Vietnam. In China, Wrigley strengthened its position as the

#1 confectioner, led by strong sales increases for Extra(R), Doublemint(R) and Tata(R) bubble gum; while in Australia, growth was driven by the combined success of Extra gum and Extra mints. Increased sales in Vietnam were fueled by the growing popularity of Cool Air(R).

In EMEAI, sales were $679 million, up $113 million or 20 percent on volume growth of 4 percent, including the incremental contribution from the A. Korkunov(R) chocolate acquisition in Russia. Of the remaining sales growth in the quarter, approximately a one-fourth is attributable to positive price/mix and the remainder to currency translation. Russia, Germany, Poland and India all recorded strong double-digit sales increases and helped drive growth in the region. Growth in Russia was fueled by its new chocolate business and a positive contribution from pricing, and India's growth reflected the continued expansion of the Boomer(R) brand. Poland benefited from the growth of Winterfresh(R) mints and bag packaging for gum, while sales of Airwaves(R) and Extra in Germany - especially in bottle packaging - led the growth there. Partially offsetting these gains were declines in the United Kingdom. The U.K. business remained solid in the face of increased competition, but the overall gum category declined in comparison to the year-ago quarter.

"The latest wave of competitive new product launches in the U.K. - and the accompanying advertising and promotional blitz - have already played out in the first quarter, with only a modest impact on our share," noted Bill Perez. "In the second quarter, we are looking to energize U.K. consumers and spark the category with the introduction of exciting new versions of Extra Ice(R) and Orbit Complete(R), supported by outstanding marketing campaigns."

North America net sales were $433 million, up $19 million or five percent, despite an overall 10 percent decline in volume. The positive impact of price/mix accounted for the lion's share of the differential, with currency translation contributing about two percent in the quarter. Gum sales showed strength, led by the record-setting growth of the 5(TM) brand, along with continuing sales gains for Orbit and Eclipse(R) in the quarter. Those gains were more than offset by declines for Altoids(R) and Lifesavers(R), which faced difficult comparisons versus new product launches in the year-ago period.

Consolidated gross margins for the first quarter were 53.1 percent versus 52.1 percent the same quarter last year. Excluding the impact from restructuring in the year-ago period, the gross margin differential would have been 40 basis points - 53.1 percent versus 52.7 percent. ...

"With the cost environment every bit as challenging in 2008 as it was a year ago, we are pleased with our ability to show improvement in our gross margin," said Senior Vice President and Chief Financial Officer Reuben Gamoran. "Even more encouraging is our management of operating expenses, which increased at only

half the rate of sales growth in the quarter, consistent with our commitment to continue leveraging our sales and innovation investments."

Operating Profits and Net Earnings

Consolidated operating profits in the period were $270 million, up 28 percent from the same quarter in the prior year. The increase was primarily driven by improved pricing and product mix, lower expense growth and slightly higher shipment volume, partially offset by increased investment in brand support. Favorable translation of foreign currencies to the weaker U.S. dollar accounted for approximately half the gain.

Consolidated net earnings of $169 million were up by nearly 18 percent or $26 million from the first quarter of 2007. On a diluted per share basis, earnings were $0.61, up 17 percent versus the prior year, with positive currency translation adding about seven cents to the gain. On a non-GAAP basis, excluding the impact of restructuring and the one-time asset sale gain in the year-ago period, earnings per share increased 22 percent versus the first quarter of 2007.

New Product Activity

U.S. 2008 launches unveiled at the March Annual Meeting included product improvements and new Slim Pack envelope packaging for Wrigley's Spearmint(R), Doublemint, Juicy Fruit(R), Big Red(R), Winterfresh and Extra, in addition to the roll-out of the new Extra Fruit Sensations(TM) line, two new fruit flavors for Orbit and the new Altoids Creme de Menthe mints - both regular and chocolate-dipped. Other new offerings that will begin shipments later in the second quarter include Eclipse Fresh and Cool pellet gum and Life Savers Gummies(R) Tangy Fruits. Also coming to market will be the first fruit versions of the fast-growing 5(TM) brand - Lush and Elixir.

## The Proposed Buyout

23.    On April 28, 2008, the Company announced the Proposed Buyout to shareholders,

in the following release:

### The Wrigley Company Agrees to Merger with Mars, Incorporated
### Historic Combination Values Wrigley at $80 Per Share

The Wm. Wrigley Jr. Company (NYSE: WWY) today announced that it had reached an agreement to merge with Mars, Incorporated, one of the world's leading confectionery and consumer goods companies. As a result of this transaction, Wrigley will become a private company and part of one of the world's premier family-owned companies. The combined organization will have a product portfolio containing some of the world's most recognizable and well-

9

loved confectionery brands -- including Orbit(R), Extra(R), Doublemint(R), M&M's(R), Snickers(R) and Mars(R) -- as well as leading food, beverage and pet care brands, totaling over $27 billion in global sales.

Mars, Incorporated has agreed to pay $80 cash for each share of Common Stock and Class B Common Stock of the Wrigley Company in a transaction valued at approximately $23 billion. The terms of the transaction have been unanimously approved by the Wrigley Board of Directors. Based on Wrigley's closing share price of $62.45 on April 25, 2008, and its three-month weighted average share price of $59.88, this price represents a premium of 28 percent and 34 percent, respectively, to the Company's stockholders. This price also represents 4.3 times Wrigley's 2007 net sales and over 35 times Wrigley's 2007 earnings per share.

Mars, Incorporated, will acquire 100 percent of Wrigley's outstanding shares and all of its outstanding options will be cashed out. The Wrigley Company will operate as a separate, stand-alone subsidiary, keeping its headquarters in Chicago and continuing its civic and philanthropic involvement, both locally and in its communities around the world. Additionally, Bill Wrigley, Jr. will continue serving as the Company's Executive Chairman. As part of the transaction, Mars' non-chocolate sugar brands -- including Starburst(R) and Skittles(R) -- will be added to Wrigley's confectionery portfolio, joining such well-known brands as Lifesavers(R) and Altoids(R).

"First and foremost, this is a great transaction at a great price that provides tremendous value to Wrigley stockholders," noted Bill Wrigley, Jr., Executive Chairman and Chairman of the Board. "Additionally, in terms of Wrigley's ongoing business, the true value of this transaction arises primarily from enhanced growth opportunities, including the potential for cross-pollination of people, ideas and brands, and significant enhancements of sales, marketing and distribution infrastructures. We see this as an historic opportunity to preserve what is special about the Wrigley Company in terms of values and culture, while continuing to grow and develop our associates, invest in our brands and drive long-term generational growth. So, from every perspective, I strongly support the transaction." ...

The merger unites two outstanding confectionery traditions. With the Wrigley Company being founded in 1891 and Mars, Incorporated being established in 1911, the combined enterprise will have over two centuries of experience in producing outstanding confectionery products, delighting consumers, and building great brands and strong businesses around the world.

"This combination brings together two strong, complementary confectionery organizations," noted Bill Perez, President and Chief Executive Officer. "A big part of what attracted Mars to Wrigley was our proven track record in the marketplace and the talent of our people. As a stand-alone subsidiary of Mars,

with our strong, global leadership team in place, we will have the opportunity to accelerate our already strong growth trajectory."

Funding for the transaction includes approximately $11 billion from Mars, a $5.7 billion committed senior debt facility from Goldman, Sachs, and $4.4 billion of subordinated debt from Berkshire Hathaway, Inc. At closing, Berkshire Hathaway has committed to purchase a minority equity interest for $2.1 billion in the Wrigley Company subsidiary at a discount to the share price being paid to the stockholders of Wrigley. …

For this transaction, Goldman, Sachs acted as the Wrigley Company's financial advisor and also as placement agent for the securities to Berkshire Hathaway; William Blair Incorporated acted as a financial advisor and provided an independent fairness opinion; and Skadden, Arps, Slate, Meagher & Flom, LLP served as legal advisor.

SPECIAL NOTE: As a result of this significant event, Bill Wrigley, Jr. sent the following e-mail to all Wrigley associates worldwide:

From the Office of Bill Wrigley, Jr.
TO: All Wrigley Associates
FROM: Bill Wrigley, Jr.
DATE: April 28, 2008
SUBJECT: Important Announcement Regarding Our Future

Dear Wrigley Associates,

Today, the Wrigley Company is making a momentous and exciting announcement about our future as a global confectionery company. We have signed an agreement to merge with Mars, Incorporated, a global, $22 billion private family-owned company. If approved, the Wrigley Company will become a separate, stand-alone subsidiary of Mars, with me serving as Executive Chairman of the Wrigley Company, our current leadership team in place, and an understanding that we will manage our company as a stand-alone entity. We will continue to do what we do best, while having access to taking full advantage of the worldwide talent, innovation, and experiences of Mars, Incorporated.

Obviously, this is an historic decision, and one that, no doubt, will come as a great surprise to all of you. Frankly, it's not something that even I had envisioned, until this extremely compelling opportunity was presented to us.

The Mars family approached us with an all-cash offer to merge with their company. While the Board of Directors did not seek out the Mars offer, we had a fiduciary responsibility to consider it and, after thorough deliberations, determined that the opportunity is in the best interest of the Company's stockholders, many of whom are Wrigley associates. Funding for the purchase

includes cash from Mars and subordinated debt financing from Warren Buffett's company, Berkshire Hathaway -- which will hold an equity interest in the Wrigley Company subsidiary. Our stockholders will vote on the merger at a special stockholders' meeting later this year.

The stockholder benefits of this opportunity are clearly apparent. What I find especially motivating and compelling, however, is what it means for the future generational growth of our company and our people. This combination has the potential to bring together two strong, complementary confectionery organizations, both committed to driving long-term dynamic growth. At the same time, it frees us from some of the costs -- as well as the constraints and short-term results pressure -- that come with being a public company.

I want you to know that I strongly support this decision, and I will remain fully involved in the organization and the business going forward as Executive Chairman of the Wrigley Company. I also want to emphasize that Mars recognizes that our success has been fueled by the energy, imagination and hard work of our strong leadership team and remarkably talented associates around the world. Their intent is for us to run as a separate entity with a high degree of autonomy -- which they have done successfully with other mergers. Bill Perez and I, along with Paul S. Michaels, Mars Global president, fully expect our Executive Leadership Team and the global leadership of our company to remain in place as active leaders of the business.

I've spent a considerable amount of time with their leadership team and Mars family members, and I do take them at their word on this. Mars understands our business, our values and our culture, as well as our operating philosophy and the way we invest long-term in our brands and our people, and they have no intention to change the way we operate or our unique culture. In fact, our people, our ability to drive growth, iconic brands, geographic reach, and extensive supply chain and innovation expertise are all things that attracted them to Wrigley. In addition, we will maintain our headquarters in Chicago and continue our community involvement, both in the areas of the world where do business as well as through the Wm. Wrigley Jr. Company Foundation.

Since its founding in 1911, Mars has been a private company, so you might not be very familiar with the size and breadth of their organization. Although best known for M&Ms(R), and Snickers(R), Mars is a major, global consumer goods company with interests in confectionery and snacks, as well as other food, beverage, and pet care products including Dove(R), Uncle Ben's(R), Pedigree(R), Whiskas(R), Royal Canin(R), and Banfield Pet Hospitals(R). Like us, they invest in their brands and build for the long-term. In fact, a significant majority of their business comes from a relatively small number of brands -- which is an important indication of their commitment to building and sustaining brand strength.

The true value of this combination arises primarily from enhanced prospects for growth. The merger will generate a new world of opportunities for our people, in addition to the potential for cross-pollination of ideas and brands and further enhancements of sales, marketing and distribution infrastructures. One immediate advantage is that Mars' non-chocolate sugar brands -- including Starburst(R) and Skittles(R) -- will be added to Wrigley's confectionery portfolio upon consummation of the merger.

The intent is for the Wrigley Company to be a stand-alone entity in order to avoid distracting the associates of both companies and possibly diminishing the outstanding business momentum currently in place. Our objective is to allow our strengths and assets to complement each other, providing even more opportunity for growth and career development.

Overall, I am confident that there are more opportunities to grow this business in a private environment than there are as a publicly-held company. Together, we will be a company with over $27 billion in sales and more than 64,000 associates worldwide. This combined entity will be, among other things, the world's leading confectionery company, with the resources and critical mass to explore new geographies and categories that might have been beyond our reach in the past.

Of course, this represents a significant change for us -- a change that is emotional for me, as I imagine it will be for you. As we assessed this opportunity, however, I thought a lot about something you've heard me say many times. We must respect the past, but, at all times, do what's right for the future. Every generation of Wrigley leadership has had to make decisions that are in the best long-term interests of our stockholders and our associates. We have a long legacy of preserving what makes us special, while always doing what it takes to be dynamic, competitive, and forward-looking. Being a public company has given us the financial security to grow with the support of our stockholders. Today, however, we have an opportunity to grow as a private company, while preserving our values, our heritage, and the unique culture that has inspired our success. Rest assured, one thing that will never change is the way we treat our associates, both in terms of acting with trust, dignity and respect and in terms of rewarding you appropriately for your hard work and dedication.

I also want to emphasize that we remain committed to an operating philosophy of driving generational growth, and that this opportunity will be, in fact, an enabler of generational growth. I have always believed that generational growth means the responsibility and the privilege of passing on to future associates a company that is stronger and better poised for growth than the one we received. It is about building a legacy of opportunity and shared success ... and that legacy is much more than the Wrigley family, it is about all of our associates who have made and will continue to make that growth possible. This is our chance to create a legacy of opportunity and long-term future success.

So, we envision this to be a win-win-win for our stockholders, the company and our people. We have the opportunity to be a privately-held company, add significant confectionery brands to our portfolio, and combine ideas, resources and energy with one of the best consumer product companies in the world. ...

If there were one thing I could change about this opportunity, it would be the "hurry up and wait" nature of this process. I wish the timing and the pace of the announcement could have been slower, allowing you more time to analyze, discuss and adjust to this news. But as a still publicly-traded company, we are legally obligated to disclose this kind of information as quickly and broadly as possible. That said, I wish the interim period between now and the close could go faster, eliminating the stretches of time when we are in a "wait-and-see" mode and getting us to the point where we can really drive the combined business as soon as possible. Our intent is to close the transaction in the next 6-12 months.

Bill Perez, the Executive Leadership Team and I want to emphasize that we need to continue to do what we do best - winning consumers, servicing customers, and delivering great products and results. All of our energy needs to be focused on our aspirations for growth and delivering our 2008 plan - and we're off to a great start. By maintaining business momentum - at both companies - we will be in the optimal position to capitalize on the opportunities that will be available to the combined organization. ...

We all need to look to the future with optimism. I am certain that this merger will bring new opportunities for growth and tremendously exciting possibilities for all of us. I can't wait to be part of this dynamic future, and I hope you will feel the same way.

With best regards,

Bill Wrigley, Jr.

24.     Bill Wrigley, the Company's former President and Chief Executive Officer, and current Executive Chairman and Chairman of the Board, as well as the Company's controlling shareholder (with over 40% of voting control), has a personal significant interest in the Proposed Buyout. The Proposed Buyout would create a liquidity event to cash out his otherwise illiquid equity interest in Wrigley. As a group, all directors and executive officers own 3.8% of Class A Common Stock and 45.15% of Class B Common Stock. The Proposed Buyout would also trigger substantial change in control benefits in excess of $70 million for Bill Wrigley and other

Company executives and board members. According to an April 29, 2008 article in *Financial Week*, Bill Wrigley "will pocket $1.36 billion in cash from the sale" and the "Wrigley family will receive more than $4.33 billion by selling its stock." Other senior executives will receive a combined $61.34 million from the sale.

25.    Defendant Bill Wrigley and other Company executives will receive financial gain under the Merger Agreement because options they hold, included unvested options, will be cashed out immediately upon consummation of the Proposed Buyout. Section 2.2 of the Merger Agreement provides that options "outstanding and unexercised as of the Effective Time (whether vested or unvested)" granted under the Company's 2007 or 1997 Management Incentive Plan to be cashed out and "converted into the right of the holder to receive from the Surviving Corporation an amount of cash...."

26.    Defendant Bill Wrigley will also be "designated the Executive Chairman (and senior most executive officer of the Surviving Corporation) ... with responsibility for the business and operations of the Surviving Corporation." Additionally, most members of Wrigley's senior management will retain their positions and the perquisites therefrom after the completion of the Proposed Buyout. According to an April 29, 2008 article in *The Chicago Tribune*, Bill Wrigley has said that he expects a "high degree of autonomy" from Mars in running the Wrigley subsidiary; that defendant Perez will remain as chief executive; and that he does not anticipate any major changes in employment in Chicago (the Company's headquarters). Indeed, as noted by Robert Moskow, an analyst with Credit Suisse: "Wrigley has always wanted to expand into the broader confectionary arena, and maybe they realize this is the best way to do that *and keep their jobs*." [Emphasis added].

15

27.     The terms of the Merger Agreement are also favorable for the members of the Wrigley board – the Individual Defendants – who will retain positions at the new company. Pursuant to Section 1.5 of the Merger Agreement, the directors "immediately prior to the Effective Time shall be the directors of the Surviving Corporation…."

28.     The Merger Agreement and related agreements further include a combination of onerous and unreasonable deal protection devices that effectively preclude topping bids.

29.     Section 6.5 of the Merger Agreement prohibits Wrigley and its Board from discussing or negotiating with any third parties, except in very limited circumstances.  In order for Wrigley to even discuss a potential competing "Acquisition Proposal," as defined in the Merger Agreement, the Board must determine in good faith that a failure to consider the proposed transaction would be inconsistent with its fiduciary duties.  Once Wrigley receives an Acquisition Proposal, or any request for information that could reasonably be expected to lead to an Acquisition Proposal, it must notify Mars in writing within 48 hours, and it must include the identity of the person making such a proposal and provide a summary of the material terms.  The Merger Agreement defines Acquisition Proposal as:

> any proposal or offer to acquire in any manner an equity interest representing a 20% or greater economic or voting interest in the Company or any of its material subsidiaries representing 20% or more of the consolidated assets or net income of the Company and its subsidiaries, other than transactions contemplated by this Agreement.

30.     Under Section 6.5(b) of the Merger Agreement, if Wrigley's Board receives an unsolicited Acquisition Proposal that constitutes a Superior Proposal (as defined in the Merger Agreement) and the Company has not breached any of the provisions set forth in Section 6.5(a), the Board may terminate the Merger Agreement or may approve or recommend such Superior Proposal to its stockholders.  In order to terminate the Merger Agreement, however, the Board

16

must provide written notice to Mars (a "Notice of Superior Proposal") advising Mars that the Company has received a Superior Proposal. The Notice of Superior Proposal must specify the identity of the person making such Superior Proposal and must include the material terms of such Superior Proposal and copies of any written offer or proposal. Mars has four business days following receipt of the Notice of Superior Proposal to make adjustments to the Merger Agreement so that, as determined by the Board, such Acquisition Proposal would no longer constitute a Superior Proposal (*i.e.*, all Mars has to do is match the competing offer). Further, the Merger Agreement provides that if Wrigley terminates the Merger Agreement, the Company must pay a $690 million termination fee to Mars, approximately 3 percent of the $23 billion deal value.

31.   The Merger Agreement defines a "Superior Proposal" in 6.5(c) as:

Any Acquisition Proposal for more than 80% of the outstanding equity interests in the Company or more than 80% of the consolidated assets of the Company and its subsidiaries, taken as a whole, on terms that the Board of Directors of the Company determined in good faith, after consultation with the Company's outside legal and financial advisors (taking into account such factors at the Board of Directors of the Company considers to be appropriate including the conditionality, timing and likelihood of consummation of such Acquisition Proposal) are more favorable to the Company's stockholders from a financial point of view than the transactions contemplated by this Agreement.

As such, a Superior Proposal can arise, and the Board can change its recommendation, only where the competing "Acquisition Proposal" is for more than 80% of Wrigley's outstanding equity interests or for more than 80% of its consolidated assets and its subsidiaries. That provision prevents the Wrigley Board – which did not conduct any sort of auction or seek alternative proposals – from considering any competing strategic alternative except and unless it is for the overwhelming majority of the company. This effectively precludes financing arrangements that could otherwise provide a superior alternative to the merger currently contemplated.

17

32.     Section 6.7 of the Merger Agreement provides signification indemnification for Wrigley directors and officers, including the Individual Defendants.    This indemnification includes shielding the Wrigley directors and officers from "all claims, losses, liabilities, damages, judgments, inquiries, fines and reasonable fees, costs and expenses, including attorneys' fees and disbursements (collectively, 'Costs'), incurred in connection with an Action, whether civil, criminal, administrative or investigative" pertaining to the fact that the Indemnified Party is or was an officer, director, fiduciary or agent of the Wrigley and any of its subsidiaries, whether asserted to, or claimed prior to, at or after the Effective Time.  Mars will protect the directors and officers to the fullest extent permitted by applicable law for a period of six years from the Effective Time.

33.     On April 27, 2008, Wrigley amended its Rights Agreement, adding a provision limiting the "legal or equitable rights, remedy or claim" of registered holders of the Rights Certificates in connection with any Acquiring Person (as defined in the Rights Agreement). Wrigley's Board took this action specifically for the benefit of Mars, the Wrigley family, its Board and management, so that the Proposed Buyout could be entered into without triggering Wrigley's "poison pill."

34.     The Proposed Buyout was negotiated in only two weeks without any effort to contact other potential bidders in order to put the Company in the best position to maximize shareholder value.  According to news reports, there seems to have been no effort made to contact other potential bidders for the Company.  To the contrary, after Mars' management approached Wrigley's management in early April 2008, talks between the two companies are reported to have commenced on April 11, 2008, and the Merger Agreement followed within just over two weeks.    Indeed, according to Wrigley's press release announcing the Merger

Agreement, the Company's financial advisor for the transaction – Goldman, Sachs – is providing a $5.7 billion committed senior debt facility in connection with the Proposed Buyout.

35.     The Merger Agreement was agreed to in furtherance of an unfair plan by the Individual Defendants to sell the Company, which sale, if not enjoined, will result in the improper elimination of the public stockholders of Wrigley in a transaction that is inherently unfair to them and that is the product of the Individual Defendants' conflicts of interest and breach of fiduciary duties, as well as a conflict of interest of the Company's financial advisor, as described herein. More particularly, the transaction is in violation of the Individual Defendants' fiduciary duties and has been timed and structured unfairly in that:

(a)     The Proposed Buyout is designed and intended to eliminate members of the Class as stockholders of the Company from continued equity participation in the Company for cash consideration that the Individual Defendants know or should know is unfair and inadequate.

(b)     The Individual Defendants have unique knowledge of the Company and have access to information denied or unavailable to the Class. Without all material information, Class members are unable to determine whether the price offered in the transaction is fair.

(c)     In agreeing to the Proposed Buyout, the Individual Defendants have initiated a process to sell Wrigley that imposes heightened fiduciary responsibilities on them and requires enhanced scrutiny by the Court. The Individual Defendants owe fundamental fiduciary obligations to the Company's public shareholders to take all necessary and appropriate steps to maximize the value of their shares in implementing such a transaction. In this regard, the Individual Defendants have the responsibility to conduct fair and active bidding procedures or other mechanisms for reliably checking the market to assure that the highest possible price is

achieved. The Individual Defendants have breached their fiduciary duties by reason of the acts and transactions complained of herein, including their agreement with Mars without making any effort to ascertain the transactional value of the company and by giving matching rights to Mars to thwart any competitive bidding interest.

36.     Because the Individual Defendants dominate and control the business and corporate affairs of Wrigley, and are in possession of private corporate information concerning Wrigley's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Wrigley, that makes it inherently unfair for them to pursue any proposed transaction wherein they and/or third parties will reap disproportionate benefits without maximizing stockholder value for Wrigley's public Class A shareholders.

37.     As a result of the actions of defendants, plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Wrigley's assets and businesses and will be prevented from benefiting from a value-maximizing transaction.

38.     Defendant Mars has aided and abetted the Individual Defendants in their breaches of fiduciary duty. Mars knows of the Individual Defendants' breaches of fiduciary duty and, in fact, Mars actively and knowingly encouraged and participated in said breaches in order to obtain the substantial financial benefits that the Proposed Buyout would provide to Mars at the expense of Wrigley's Class A shareholders.

39.     Mars participated in the breaches of the fiduciary duties by the Individual Defendants for the purpose of advancing its own interests. Mars will obtain both direct and indirect benefits from colluding with and aiding and abetting the Individual Defendants'

breaches. Mars will benefit from the acquisition of the Company at an inadequate and fair price if the Proposed Buyout is consummated.

40.     Mars has knowingly aided and abetted the breaches of fiduciary duty committed by the Individual Defendants to the detriment of Wrigley's public shareholders. Mars demanded deal protection measures knowing that the Individual Defendants had failed to take any measures to ascertain Wrigley's transactional value. Mars thereby facilitated the Individual Defendants' breaches of fiduciary duty in the sale of the Company. Further, Mars and its shareholders are the intended beneficiaries of the wrongs complained of herein and would be unjustly enriched absent relief in this action.

41.     Unless enjoined by this Court, the Individual Defendants, aided and abetted by defendant Mars, will continue to breach their fiduciary duties owed to plaintiff and the Class, and may consummate the Proposed Buyout, which will exclude the Class from its fair share of Wrigley's valuable assets and businesses to the irreparable harm of the Class.

42.     Plaintiff and the other members of the Class have no adequate remedy at law.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff respectfully demands judgment, on behalf of itself and all members of the Class, against defendants as follows:

A.     Declaring this action to be a class action and certifying plaintiff as the Class representative and plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants from taking any steps to consummate the Proposed Buyout;

C.     Ordering the Individual Defendants to carry out their fiduciary duties to plaintiff and the other members of the Class by announcing their intention to:

21

      (i)     cooperate fully with any person or entity having a *bona fide* interest in proposing a transaction that would maximize shareholder value, including, but not limited to, a buyout or takeover of the Company;

      (ii)    undertake an appropriate valuation of Wrigley's worth as a merger/ acquisition candidate; and

      (iii)   take all appropriate steps to expose Wrigley to the marketplace in an effort to create an active auction among all potential bidders.

     D.    Directing defendants, jointly and severally, to account to plaintiff and the Class for all damages suffered and to be suffered by them as a result of the wrongs complained of herein;

     E.    Awarding plaintiff the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of plaintiff's attorneys and experts; and

     F.    Granting such other and further relief as may be just and fair in the premises.

ROSENTHAL, MONHAIT & GODDESS, P.A.

Joseph A. Rosenthal (Del. Bar No. 234)
Jessica Zeldin (Del. Bar No. 3558)
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
(302) 656-4433
  Attorneys for Plaintiff

22

OF COUNSEL:

Jeffrey W. Golan
Jeffrey B. Gittleman
Julie B. Palley
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19130
(215) 963-0600

May 8, 2008

Exhibit D

EFiled:  May  8 2008  4:10PM EDT
Transaction ID 19750756
Case No. 3756-

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CORA E. BENNETT, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No._____ |
| WILLIAM WRIGLEY, JR., WILLIAM D. PEREZ, JOHN F. BARD, HOWARD B. BERNICK, THOMAS A. KNOWLTON, JOHN RAU, MELINDA R. RICH, STEVEN B. SAMPLE, ALEX SHUMATE, RICHARD K. SMUCKER, and WM. WRIGLEY JR. COMPANY, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiff alleges upon information and belief, except for paragraph 3 hereof, which is alleged upon personal knowledge, as follows:

## SUMMARY OF ACTION

1.    Plaintiff brings this case as a class action on behalf of herself and all other similarly situated shareholders of Wm. Wrigley Jr. Company ("Wrigley" or the "Company"), for injunctive and other appropriate relief in connection with the proposed acquisition of Wrigley by Mars Incorporated ("Mars"), through a merger for $23 billion.  Pursuant to the terms of the Merger Agreement, stockholders of the Company will be entitled to receive $80.00 in cash for each share of the Company's common stock and Class B common stock.  The Merger Agreement provides that if the Agreement is terminated, Wrigley will be required to pay a termination fee of $690 million, under certain circumstances.

2.    This merger consideration is unfair and inadequate because it does not provide Wrigley shareholders with a sufficient premium over market.

## THE PARTIES

3.    Plaintiff owns shares of Wrigley common stock and has owned such shares at all material times.

4.    William Wrigley is the Executive Chairman and Director of Wrigley since 1988.

5.    William D. Perez ("Perez") is the President, Chief Executive Officer and has served as a director since 2006.

6.    John F. Bard ("Bard") has been a director since 1999.

7.    Howard B. Bernick ("Bernick") has been a director since 2001.

8.    Thomas A. Knowlton ("Knowlton") has been a director since 1996.

9.    John Rau ("Rau") has been a director since 2005.

10.    Melinda R. Rich ("Rich") has been a director since 1999.

11.    Steven B. Sample ("Sample") has been a director since 1997.

12.    Alex Shumate ("Shumate") has been a director since 1998.

13.    Richard K. Smucker ("Smucker") has been a director since 1988.

14.    Wrigley is a Delaware corporation with headquarters located in Chicago, Illinois. Wrigley stock is actively traded on the New York Stock Exchange (an open and efficient market) under the symbol "WWY."

15.    The defendants identified in paragraphs four through thirteen hereof will be referred to as the "Individual Defendants". By virtue of the Individual Defendants' positions as officers and/or directors of Wrigley, they are in a fiduciary relationship with plaintiff and the other Wrigley public shareholders and owe them the highest obligations of good faith, fair dealing, loyalty and due care.

**CLASS ACTION ALLEGATIONS**

16.     Plaintiff brings this action individually and as a class action on behalf of the holders of Wrigley common stock (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants.

17.     This action is properly maintainable as a class action because:

a.     The class is so numerous that joinder of all members is impracticable.  As of January 15, 2008 there were approximately 217,515,229 shares of Wrigley common stock outstanding.

b.     There are questions of law and fact which are common to the class including *inter alia,* the following:

i.     Whether the individual defendants have breached their fiduciary and other common law duties owed by them to plaintiff and the other members of the Class;

ii.     Whether defendants are unlawfully preventing the Company's public shareholders from maximizing the value of their Wrigley holdings; and

iii.     Whether the Class is entitled to injunctive relief or damages as a result of defendants' wrongful conduct.

c.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of other members of the Class and plaintiff has the same interests as the other members of the Class.

d.     Defendants have acted in a manner which affects plaintiff and all other members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

3

## SUBSTANTIVE ALLEGATIONS

**Background**

18.    Wrigley together with its subsidiaries describes itself as a manufacturer and marketer of chewing gums, mints, hard and chewy candy, and other confectionary products in the United States and internationally.  The Company offers its products in approximately 180 countries under the Wrigley's Spearmint, Juicy Fruit, Life Savers, Altoids, Creme Savers, and Sugus brand names.

19.    On April 28, 2008, Wrigley issued a press release announcing the Company reached an agreement to merge with Mars.  The offer by Mars is partially financed by Warren Buffett's Berkshire Hathaway Inc. for approximately $4.4 billion of subordinated debt.  The deal will give Berkshire Hathaway Inc. a stake of more than 10 percent in Wrigley.

20.    It is apparent, according to news articles, that the Wrigley Board did not conduct an auction before agreeing to the cash out merger with Mars.  The lack of an auction is corroborated by a *Hoover's* article titled: "The luxury of being Warren Buffett," posted on August 31, 2007. According to the article, Berkshire Hathaway Inc. "doesn't participate in auctions."

21.    The lack of an auction consideration was confirmed on April 28, 2008 by a letter from Bill Wrigley, Jr., to the Wrigley associates. In the letter, Mr. Wrigley discusses in detail the merger agreement with Mars, and Berkshire Hathaway.  The letter fails to mention whether there were other potential offers for Wrigley or whether the Company did anything to conduct an auction to obtain the highest bid for shareholders.  Indeed, in an April 29, 2008, article entitled "Buffett Unveils Latest Deal Days Before Annual Meeting, But He May Need to Do More," *The Wall Street Journal* reported that at the instance of Mr. Buffett, there was no auction process, noting that "there aren't many public traded – or even closely held – companies whose boards wouldn't want to shop around for the highest prices."

4

**Company Financials**

22.     On February 4, 2008, the Company issued a press release announcing a "15 Percent Gain to Record Annual Net Sales of $5.4 Billion; Full Year Earnings Per Share Climb 20 Percent to New High." According to the press release, "fully diluted net earnings per share were $2.28 for the year, up $0.30 or 20 percent from a year ago. On a non-GAAP basis, excluding the impact of current year gains from asset sales, and restructuring charges in both periods, fully diluted earnings per share for the full year were $2.24, up $0.23 or 11 percent from 2006." President and Chief Executive Officer Bill Perez is quoted stating:

> In a year of rising costs and competition, we delivered against our long-term goal of 9 to 11 percent earnings per share growth for the eighth consecutive year. In fact, we pushed the high end of that range, while at the same time, improving the overall shape of our financial results, with higher gross margins, lower relative operating expenses, and sharply increased brand support.

23.     Bill Wrigley, Jr., Executive Chairman of the Board, was also quoted in the press release stating:

> Crossing $5 billion in sales represents the achievement of an ambitious aspiration we had set for ourselves several years ago. More importantly, this growth was accomplished along with the strategic diversification of our brand portfolio and confectionary capabilities, as well as the expansion of our sales infrastructure and the increased efficiency of our supply chain operations. These initiatives have us well-positioned to continue capturing opportunities in global confectionery, which remains one of the fastest growing categories in the food sector.

24.     Included in the February 4, 2008, press release was a statement by Perez addressing the Board's action on dividends and repurchase authority, which stated in relevant part: "The dividend increase and new share buyback authorization underscore the Company's continued financial strength and the confidence the Board of Directors has in Wrigley's long-term business prospects."

5

25.     On March 12, 2008, the Company issued a press release discussing the year 2007 accomplishments and strategies for future success.  CEO Bill Perez stated in relevant part:

> Wrigley grew its global top-line at a healthy 15% and has strong plans to improve its global share performance in 2008.
>
> ***
>
> Wrigley also has tremendous opportunities to build consumption of its brands in China, India and Russia, where per capita gum consumption is lower than in the U.S. and Western Europe.  In China, Wrigley is the largest confectionery company with more points of distribution than any other consumer packaged goods company in the country.  In India, Wrigley is improving its presence in traditional and in growing modern trade channels.  In Russia, there is significant opportunity to increase non-gum confections like Juicy Fruit chewy candies and A. Korkunov chocolates.
>
> ***
>
> We have a remarkable Wrigley team around the world, and we know that our people-who helped deliver our $5 billion sales aspiration– are ready to take it to the next level.

26.     On April 28, 2008, the Company announced a 17% per share increase on double-digit sales gains to new first quarter record.  According to the press release net earnings for the quarter of earnings rising per share to $0.11 or 22 percent from the same quarter last year.  CEO Bill Perez is quoted as stating:

> In addition to delivering strong first quarter results, we are taking the necessary steps to strengthen our brands, our marketplace position, and some key financial metrics.  Gross margins are up, operating expenses as a percentage of sales are down, and we continue to make strategic, incremental investments in brand support. We are focused on growth, particularly in the U.S., where we remain pleased with the continued strong performance of 5TM and are excited about the potential of our new product and packaging initiatives currently rolling out into the marketplace, both in the U.S. and around the world.

27.     Bill Wrigley is also quoted stating:

> The strong results this quarter are a reflection of our broad global base of operations, in particular, the vigor of our business operations in fast-growing marketplaces across the developing

6

> geographies of East Europe and Asia. The overall confectionery category remains strong despite the economic turbulence so far this year, and we continue to make significant investments in sales capabilities, innovation and brand building to take full advantage of long-term business opportunities.

28.     According to the S&P 1500 Packaged Food Index, Wrigley traded at 23 times estimated 2009 earnings, the second-highest multiple in the Index (_15GSPFOOD-News).

## Analysis of the Acquisition

29.     On April 28, 2008, *Reuters* issued a ratings update of the proposed merger with Mars. According to the article, Wrigley's "may see its ratings cut due to its proposed merger with Mars Inc. whose partial debt financing may worsen the No. 1 chewing gum maker's credit profile." The Standard and Poor's ("S&P") commented: "Given the expected increase in debt associated with this transaction, we believe Wrigley's credit measures will weaken from currently strong levels." The S&P further stated that "it may cut Wrigley's corporate rating of "A-plus," the fifth highest investment grade." The article continued with Moody's Investors Service commenting on the merger by stating it may "downgrade Wrigley's ratings because the partially debt-financed transaction will likely result in a weaker credit profile at Wrigley, as a subsidiary of Mars."

30.     On April 29, 2008 The *AP* issued an article titled "Ahead of the Bell: Citi cuts Wrigley as it nears bid price." The article discussed the downgrading of Wrigley shares after the Mars announcement that it would buy Wrigley's. Citi Investment Research analyst David Driscoll in a note to investors stated: "shares are fast approaching the $80 per share purchase price." As a result, Wrigley was lowered to a status of "Hold" from "Buy."

## Summary of the Breaches

31.     Wrigley has knowingly aided and abetted the breaches of fiduciary duty committed by the director defendants. The Company has allowed itself to be sold to the lowest bidder, to the

detriment of Wrigley shareholders.  Wrigley has so agreed to enable Mars to acquire Wrigley at the lowest possible price.

32.      By reason of the foregoing, the director defendants, aided and abetted by Wrigley, have breached and are breaching their fiduciary duties to the members of the Class to the detriment and at the expense of Class members.  The price that the defendants agreed to sell Wrigley to Mars is far below Wrigley's value.  The Board's approval of the merger was a breach of fiduciary duty.

### BREACH OF FIDUCIARY DUTY

33.      Plaintiff incorporates by reference the prior allegations set forth above.

34.      Defendants owe plaintiff and other Wrigley shareholders a fiduciary duty of loyalty, good faith, due care, and candor.

35.      Defendants breached those fiduciary obligations to plaintiff and other class members by agreeing to accept a consideration for the shares of Wrigley that is substantially less than their value.  Defendants have breached their fiduciary obligations to maximize the value of plaintiff's and other class members' Wrigley shares.

36.      Defendants' breach of fiduciary duty has caused injury to plaintiff and other Wrigley shareholders.

37.      Plaintiff and other class members have suffered damages because they will only receive $80.00 for each of their Common and Class B Wrigley shares, an amount substantially less than the value of plaintiff's and other class members' Wrigley shares.

38.      Plaintiff has no adequate remedy at law.

WHEREFORE, plaintiff prays for judgment and relief as follows:

A.      Ordering that this action may be maintained as a class action and certifying plaintiff as the Class representative;

8

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them, from proceeding with, consummating or closing the proposed merger;

C.      In the event the proposed merger is consummated, rescinding it and setting it aside or awarding rescissory damages to the Class;

D.      Directing defendants to account to Class members for their damages sustained as a result of the wrongs complained of herein;

E.      Awarding plaintiff the costs of this action, including a reasonable allowance for plaintiff's attorneys' and experts' fees;

F.      Granting such other and further relief as this Court may deem just and proper.

Dated: May 8, 2008                           **RIGRODSKY & LONG, P.A.**

                                    By:  */s/ Brian D. Long*
                                          Seth D. Rigrodsky (#3147)
                                          Brian D. Long (#4347)
                                          919 North Market Street, Suite 980
                                          Wilmington, DE  19801
                                          (302) 295-5310

                                          *Attorneys for Plaintiff*

**OF COUNSEL:**

**VIANALE & VIANALE LLP**
2499 Glades Road, Suite 112
Boca Raton, FL 33431
(561) 392-4750

**SARRAF GENTILE LLP**
11 Hanover Square
New York, New York
(212) 868-3610

9

Exhibit E

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 1941375 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1941375 (N.D.Ill.))**

**H**

Starr v. Levin
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Max STARR, Plaintiff,
v.
Martin LEVIN, Defendant.
**No. 02 C 2258.**

Aug. 21, 2002.

Investor brought diversity action against salesman
alleging fraud, breach of fiduciary duty, and breach
of contract in relation to real property investment in
Florida. On salesman's motion to stay action, the
District Court, Aspen, J., held that: (1) state and
federal cases were in parallel, and (2) exceptional
circumstances existed to justify court's surrender of
jurisdiction.

Motion granted.

West Headnotes

**[1] Federal Courts 170B ⇐⇒47.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(B) Right to Decline Jurisdiction; Ab-
stention Doctrine
       170Bk47 Particular Cases and Subjects,
Abstention
        170Bk47.1 k. In General. Most Cited
Cases
Diversity lawsuit in federal district court in Illinois
was parallel with state proceeding in Florida, for
purpose of consideration of stay based on *Colorado
River* abstention doctrine, since complaints con-
tained essentially same factual allegations, parties
were substantially same in both lawsuits, both law-
suits sought damages to be awarded to plaintiff,
even though in state case those damages were on
behalf of corporations he wholly owned, or owned

in conjunction with defendant, and state case
claimed various equitable remedies in the form of
accounting and constructive trust.

**[2] Federal Courts 170B ⇐⇒47.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(B) Right to Decline Jurisdiction; Ab-
stention Doctrine
       170Bk47 Particular Cases and Subjects,
Abstention
        170Bk47.1 k. In General. Most Cited
Cases
Exceptional circumstances existed to justify sur-
render of jurisdiction by Illinois federal district
court to Florida state court, for purpose of consider-
ation of stay based on *Colorado River* abstention
doctrine, of cases that were parallel actions, since
Florida assumed jurisdiction over property at issue,
inconvenience of federal forum placed greater bur-
den on defendant, Florida case had already pro-
ceeded to discovery while time to answer had not
expired in federal case, and source of governing
law for plaintiff's claims of fraud, breach of con-
tract, and breach of fiduciary duty under both com-
plaints was state law, as opposed to federal law.

MEMORANDUM OPINION AND ORDER

ASPEN, Senior J.
**\*1** Plaintiff Max Starr has filed a three count com-
plaint against Defendant Martin Levin alleging
fraud, breach of fiduciary duty, and breach of con-
tract in relation to a real property investment in
Nassau County, Florida. Starr has also filed a re-
lated suit in Nassau County. Given the existence of
the Florida suit, Levin has filed a motion to dismiss
or stay pursuant to the *Colorado River* abstention
doctrine or, in the alternative, to transfer venue to
the Middle District of Florida. For the following
reasons, we grant Levin's motion to stay these pro-
ceedings pending resolution of parallel proceedings

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in the Florida state court.

## BACKGROUND

The following facts are taken from Plaintiff's complaint and are assumed to be true for purposes of this motion. Starr and Levin own and operate Group 12, L.L.C. ("Group 12"), a Delaware limited liability company, and, in its name, purchased all of the outstanding capital stock of Native Woodland Properties, Inc. ("Native Woodland"), a Florida corporation. Native Woodland owns 950 acres of land in Nassau County, Florida, known as Oyster Bay Property ("Oyster Bay"), which Starr and Levin intended to develop, improve and sell for their mutual benefit.

Count One alleges fraudulent conduct by Levin and corresponding injury to Starr. From December 1998, Levin allegedly made several fraudulent statements to Starr to induce Starr's further investment in Group 12. These statements include Levin's unfulfilled promise to contribute equally to Group 12's business ventures, Levin's false representations that he had contributed the assets of a Russian lumber mill and Swiss bank account to Group 12, Levin's false representation that mortgages encumbering Oyster Bay totaled less than one million dollars when they actually totaled in excess of six million dollars, and Levin's false representation that the Oyster Bay mortgages had been "taken care of" and paid, thereafter causing Starr to suffer a foreclosure action for an amount in excess of seven million dollars.

Count Two of the instant complaint alleges Levin's breach of fiduciary duty. It alleges Levin's making of the fraudulent statements recited above, Levin's failure to deliver (and destruction of) original accounting documents to Starr, Levin's refusal or failure to cause numerous corporations to issue stock to Starr where Starr was supposed to own 50% of those corporations, Levin's inappropriate moving of assets between various other corporate entities in order to hide those assets from Starr, Levin's re-

peated issuance of bad checks on behalf of Group 12, and Levin's gross mismanagement of Group 12 and Native Woodland.

Count Three of the instant complaint alleges breach of contract-specifically, that Levin and Starr each promised to provide equal amounts of capital to Group 12, but Levin contributed far less than the required amount.

As the basis for his motion to stay, Defendant Levin cites to the existence of a concurrent action pending in the Florida state court.[FN1] On March 8, 2002 (three weeks prior to the instant action), Starr filed a derivative suit on behalf of Group 12 and Native Woodland in Nassau County, Florida, naming, as defendants, Levin, Maralyn Levin, Ronnie Hankins, Autospace, Inc., Aerospace Corp., Inc., Nantomics Science Corp, Inc., System Site Homes, Inc., Timberlore A.G., Timberlore, Ltd., Ontos, LLC, Group 12 Forest Products, Inc., and Group 12 Trading & Development Corporation. All of the corporate defendants are owned solely by Levin, or owned in conjunction with Starr.

> FN1. Two days after filing the instant complaint, Starr filed another complaint in the state court in Charlevoix County, Michigan. The Charlevoix County complaint is against Aerospace, Inc. (one of the corporations to which Levin has allegedly transferred funds), and alleges many of the same allegations (with large swaths actually written word for word) as the instant complaint. Because our decision to stay is based solely upon the pending action in Nassau County, however, we need not further examine the pending Michigan action.

**\*2** The Nassau County complaint has three counts: breach of fiduciary duty, accounting, and constructive trust. The breach of fiduciary duty count includes allegations against Levin including: transfer of assets for no consideration; diversion of funds of Group 12, Group 12 Advertising, and Native Woodlands to Aerospace Corp., Mrs. Levin, and

Case 1:08-cv-02449    Document 16-7    Filed 05/16/2008    Page 4 of 7    Page 3
Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1941375 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1941375 (N.D.Ill.))**

Ms. Hankins; refusal to divulge the performance of an investment made by Group 12 into a limited partnership that owns a brokerage firm in New York; failure to communicate with counsel; failure to produce documents and information with regard to actions brought against Levin and Starr in their capacity as owners and shareholders of Native Woodland; refusal to account for the activities, assets, and funds of Nantomic Science, Nantomics Science, Timberlore A.G. and Timberlore, Ltd.; refusal to divulge the location of securities purchased with Group 12 funds; inappropriately purchasing a boat and two cars for personal use with Group 12 or Group 12 Advertising funds; instructing the accountants of Group 12 and Group 12 Advertising to not divulge financial information to Starr and to improperly classify receipts and expenditures; hiding original accounting documents; and misrepresenting the amount of encumbrance due on Oyster Bay Property.

Count Two of the Nassau County complaint is one for accounting, alleges the actions described above, and asks for Levin to account for all funds and property of Group 12, Group 12 Advertising and Native Woodlands and affiliates, in whatever form they may be found.

Count Three of the Nassau County complaint requests that the court impose a constructive trust on Levin for the benefit of Group 12, Group 12 Advertising and/or Native Woodland, on any funds and property held by any Defendant or any entity owned or controlled by any Defendant. Count Four of the Nassau County complaint requests an alternative, but similar, constructive trust as Count Three.

The action in Nassau County, Florida has progressed to discovery but, as of July 10, 2002, was delayed due to withdrawal by Levin's counsel. Pla. Brief Ex. A. The action is set to resume discovery as soon as Levin finds replacement counsel.

## ANALYSIS

[1] A district court may stay an action when there is a concurrent, parallel state or federal proceeding. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). However, the surrender of jurisdiction is only warranted in "exceptional circumstances" where the decision to stay an action subject to the pendency of a concurrent action is a matter of "wise judicial administration, giving regard to the conservation of judicial resources and comprehensive disposition of litigation."*Id.* Thus, a district court must determine whether exceptional circumstances exist to justify a surrender of federal jurisdiction. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25-6, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

A two-part test exists for determining whether a federal district court should abstain from adjudicating a claim when there is a related state court proceeding. *Admin.* *Comm. v. Gauf,* 188 F.3d 767, 772 (7th Cir.1999). First, the suits must be parallel in that "substantially the same parties are contemporaneously litigating substantially the same issues in another forum."*Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.,* 962 F.2d 698, 700 (7th Cir.1992). This does not mean that the parties and issues must be identical. *AAR Int'l Inc. v. Nimelias Enter. S.A.,* 250 F.3d 510, 518 (7th Cir.2001). Indeed, the mere presence of additional issues or parties does not preclude a finding that the suits are parallel. *Id.*

*3 Here, Starr argues that the suits are not parallel because they do not seek the same relief, and because the Nassau County case involves breach of fiduciary duty to Starr through AeroSpace, Inc. (AeroSpace) and through transfers of property to Mrs. Levin and Ms. Hankins, which are not remedies sought in the instant case. His argument, however, is without merit. First, the suits are parallel in that they both seek damages to be awarded to Starr, even if, as in the Nassau County case, those damages are on behalf of the corporations he wholly owns (or owns in conjunction with Levin).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1941375 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1941375 (N.D.Ill.))**

The Nassau County case also seeks various equitable remedies in the form of accounting and constructive trust. However, Starr's request for additional remedies in the other forum, by itself, does not convince us that the suits are not parallel. The dispositive issue is whether substantially the same parties are litigating substantially the same issues. *Caminit & Iatarola,* 968 F.2d at 762. Levin is named Defendant in this case and the Florida case. Def. Brief, Ex. A-C. The complaints contain essentially the same factual allegations, as evidenced by the above recitation of the facts. Common to both complaints are a breach of fiduciary duty and allegations of fraud on the part of Levin. At the heart of the complaints is a challenge to the behavior and activities of Levin in his business dealings with Starr revolving around Oyster Bay and the Group 12 companies. These cases involve substantially the same parties litigating substantially the same issues; the mere involvement of additional parties or additional (ultimately related) claims, does not cause this case to veer from its parallel nature.

Starr also argues that the suits are not parallel because he brought the Florida case in his capacity as a shareholder, not as an individual plaintiff. Starr argues that the corporation is the real party in interest and the shareholder is only a nominal plaintiff. This fact is not enough to convince us that this suit is not parallel. It is true that normally the plaintiff in a shareholder derivative suit is merely a "nominal plaintiff." *See, e.g., Kaplus v. First Contin'l Corp.,* 711 So.2d 108 (Fla.App.3d Dist.1998). However, in this case, since Starr owns and operates the corporations in conjunction with Levin, and brings both of these actions for the restoration of his financial dealings and business reputation, any damages or equitable remedies given will be within his control.

Again, the heart of Starr's allegations, whether brought by him, or on behalf of his companies, contain a challenge to Levin's behavior in his business dealings with Starr. The important parties in both cases are Starr and Levin. Bringing suit on behalf of corporations owned by Starr and Levin, or suing corporations solely owned by Levin cannot disguise the fact that Starr and Levin remain, ultimately, the primary adverse parties.

[2] Since we find that the suits are parallel, we turn to the second part of the *Colorado River* test which requires us to balance ten factors to determine whether or not exceptional circumstances exist to justify a surrender of jurisdiction. *LaDuke v. Burlington N.R.R .,* 879 F.2d 1556, 1559 (7th Cir.1989). These factors are: (1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim. *Id.* No single factor is determinative and they are "to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand." *Id.*

**\*4** In the instant case, the parties do not dispute factors nine and ten: removal is not available and the federal claim does not appear to be vexatious or contrived. Accordingly, we address only the relevant remaining factors.

The first factor is whether the state has assumed jurisdiction over property. The parties agree that the Florida suit involves an interest in real property. However, Starr maintains that Levin owns none of the property and, therefore, that no state has assumed jurisdiction over the property of Levin. Notwithstanding Starr's contentions, the fact remains that Florida has assumed jurisdiction over the property at issue in Nassau County and that Levin is a named defendant in the suit. Thus, since Florida has assumed jurisdiction over the property at issue, this factor weighs in favor of granting a stay.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1941375 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1941375 (N.D.Ill.))**

The next factor is the inconvenience of the federal forum. Starr is an Illinois resident while Levin is a Michigan resident. Starr filed the action in Nassau County, Florida because "a key defendant" is a Florida corporation with no known business outside the state of Florida. Plaintiff's Resp. at 6. Levin is already subject to the jurisdiction of state courts in Michigan and Florida. Because Starr is actively pursuing his case in Florida, we see minor inconvenience for Starr to continue to prosecute that case while this court abstains. *See LaDuke,* 879 F.2d at 1561. By contrast, Levin, already defending actions in two states, will be forced to defend in three states if the instant stay is not granted. Thus, we find the inconvenience of the federal forum factor to be a burden on Levin, and thus a factor in favor of granting a stay.

Of all the *Colorado River* factors, the desirability of avoiding piecemeal litigation weighs most heavily in favor of a stay in the present case. Concern with this factor should focus on avoiding "duplicative and wasteful litigation with the potential of inconsistent resolutions of the issue."*Caminiti & Itarola,* 962 F.2d at 701. Levin and Starr are involved in at least three cases having substantially the same parties and involving substantially the same issues. We will not take the chance that our rulings will be inconsistent with that of the Nassau County court. The integrity and authority of the judicial process must be preserved against inconsistent decisions and obligations on the parties. Thus, the likelihood of piecemeal litigation weighs in favor of a stay.

The next relevant factor is the order in which jurisdiction was obtained. The Nassau County court obtained jurisdiction first. Michigan obtained jurisdiction shortly after this court. However, the Supreme Court maintains that "priority should not be measured exclusively by which complaint was filed first but rather in terms of how much progress has been made" in each case. *Moses H. Cone Mem'l Hosp.,* 460 U.S. 1, 21, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). In the instant analysis, the Florida case has already proceeded to discovery while the instant

case is still in a relatively inchoate stage. Even though the Nassau County case is presently delayed by the withdrawal of Levin's counsel, it has still proceeded to discovery and an order has been issued. Thus, the Nassau County court has proceeded further, and as such, this factor weighs in favor of a stay.

**\*5** The parties agree that the source of governing law for all claims of fraud, breach of contract, and breach of fiduciary duty under both complaints is state, as opposed to federal, law. As such, this factor weighs in favor of a stay.

The question of the adequacy of the state court action to protect the federal plaintiff's rights is the only factor that weighs against a stay. Starr argues that the state court actions cannot provide him with the remedy of damages he seeks in this case because the Michigan case was not filed against Mr. Levin and the Florida case was filed on behalf of Starr's corporations. As evidenced by the recitation of the facts above, these cases all include Starr as Plaintiff and Levin as Defendant. While Starr seeks damages in both cases, however, he seeks additional remedies in the instant case that are not sought in the Nassau County case. Thus, this factor weighs against a stay. Yet, Starr's rights are not permanently prejudiced. If, after the Nassau County case is resolved, Starr remains convinced he has not been restored to financial well-being, he may continue to pursue this case at that time (subject, of course, to applicable principles of res judicata and collateral estoppel). Thus, while this factor tends to weigh against granting a stay, we do not think it sufficient to outweigh all the other relevant considerations.

The final relevant factor is the relative progress of the state and federal proceedings. The Nassau County action has proceeded to discovery, while the instant federal action has not yet progress to the answer stage. Starr argues that the discovery phases in the state actions are being delayed by Levin. However, we have no reason to believe that the state courts cannot adequately deal with any delay tactics used by Levin. The progress of the state

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1941375 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1941375 (N.D.Ill.))**

court in its action weighs in favor of a stay.

Upon balancing the *Colorado River* factors, we are convinced that abstention is the appropriate course of action and that exceptional circumstances have been demonstrated. This case will recommence upon the written motion of any party at the conclusion of the Nassau County proceedings.

### CONCLUSION

For the reasons above, we hereby stay these proceedings pursuant to the *Colorado River* abstention doctrine pending the completion of the Nassau County proceeding. Defendant's motion to transfer is taken under advisement and its ruling is also stayed. A status hearing is set for June 12, 2003, at 10:30 am, for the parties to inform the court as to the status of the Nassau County proceeding.

It is so ordered.

N.D.Ill.,2002.
Starr v. Levin
Not Reported in F.Supp.2d, 2002 WL 1941375 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit F

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 2095666 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2095666 (N.D.Ill.))**

Liebert Corp. v. Mazur
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
LIEBERT CORPORATION, an Ohio corporation
and Zonatherm Products, Inc., an Illinois corpora-
tion, Plaintiffs,
v.
John MAZUR and Aerico, Inc., an Illinois corpora-
tion, Defendants.
**No. 04 C 3737.**

Sept. 17, 2004.

*MEMORANDUM OPINION AND ORDER*

HART, J.
**\*1** On May 28, 2004, plaintiffs Liebert Corporation
and Zonatherm Products, Inc. filed this lawsuit
naming John Mazur and Aerico, Inc. as defendants.
The one-count complaint alleges that defendants vi-
olated the Computer Fraud and Abuse Act
("CFAA"), 18 U.S.C. § 1030, when Mazur took
computer files with him upon resigning as a Sales
Manager for Zonatherm. Zonatherm acted as
Liebert's exclusive sales agent in the Chicago area.
Much of the information contained in the computer
files allegedly taken by Mazur was information
concerning Liebert and its products. Mazur is
presently the President of Aerico, a company he
founded with two other individuals a few months
before Mazur resigned from Zonatherm. When tak-
ing the computer files, Mazur allegedly acted as a
agent of Aerico. Aerico is American Power Conver-
sion Corporation's ("APC") exclusive authorized
representative in the Chicago area. APC is a com-
petitor of Liebert. On February 5, 2004, prior to fil-
ing their federal lawsuit, plaintiffs filed a lawsuit in
the Circuit Court of Cook County, Illinois against
Mazur and Aerico and also naming APC and four
other individuals as defendants. Based on essen-

tially the same underlying facts as the federal law-
suit, the state lawsuit included claims for violation
of the Illinois Trade Secrets Act ("ITSA"), 765
ILCS 1065, and related common law counts. [FN1] In-
voking *Colorado River Water Conservation Dis-
trict v. United States,* 424 U.S. 800 (1976), defend-
ants move to stay the federal proceeding in light of
the related state court proceeding. [FN2]

> FN1. On July 16, 2004, the state court dis-
> missed all the common law counts except
> for a count labeled "spoliation of evid-
> ence." Plaintiffs, however, were granted
> leave to replead the dismissed counts.

> FN2. Defendants also moved to strike
> plaintiffs' request for admissions and to
> sanction plaintiffs for having filed the re-
> quest for admissions. In response,
> plaintiffs withdrew the request for admis-
> sions. Therefore, the motion to strike is
> moot. As plaintiffs point out, defendants
> do not show that, prior to filing the motion
> to strike, they adequately complied with
> the meeting requirement of N.D. Ill. Loc.
> R. 37.2. No sanctions will be awarded.

Federal courts have "the virtually unflagging oblig-
ation ... to exercise the jurisdiction given
them."*Colorado River,* 424 U .S. at 817;*Clark v.
Lacy,* 376 F.3d 682, 685 (7th Cir.2004); *Interstate
Material Corp. v. City of Chicago,* 847 F.2d 1285,
1287 (7th Cir.1988). Other than in instances raising
special constitutional or federalism concerns, a fed-
eral court should only defer to the concurrent juris-
diction of a parallel state court proceeding in
"exceptional circumstances." *Colorado River,* 424
U.S. at 818;*Clark,* 376 F.3d at 685. In exceptional
circumstances, "[w]ise judicial administration," in-
cluding regard for the "conservation of judicial re-
sources and comprehensive disposition of litiga-
tion" may counsel abstention on the part of a feder-
al court. *Colorado River,* 424 U.S. at 818.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2095666 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2095666 (N.D.Ill.))**

There is no basis for staying a case under the *Colorado River* doctrine unless the state and federal proceedings are parallel. *Clark,* 376 F.3d at 685; *Interstate Material,* 847 F.2d at 1287. The "initial step in determining whether the *Colorado River* doctrine is applicable is to inquire whether the concurrent state and federal proceedings are parallel. It is important to note that 'the requirement is of parallel suits, not identical suits. *A suit is parallel when substantially the same parties are contemporaneously litigating substantially the same issues in another forum."* *'Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.,* 962 F.2d 698, 700 (7th Cir.1992) (quoting *Interstate Material,* 847 F.2d at 1288)) (emphasis in *Caminiti* ).*Accord Clark,* 376 F.3d at 686. In determining whether cases are parallel, a court "look[s] not for formal symmetry between the two actions, but for a substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Lumen Construction, Inc. v. Brant Construction Co.,* 780 F.2d 691, 695 (7th Cir.1985).*Accord Clark,* 376 F.3d at 686.

**\*2** If the two suits are parallel, there are ten nonexclusive factors that a district court can consider in deciding whether "exceptional circumstances" exist that would justify deference to the state courts under the *Colorado River* doctrine. These factors are: "(1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of state-court action to protect the federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim."*Clark,* 376 F.3d at 685. "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is re-

quired."*Colorado River,* 424 U.S. at 818-19. The checklist is not to be applied mechanically, but flexibly and pragmatically.*LaDuke v. Burlington Northern R.R.,* 879 F.2d 1556, 1559 (7th Cir.1989).

Both the CFAA claims in the federal case and the ITSA claims in the state case arise from the same occurrence and set of facts. Although the taking of trade secrets is not a necessary element of the CFAA claim, plaintiffs do expressly allege in the federal suit that information that was allegedly taken by Mazur included "confidential, proprietary, and trade secret information."*See* Com pl. ¶¶ 17-19, 25, 30-31, 33. *See also id.* ¶¶ 7-11.While plaintiffs may not need to prove the existence of a trade secret (as that term is used in the ITSA) in order to succeed on their CFAA claim, the allegations of the complaint indicate that, in proving the damages they allegedly sustained, plaintiffs will indeed attempt to prove the information that was taken was a trade secret. Plaintiffs will at least have to show that the information was taken "without authorization" or "exceed[ed Mazur's] authorized access." *See* 18 U.S.C. § 1030(a).

While it is possible that plaintiffs could succeed on their CFAA claims without also succeeding on their ITSA claims, or *vice versa,* litigation of the two claims will involve identical or almost identical discovery and very similar factual proof at trial. Also, even if plaintiffs do not amend the state law suit to add CFAA claims, resolution of the state law case would likely dispose of the CFAA claims as well because of Illinois law as to *res judicata* and claim splitting. Nothing in the CFAA's jurisdictional provision indicates that civil claims under the statute may only be brought in federal court. *See* 18 U.S.C. § 1030(g). Plaintiffs could have, and likely still may, include the CFAA claims in the state action. Since the CFAA claims arise from the same occurrence as the ITSA claims, the CFAA claims would likely be found to be part of the same cause of action that has already been raised in the state lawsuit. Illinois *res judicata* rules apply to claims that are part of the same cause of action if those claims

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 3
Not Reported in F.Supp.2d, 2004 WL 2095666 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2095666 (N.D.Ill.))**

could have been raised in the prior lawsuit. See *Jones v. Grinnell,* 1995 WL 699653 *2 (N.D.Ill. Nov. 24, 1995); *Erickson v. Village of Willow Springs,* 876 F.Supp. 951, 958 (N.D.Ill.1995). Even if plaintiffs are successful in their state lawsuit and believe they can obtain additional relief by continuing to pursue the CFAA claims in federal court, the Illinois rule against claim splitting would likely preclude such an attempt. See *Saxon Mortgage, Inc. v. United Financial Mortgage Corp.,* 312 Ill.App.3d 1098, 728 N.E.2d 537, 545-46 (1st Dist.2000). Thus, resolving the state case on its merits would likely preclude continuing with the federal lawsuit based on the *res judicata* effect of the state lawsuit. The state lawsuit and the federal lawsuit are parallel proceedings. Cf. *Jones,* 1995 WL 699653 at *2.

**\*3** Turning to the customary factors to consider. First, this is not a case in which the state court has assumed jurisdiction over a piece of real or personal property.

There is no distinction as to which forum is more convenient. The two courthouses are located within a few blocks of each other and the parties do not point to any potential problems regarding obtaining jurisdiction over any potential witness.

Avoiding piecemeal litigation strongly favors staying the present action. See *Clark,* 376 F.3d at 687. Proceeding with both cases could result in duplicative discovery, summary judgment motions based on nearly identical facts, and/or two different juries hearing nearly identical evidence.

The state court action was filed almost four months prior to the federal action. More importantly, substantial discovery has already occurred in the state court proceeding and the state court has already ruled on a summary judgment motion and is considering preliminary relief. No substantive proceedings have been held in the federal case and it appears that the parties have not yet exchanged any discovery.

State law applies to the claims presently raised in state court and federal law applies to the claims presently raised in federal court. Plaintiffs seek the same type of relief in both courts, damages and injunctive relief. Relief available under the ITSA is broader than that available under the CFAA. Under appropriate circumstances, the ITSA allows unjust enrichment damages in addition to damages based on actual losses or alternatively permits damages based on a royalty. 765 ILCS 1065/4(a). If willful or malicious misappropriation is shown, plaintiffs may recover exemplary damages equal to as much as double § 4(a) damages. *Id.* § 4(b). The ITSA also permits an award of attorney fees if there is willful or malicious misappropriation or a motion for injunctive relief is resisted in bad faith. *Id.* § 5. The CFAA limits damages to actual compensatory damages and, for certain violations, economic damages. There is no express provision for exemplary damages or attorney fees. See 18 U.S.C. § 1030(g). The state court case is sufficient to fully protect plaintiffs' rights, especially if plaintiffs seek to amend that case to add the federal claim.

As presently constituted, the state case is not subject to removal because diversity of citizenship is lacking.

The federal claims do not appear to be vexatious or contrived.

The two cases are based on the same facts. They only involve somewhat different legal grounds for the claims. Judicial economy would strongly favor joining all the claims in a single case. Cf. *Clark,* 376 F.3d at 687. Since the state case was filed first and has proceeded substantially further than the federal case, it is appropriate to stay the federal case pending resolution of the state case. Cf. *id.* at 687-88; *Jones,* 1995 WL 699653 at *2-3. A stay will be effectively imposed by dismissing the case without prejudice with leave to move to reinstate this case within 30 days after the state case becomes final in the event that further proceedings in the federal case would be appropriate.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2095666 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2095666 (N.D.Ill.))**

**\*4** IT IS THEREFORE ORDERED that defendants'
motion to stay proceedings [3-1] is granted. De-
fendants' motion to strike [8-1] is denied as moot
and defendants' motion for sanctions [8-2] is
denied. Plaintiffs' cause of action is dismissed
without prejudice with leave to move to reinstate
this case within 30 days after the state case be-
comes final in the event that further proceedings in
the federal case would be appropriate. Each party
shall bear its own costs.

N.D.Ill.,2004.
Liebert Corp. v. Mazur
Not Reported in F.Supp.2d, 2004 WL 2095666
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit G

Slip Copy                                                                                                                                Page 1
Slip Copy, 2007 WL 914219 (N.D.Ill.)
**(Cite as: 2007 WL 914219 (N.D.Ill.))**

Ⓗ

Georgeson v. DuPage Surgical Consultants, LTD.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Andrew GEORGESON, D.O., Plaintiff,
v.
DuPAGE SURGICAL CONSULTANTS, LTD., et
al., Defendants.
No. 05 CV 1653.

March 22, 2007.

John Peirce Morrison, Jeffrey T. Petersen, Bell
Boyd & Lloyd LLC, Maria M. Troxclair, Franczek
Sullivan, P.C., Chicago, IL, for Plaintiff.
Daniel Richard Formeller, Basileios Katris, Char-
magne Topacio, James Kenneth Borcia, Katherine
Louise Haennicke, Tressler, Soderstrom, Maloney
& Priess, Chicago, IL, for Defendants.

**MEMORANDUM AND ORDER**

BLANCHE M. MANNING, United States District
Judge.
**\*1** Plaintiff Andrew Georgeson joined an existing
medical practice in Wheaton, Illinois, by buying
shares of the practice for $150,000. When he left
the practice a few years later, he received nothing
for his shares. Georgeson contends the remaining
shareholders improperly terminated his shareholder
rights. He thus sued them and the practice for op-
pression (Count I), breach of fiduciary duty (Count
III), civil conspiracy (Count IV), and for failing to
let him examine the corporate records (Count II).
The defendants have moved for summary judgment
on Counts I, III and IV, arguing that they were not
obligated to repurchase Georgeson's shares when he
left, and their decision not to repurchase his shares
is protected by the business judgment rule. For the
reasons that follow, the court denies the defendants'
motion for partial summary judgment.

**BACKGROUND**

The following background is based upon uncon-
tested facts, except where noted. Andrew
Georgeson began performing surgeries at DuPage
Surgical Center in 1996. Two years later, the exist-
ing shareholders of DuPage Surgical-defendants
Richard Jorgensen and Anthony Altimari, along
with Louis Montana, who is not a party to this suit-
invited Georgeson to become a shareholder.
Georgeson accepted and paid a total of $150,000
for his shares, which he paid over time through
payroll deductions. At the time Georgeson accepted
the invitation to become a shareholder, defendant
Altimari told him that the $150,000 payment was
for the purchase of an ownership interest in DuPage
Surgical. Although Georgeson had completed pay-
ing for his shares in 2000, he never received share
certificates.

During Georgeson's tenure at DuPage Surgical, one
shareholder left the group practice and, upon his
departure, received back the full amount he had
paid for his shares. Another shareholder who had
not fully paid for his shares before he left was nev-
ertheless refunded the "nominal contribution" that
he had paid toward his purchase of shares.

In 2001, Georgeson asked one of DuPage Surgical's
accountants, Ronald Austin, to prepare a valuation
of his shares that he needed to complete a loan ap-
plication. In response, Austin sent him a letter ac-
knowledging his ownership of "1/7th of the total is-
sued and outstanding shares in the company."
which Austin valued at $255,000.

In the summer of 2002, Georgeson announced to
the other shareholders that he was leaving DuPage
Surgical. According to Georgeson, he expected the
defendants to buy back his shares same as they had
done upon other shareholders' departures. However,
unlike the previous shareholders who had left,
Georgeson received nothing for his shares upon his
departure. Months later, the remaining shareholders

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of DuPage Surgical met and decided that they would pay Georgeson nothing for his shares. Defendant Jorgensen admits that one reason the remaining shareholders have paid Georgeson nothing for his shares is because the corporation failed to issue Georgeson his stock certificates in exchange for his $150,000 capital contribution.

**\*2** The defendants have refused to make other payments normally due shareholders, including equal shares of profits generated by non-shareholder employees, as well as the capital contributions of new shareholders. Twice Georgeson contacted the defendants to finalize a buyout of his shares of stock, but he received no response. DuPage Surgical no longer lists Georgeson as a shareholder in its annual tax returns.

### ANALYSIS

**1. Summary Judgment Standard**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact."*Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).*"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."*Valenti v. Qualex, Inc., 970 F.2d 363, 365 (7th Cir.1992), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* Moreover, a court may grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Valenti, 970 F.2d at 365;Anderson, 477 U.S. at 248.*

Accordingly, the nonmoving party may withstand summary judgment only by showing that a dispute over a "genuine" material fact exists; that is, the evidence is such that a reasonable jury could render a verdict for the nonmoving party. *Anderson, 477 U.S. at 248.* The nonmoving party may not merely rest upon the allegations or details in his pleading, but instead, must set forth specific facts showing that there is a genuine issue for trial.*Celotex, 477 U.S. at 322;Anderson, 477 U.S. at 248.*

Before turning to the plaintiffs' claims, the court first addresses two threshold matters. First, the defendants have raised dozens of objections to the plaintiff's responses to their Rule 56.1 statements of fact, as well as the plaintiff's statement of additional facts. The most prevalent objections are to relevance, vagueness, facts unsupported by the record, and facts supported only by self-serving statements in the plaintiff's affidavit. The court will not address each of objections individually. Suffice it to say that the court has carefully reviewed each parties' statements of fact, the corresponding objections, and the record. Only those facts supported by the record have been taken into account. However, the court notes generally that otherwise admissible evidence may be used to defeat summary judgment even though it appears in a"self-serving" affidavit. *See Paz v. Wauconda Healthcare & Rehabilitation Centre, LLC, 464 F.3d 659, 664-65 (7th Cir.2006)* (evidence presented in a "self-serving" affidavit is enough to defeat a motion for summary judgment as long as the evidence meets the usual requirements for evidence at the summary judgment stage); *Keefe v. Mega Enterprises, Inc., No. 02 CV 5156, 2005 WL 693795, at \*1 (N.D. Ill Mar. 23, 2005)* (objecting to statements of facts on relevance grounds is inappropriate).

**\*3** Second, the parties do not address what state's law the court should apply to each of Georgeson's claims. However, it appears uncontested that DuPage Surgical was incorporated in and its principal place of business is in Illinois, and that all events giving rise to Georgeson's claims occurred in Illinois. Accordingly, the court will apply Illinois law. *Foodcomm Int'l v. Barry, 463 F.Supp.2d 818, 830 (N.D.Ill.2006)* (under Illinois' internal affairs doctrine, internal corporate matters are governed by the law of the state of incorporation, while civil conspiracy is governed by the law of the state

where the conspiracy occurred); *Prime Leasing, Inc. v. Kendig,* 332 Ill.App.3d 300, 265 Ill.Dec. 722, 773 N.E.2d 84, 96 (Ill.App.Ct.2002) (under Illinois' choice-of-law rules, breach of fiduciary duty claims are governed by the law of the state of incorporation).

### 2. Shareholder Oppression (Count I)

In Count I, Georgeson alleges shareholder oppression by majority shareholders Jorgensen and Altimari based upon their initial failure to issue him share certificates, as well as their subsequent efforts to thwart his ability to recover the value of his shares and other monies he alleges he is due. The Illinois Business Corporation Act prohibits "directors or those in control" from acting in a way that is "illegal, oppressive, or fraudulent with respect to" the other shareholders. *See* 805 Ill. Comp. Stat. 5/12.56(a)(3). Although the Act does not define what types of conduct are "oppressive," the few cases that address the issue under Illinois law have found that conduct is oppressive if it is "arbitrary, overbearing and heavy-handed." *See, e.g., Compton v. Paul K. Harding Realty Co.,* 285 N.E.2d 574, 499 (Ill.App.Ct.1972). Thus, in *Compton,* the court held that the defendant had oppressed a minority shareholder by "failing to call meetings of the board of directors or to consult with plaintiff Compton regarding management of corporate affairs."In other words, the defendant oppressed the minority shareholder by shutting him out of the corporation's affairs. *Id. See also Gidwitz v. Lanzit Corrugated Box Co.,* 20 Ill.2d 208, 170 N.E.2d 131, 138 (Ill.1960) (shareholder of closely-held corporation used his position as president to oppress the other shareholders by denying them their "rights and privileges," including the right to participate in the management of the corporation); *Notzke v. Art Gallery, Inc.,* 84 Ill.App.3d 294, 39 Ill.Dec. 860, 405 N.E.2d 839, 843 (Ill.App.Ct.1980) (conduct that "allegedly affect[ed] an individual shareholder's control over corporate matters" was oppressive).

Georgeson has presented evidence that the defendants shut him out of the corporate affairs of DuPage Surgical. According to Georgeson, upon his departure the defendants eliminated his shares (as reflected on corporate income tax returns which no longer listed Georgeson as a shareholder), and refused to compensate him for those shares even though they had compensated the other shareholders who had left. Georgeson's evidence, if true, shows that the defendants completely denied him the incidents of ownership of his shares in DuPage Surgical, and therefore the evidence is sufficient to withstand summary judgment on Georgeson's claim of oppression.

**\*4** Nevertheless, the defendants set forth several alternative arguments they contend entitle them to summary judgment. First, they argue that their alleged conduct injured the corporation, not Georgeson personally. For instance, they argue that their alleged failure to maintain corporate records directly harmed only the corporation; shareholders would be harmed only indirectly. Therefore, they conclude, Georgeson lacks standing to assert claims based upon such conduct. *See Small v. Sussman,* 306 Ill.App.3d 639, 239 Ill.Dec. 366, 713 N.E.2d 1216, 1222 (Ill.App.Ct.1999) (shareholder lacks standing to sue in his own right when the alleged injury was inflicted on the corporation; such claims must be brought derivatively on the corporation's behalf).

The court notes first that Georgeson has either (1) agreed not to rely upon most of the conduct which the defendants argue harmed only the corporation (for instance, the defendants' alleged use of DuPage Surgical resources for their own benefit, their acceptance of excessive salaries, and their mismanagement of the corporation) or, (2) has failed to submit the evidence the defendants anticipated that he would (for instance, the defendants' alleged failure to cause the corporation to pay dividends, or to cause the corporation to arrange for "tail" malpractice coverage for Georgeson after he left DuPage Surgical). Therefore, the defendants' argument that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Georgeson may not base his claims upon this conduct is misplaced.

As for Georgeson's evidence that the defendants failed to properly maintain corporate records, Georgeson has sufficiently established that the defendants' conduct was directed at him personally. According to Georgeson's evidence, the defendants failed to properly maintain corporate records by failing to issue share certificates to Georgeson even though the corporate by-laws required the corporation to do so. This alleged failure resulted, at least in part, in the defendants' decision not to compensate Georgeson for his shares upon his departure. Therefore, the defendants' alleged failure to properly maintain corporate records injured Georgeson personally, not the corporation. Moreover, Georgeson has offered evidence of other allegedly oppressive conduct directed at him individually. For instance, according to Georgeson, the defendants stripped him of all incidents of ownership by failing to either (1) buy back his shares or, (2) pay him the share of profits and other shareholders' buy-ins that other shareholders receive.

The court now turns to the defendant's next argument as to why they are entitled to summary judgment on Georgeson's claim of oppression. According to the defendants, Georgeson no longer has standing to assert a claim of oppression because he no longer has an Illinois medical license, and therefore cannot be a shareholder of an Illinois medical corporation. Georgeson's Illinois medical license lapsed on July 31, 2005, when he did not renew it (Georgeson had moved to Michigan and apparently is licensed there). According to the defendants, DuPage Surgical is registered with the state of Illinois as a medical corporation, and therefore its owners must consist entirely of licensed physicians. *See* Illinois Medical Corporation Act, 805 Ill. Comp. Stat. 15/13 ("No person who is not so licensed shall have any part in the ownership, management, or control of such corporation ....") Without an Illinois medical license, Georgeson's ownership of shares of DuPage Surgical would run

afoul of the Illinois Medical Corporation Act.

**\*5** However, the defendants merely assume, without citation, that the consequence of Georgeson's lack of an Illinois license is that he has lost his ownership interest. Georgeson does not respond to the defendants' argument, asserting instead that DuPage Surgical is not registered as a medical corporation (despite evidence to the contrary), and therefore the status of his Illinois license is irrelevant.

The defendants' failure to develop its argument, or to cite any support for it, dooms its request for summary judgment on this issue. *Andy's Restaurant & Lounge, Inc. v. City of Gary,* 466 F.3d 550, 553 n. 1 (7th Cir.2006) (perfunctory and undeveloped arguments that are unsupported by pertinent citations are forfeited). Furthermore, other provisions within the Medical Corporation Act raise serious questions about the defendants' assumption that the consequence of losing one's license is to lose one's ownership interest in a registered medical corporation. For instance, the Act provides that a corporation or its shareholders "may purchase the shares of ... a shareholder no longer qualified to own shares in the corporation" based upon the book value of the shares, unless a different method of valuing the shares is set forth in the articles of incorporation of the by-laws. *See* 810 Ill. Comp. Stat. 15/16. The Act therefore contemplates that ineligible shareholders will be compensated for their shares, even in the absence of relevant provisions within the corporation's bylaws. Another provision of the Act provides that the consequence for failing to remove or discharge an ineligible shareholder is the suspension or revocation of the medical corporation's registration. *See* 810 Ill. Comp. Stat. 15/10 ("The Department may suspend or revoke any certificate of registration for any of the following reasons: (a) the revocation or suspension of the license to practice medicine of any officer, director, shareholder or employee not promptly removed or discharged by the corporation.")

None of the Act's provisions calls for a shareholder

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 914219 (N.D.Ill.)
**(Cite as: 2007 WL 914219 (N.D.Ill.))**

to forfeit the value of his ownership interest upon becoming nonlicensed; to the contrary, section 16 contemplates that the corporation will compensate the former shareholder for the loss of his shares. Therefore, at this juncture, the court cannot conclude that the loss of Georgeson's Illinois medical license adversely affected his ownership interest in DuPage Surgical, or his right to be compensated for that interest.

Next, the defendants argue that, as a matter of law, their conduct was not oppressive because it was protected by the business judgment rule. Under Illinois law, the business judgment rule "is a presumption that officers and directors of a corporation make decisions on an informed basis, and with the best interests of the corporation at heart." *Willmschen v. Trinity Lakes Improvement Ass'n,* 362 Ill.App.3d 546, 298 Ill.Dec. 840, 840 N.E.2d 1275, 1279 (Ill.App.Ct.2005). However, the presumption that normally shields defendants for their business decisions does not apply if the plaintiff presents evidence of fraud, bad faith, or self-dealing. *See Shlensky v. Wrigley,* 237 N.E. 776, 779-80 (Ill.App.Ct.1968); *see also Sharper v. Bryan,* --- N.E.2d ----, No. 1-05-3849, 2007 WL 703547, at *4 (Ill.App.Ct. Mar. 8, 2007) ("This presumption applies when there is no evidence of fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment on the part of the directors.") (applying Delaware law).

**\*6** Georgeson has presented evidence that undermines the defendants' attempt to avail themselves of the business judgment rule. Specifically, Georgeson's evidence, if true, would establish that the defendants acted in their own self-interest when they refused to compensate Georgeson for his shares and denied him the other compensation to which he contends he is entitled. The defendants would have benefitted personally because stripping Georgeson of the value of his shares would have raised the value of their own. Accordingly, because Georgeson has evidence that the defendants acted in their own, rather than the corporation's interests,

their conduct is not protected under the business judgment rule. *See Sharper,* 2007 WL 703547, at *4 (business judgement rule does not protect self-dealing).

Finally, the defendants contend that they are entitled to summary judgment on count I based upon their affirmative defense of "unclean hands." According to the defendants, the plaintiff has "unclean hands" because he waited until three years after he left DuPage Surgical to sue for the value of his shares. What the defendants are actually attempting to assert (as pointed out in the sole case they cite) is the affirmative defense of estoppel or, more specifically, laches. *See Brenner v. Berkowitz,* 134 N.J. 488, 634 A.2d 1019, 1029 (N.J.1993) ("courts have applied the equitable concept of estoppel to bar relief when a shareholder or director had or should have had knowledge of alleged misconduct but failed to act"). Under the equitable doctrine of laches, a plaintiff who has delayed filing suit loses his right to sue if the delay was both (1) inexcusable and, (2) harmed the defendant. *See Teamsters & Employers Welfare Trust of Ill. v. Gorman Bros. Ready Mix,* 283 F.3d 877, 880 (7th Cir.2002).

The defendants have not even attempted to explain how they were harmed by Georgeson's decision when to sue. For that reason alone, their attempt to assert the affirmative defense fails.

In summary, Georgeson has submitted evidence of oppressive conduct by the controlling shareholders of DuPage Surgical, defendants Jorgensen and Altimari. None of the defendants' arguments that Georgeson is precluded from prevailing on his claim of oppression is availing, and therefore their motion for summary judgment on count I is denied.

**3. Breach of Fiduciary Duty (Count III)**

Shareholders in a close corporation owe a fiduciary duty to deal fairly, honestly, and openly with each other. *See Rexford Rand Corp. v. Ancel,* 58 F.3d 1215, 1218 (7th Cir.1995); *Hagshenas v. Gaylord,*

199 Ill.App.3d 60, 145 Ill.Dec. 546, 557 N.E.2d 316, 321-22 (Ill.App.Ct.1990). The defendants do not dispute that they owed Georgeson such a duty. Instead, they argue that Georgeson has no evidence that DuPage Surgical performed poorly financially or that the defendants mismanaged it, and therefore cannot show that they breached their duty. To the contrary, the defendants point out that while being deposed, Georgeson agreed that "DuPage Surgical was a successful financial venture for the doctors involved."

**\*7** The crux of Georgeson's breach of fiduciary duty claim is not that the defendants mismanaged DuPage Surgical to its financial detriment. Rather, as discussed above, Georgeson has evidence that the defendants shut him out of DuPage Surgical, to their own benefit, by taking away his ownership rights and refusing to compensate him for his shares. Evidence of such alleged self-dealing and oppressive conduct supports Georgeson's claim that the defendants breached their fiduciary duties to him, and defeats the defendants request for summary judgment on the claim. *See Rexford Rand,* 58 F.3d at 1218 (oppressive conduct by controlling shareholder is evidence that the controlling shareholder breached its fiduciary duty to the minority shareholder).

Accordingly, the defendants' request for summary judgment on count III is denied.

### 4. Civil Conspiracy (Count IV)

Under Illinois law, the elements of civil conspiracy are (1) an agreement between two or more people, (2) to accomplish an unlawful act or a lawful acts through unlawful means, and (3) at least one of the conspirators committed an overt or unlawful act in furtherance of the conspiracy. *See Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 206 Ill.Dec. 636, 645 N.E.2d 888, 894 (Ill.1994). But officers and employees of a corporation cannot be considered to be conspirators under the intracorporate conspiracy doctrine as long as they were acting within the

scope of their authority. *See Payton v. Rush-/ Presbyterian-St. Luke's Med. Ctr.,* 184 F.3d 623, 632 (7th Cir.1999). However, the doctrine is inapplicable if the employees or officers acted outside the scope of their authority, or acted in their own self-interest. *See United States v. All Meat & Poultry Prods. Stored at LaGrou Cold Storage,* --F.Supp.2d ----, No. 02 CV 5145, 2007 WL 30542, at \*8 (N.D.Ill. Jan.3, 2007).

The defendants contend that they are entitled to summary judgment on Georgeson's civil conspiracy claim based upon the intracorporate conspiracy doctrine arguing that, as a matter of law, they cannot have conspired with themselves. But as noted above, the doctrine does not shield from liability officers who acted in their own self-interest. *Id.* As discussed above, Georgeson has submitted evidence that the defendants acted in their own self-interest by depriving him of his shares of DuPage Surgical and refusing to compensate him for those shares. Accordingly, the defendants are not protected by the intracorporate conspiracy doctrine and therefore are not entitled to summary judgment on that basis.

### CONCLUSION

For the foregoing reasons, the defendants' motion for partial summary judgment [107-1] on Count I (shareholder oppression), Count III (breach of fiduciary duty) and Count IV (civil conspiracy) is denied.

N.D.Ill.,2007.
Georgeson v. DuPage Surgical Consultants, LTD.
Slip Copy, 2007 WL 914219 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.